## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **TECNOMATIC, S.p.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 11-1652** |
| | ) | |
| **REMY, INC.,** | ) | |
| **HANSON SYSTEMS, LLC,** | ) | |
| **D/B/A EAGLE TECHNOLOGIES GROUP,** | ) | |
| **ODAWARA AUTOMATION, INC.,** | ) | |
| **REMY INTERNATIONAL, INC.,** | ) | |
| **DELCO REMY MEXICO, S.R.L. de C.V.,** | ) | |
| **REMY COMPONENTES S. de R.L. de C.V.,** | ) | |
| **and DOES 1-10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

As and for its complaint against Remy, Inc., Remy International, Inc., Delco Remy Mexico, S.R.L. de C.V., Remy Componentes S. de R.L. de C.V. (collectively, the "Remy Defendants"), Hanson Systems, LLC d/b/a Eagle Technologies Group ("Eagle"), Odawara Automation, Inc. ("Odawara") and Does 1 through 10, inclusive (the Remy Defendants, Eagle, Odawara and Does 1 through 10 are referred to herein as "Defendants"), Tecnomatic S.p.A. ("Tecnomatic") states as follows:

### I.     INTRODUCTION

1.     This Complaint is based upon a series of acts by which the Remy Defendants, in conjunction with the other Defendants, wrongfully obtained and are using at least $60,000,000.00 (sixty million dollars) in taxpayer grant money (the "Grant") from the United States Department of Energy ("DOE") pursuant to the American Recovery and Reinvestment Act of 2009 and the Energy Policy Act of 2005.

2.     Specifically, one or more of the Remy Defendants improperly accessed the Grant money by representing, in the Grant application and elsewhere, ownership and intended use of proprietary stator technology and stator winding technology, as well as technology related to the manufacture of the same, that the Remy Defendants misappropriated and otherwise wrongfully obtained from Tecnomatic (the "Technology").  Stators are a key component of electric motors used in various industries; most notably, in the automotive industry for hybrid electric vehicles. The Remy Defendants then, upon information and belief, colluded with Eagle and Odawara to reproduce, in whole or in part, the Technology.

3.     The Technology, which one or more of the Remy Defendants publically, albeit incorrectly, holds out as "Remy" proprietary High Voltage Hairpin ("HVH") stator winding technology, has been confirmed by at least one Remy former employee to have been created by Tecnomatic.  A copy of a Remy International, Inc. brochure distributed via its internet website and otherwise, is attached as Exhibit A.

4.     Indeed, according to numerous press releases issued by one or more of the Remy Defendants, as well as their purported joint venturers and/or business partners, both Remy, Inc. and Remy International, Inc. (collectively, "Remy") have entered into various business relationships using the Technology.  In these press releases and in the Grant application, one or more of the Remy Defendants holds itself out as the originator, inventor and developer of the Technology.

5.     Remy's Grant application, currently available only in redacted form (at Remy's request) through a Freedom of Information Act Request was submitted and verified by Remy officers and its in-house counsel, Jeremiah "JJ" Shives (hereinafter "JJ Shives"), who, upon

information and belief, had personal, direct and first-hand knowledge of the true origin of the Technology.

6.      One or more of the Remy Defendants, through their officers and employees, most notably JJ Shives, also knew before, and at the time it applied for the Grant, that Tecnomatic owns patent applications for the Technology, and that Remy was bound by the terms of a Mutual Confidentiality Agreement (the "Agreement") and extensions thereto, as well as other legal and equitable obligations owed to Tecnomatic with respect to the Technology.

7.      Included among the aforementioned obligations was the requirement that the Technology not be disclosed or used for any purpose other than that contemplated by the terms of the Agreement (i.e., a joint venture with Tecnomatic).  The obligations also barred Remy from using the confidential information for its own business purposes.  Despite these legal obligations, the Remy Defendants, working in collusion with Eagle, Odawara and possibly others, used Tecnomatic's confidential information to copy and otherwise misappropriate the Technology.

8.      In fact, according to at least one former Remy employee, the Grant application contains a photograph of an actual stator developed on Tecnomatic's winding process.  A copy of the Grant application page upon which the photograph appears is attached hereto as Exhibit B.

9.      All acts alleged herein were done willfully, knowingly and intentionally with the knowledge and intent that Tecnomatic would be harmed.

## II.      JURISDICTION AND VENUE

10.      Plaintiff Tecnomatic S.p.A. is a company located in Corropoli, Italy.  Tecnomatic is a world recognized leader in the design, manufacture, and implementation of stators and stator windings used in electric motors, as well as the design, manufacture, and implementation of production lines for the manufacture of stators.

11.     Defendant Hanson Systems, LLC d/b/a Eagle Technologies Group is a Michigan limited liability corporation with its principal place of business in Bridgman, Michigan.  Upon information and belief, Eagle maintains an office in Chicago, Illinois.  Upon further information and belief, Eagle also regularly and continuously transacts business in and about Chicago, Illinois.

12.     Notably, the archival history of Eagle's website establishes a number of dramatic changes in the business offerings made by Eagle both prior to and after Defendants' acts of misappropriation as alleged herein; specifically, prior to 2008, Eagle's website contained no hybrid references.  *Cf.* Eagle's current website at http://www.eagletechnologies.com/ with Eagle's archived website for the time period of 2005-2008, which contains no hybrid references, at http://waybackmachine.org/*/http://www.eagletechnologies.com/.

13.     Defendant Remy, Inc. is a Delaware corporation with a principle place of business in Madison County, Indiana.  Remy, Inc. is in the business of, among other things, producing a new generation of electric motors unveiled in October 2009, and supplying the same to the hybrid and electric motor vehicle markets.

14.     Upon information and belief, Defendant Remy International, Inc. is a Delaware corporation with a principal place of business in Madison County, Indiana.

15.     Upon information and belief, Defendant Delco Remy Mexico, S.R.L. de C.V. is a wholly-owned subsidiary of Remy, Inc. and is located and maintains its principal place of business in San Louis Potosi, Mexico.

16.     Upon information and belief, Defendant Remy Componentes S. de R.L. de C.V. is a wholly-owned subsidiary of Remy, Inc. and is located and maintains its principal place of business in San Louis Potosi, Mexico.

4

17.     Upon information and belief, Defendant Odawara Automation, Inc. is an Ohio corporation with its principal place of business in Tipp City, Ohio.

18.     Upon information and belief, Defendants Does 1 through 10 are businesses and/or individuals residing in unknown locales in both Mexico and the United States, and doing business in connection with the Remy Defendants, Odawara and/or Eagle.

19.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 because the allegations asserted herein present federal questions.   This Court also has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332 due to the diversity of the parties.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.   This Court has personal jurisdiction over the parties because the Defendants conduct substantial business in this judicial district.

### III.     FACTS COMMON TO ALL COUNTS

#### A.     The Remy Defendants' Inexperience With Stator Technology

21.     Stators are a key component of electric motors used in various industries.   As relevant here, electric motors are increasingly being used in the hybrid automotive industry.

22.     As late as 2004, Remy, Inc. made a number of public admissions regarding its inexperience with stator technology.   During that timeframe, Remy, Inc. generally admitted that it had never produced complex, high-voltage stators, and that it only had experience in the production of conventional stators.

23.     Remy, Inc. publically admitted that as late as 2004, it did not have a manufacturing system that would bend large copper wire into a hairpin "U" shape.

24.     Remy, Inc. publically admitted that as late as 2004, it did not have a manufacturing system that would insert wires into a 60-slot cylindrical steel base.

25.     Remy, Inc. publically admitted that as late as 2004, it did not have a manufacturing system that could twist copper wires in a manner necessary to make electrical connections.

26.     Remy, Inc. publically admitted that as late as 2004, it did not have a manufacturing system that would weld twisted wires into place.

27.     Remy, Inc. publically admitted that as late as 2004, the bending and twisting of large copper wires creates complexity to the production of stators.

28.     Remy, Inc. publically admitted that as late as May 2005, it did not have a manufacturing system that would enable it to build complex stators in an automated manner.

**B.      Tecnomatic's Worldwide Recognition For Complex Stator
          Technology, Stator Winding Technology And System Design Capabilities**

29.     Tecnomatic is an internationally recognized inventor, developer, and creator of stator technology, stator winding technology, as well as the equipment used to manufacture stators.

30.     Tecnomatic has developed, invented, and owns proprietary information, patents and patent applications, in addition to specialized know-how relating to stator technology, stator winding and stator manufacturing.

31.     Tecnomatic keeps its proprietary information confidential and takes all necessary steps to maintain its confidentiality.

32.      Tecnomatic has invested much time, money and effort in identifying and developing its confidential proprietary technology and information.  This technology and information is a valuable company asset and provides Tecnomatic with a business advantage.

6

33.     Tecnomatic has been in the stator business since 1973 and, upon information and belief, well before the Remy Defendants' entry into the complex stator component business of the hybrid/electric automotive industry.

34.     In fact, Remy, Inc. publically admitted that in or around 2004 it was aware of Tecnomatic's experience and expertise in designing systems to produce four-row hairpin stators.

35.     Remy, Inc. also publically admitted that it had knowledge of Tecnomatic's experience in designing systems to produce stators and had designed such systems for Remy's competitors.

**C.     Remy's Undisclosed Plan To Access And Misappropriate Tecnomatic's Technology**

36.     Upon information and belief, and as a reasonable opportunity for discovery will show, in or around 2002, one or more of the Remy Defendants had an undisclosed strategy to enter the hybrid automotive industry, and to commercially and advantageously position itself in this industry while improperly blocking competitors from this industry (hereinafter collectively "Confidential Strategy").

37.     As publically admitted in or around 2002, Remy lacked the technological knowledge and ability to develop key complex stator components for the hybrid motor.  As such, Remy could not independently develop the same in a timeframe ahead of anticipated customer demand or competitors, as required to execute its Confidential Strategy.

38.     Upon information and belief, and as a reasonable opportunity for discovery will show, in or around 2002, the Remy Defendants were unable to independently develop sufficient complex stator technology using their own resources, and/or could not do so in a manner timely enough for potential customer demand, or ahead of competitor activity, as required to execute their Confidential Strategy.

39.     Prior to 2002, one or more of the Remy Defendants learned of Tecnomatic and its reputation in the stator and the stator winding industries, as well as manufacturing technologies regarding the same.  The Remy Defendants also learned of Tecnomatic's experience with four-wire/flat wire stators.

40.     Prior to 2002, at Remy, Inc.'s request, Tecnomatic presented a quote for flat wire winding stators to David Fulton and Terry Oaf, both of whom were Remy employees at that time.

41.     One or more of the Remy Defendants knew that unless it engaged Tecnomatic in a "relationship", which would have the effect of influencing Tecnomatic to forebear working with others in the hybrid industry or stator/stator winding industry, Tecnomatic would likely use its proprietary confidential information and the Technology, including inventions, know-how, technology and trade secrets, in competition with the Remy Defendants and Remy's Confidential Strategy.

**D.     Remy's 2002-2003 Contact With Tecnomatic**

42.     Upon information and belief, in early 2002, Remy, Inc. approached Tecnomatic under false pretenses and requested that Tecnomatic "present" on its stator technology and capabilities.

43.     During this initial time period, the Remy Defendants withheld and did not disclose their true intent and did not disclose material information about Remy's Confidential Strategy.

44.     During the same time period, Tecnomatic refused to provide access to its know-how and information, even at the presentation level, without contractual assurances from Remy related to the confidentiality and protection of Tecnomatic's proprietary information.

8

E.       **Remy's 2003 "Possible Joint Venture" Representations**

45.      In 2003, Remy, Inc. (then doing business as Delco Remy, Inc.) attempted to gain access to Tecnomatic know-how, proprietary information and material, representing that it was interested in a "possible joint venture" with Tecnomatic (hereinafter "Hybrid Motor Project").

46.      Upon information and belief, and as a reasonable opportunity for discovery will show, in 2003, the Remy Defendants had no intention to enter into a joint venture with Tecnomatic, nor did their Confidential Strategy indicate an intent to enter into such a relationship.

47.      Based upon Remy, Inc.'s representation in 2003 that it would be willing to enter into a possible joint venture with Tecnomatic, Remy, through its then president, induced Tecnomatic to enter into the Agreement in order to facilitate the exchange of "confidential information," a term defined in the Agreement.

48.      Upon information and belief, at the time Remy made these representations, one or more of the Remy Defendants, withheld material information about its Confidential Strategy, and further withheld material information about its true intention regarding the exchange of information in connection with a "possible joint venture."

49.      Further, at the time Remy, Inc. made these representations, upon information and belief, the Remy Defendants had no intention of entering into a joint venture with Tecnomatic.

50.      At the time Remy, Inc. made the representations regarding a "possible joint venture", one or more of the Remy Defendants intended to gain access to and learn about Tecnomatic's know-how and proprietary information relating to stators and stator winding technology, as well as the manufacture of lines to build the same.

51.      Due to Remy's representation regarding a "possible joint venture" in connection with the disclosure of confidential information sought by one or more of the Remy Defendants,

Remy had an obligation to fully disclose its plans and intentions, as well as a duty not to remain silent on material issues.

### F.    The 2003 Mutual Confidentiality Agreement

52.    Based on and in reliance upon the aforementioned representations of Remy, Inc. and its officer(s), including reliance on one or more of the Remy Defendants' nondisclosure of material information, Tecnomatic signed the Agreement in May 2003.  A copy of the Agreement is attached as Exhibit C.  The "term" of the Agreement was from May 2003 to May 2005.

53.    Under the terms of the Agreement "all Information," oral, written or through electronic information or observed, was deemed to be "confidential information."

54.    Under the terms of the Agreement, the Remy Defendants were obligated to exercise reasonable care to protect all such confidential information disclosed by Tecnomatic.

55.    Under the terms of the Agreement, the Remy Defendants expressly agreed that they would not publish, copy, reverse engineer, disassemble, decompile or disclose any confidential information of the other party.

56.    Under the terms of the Agreement, the Remy Defendants expressly agreed that they would use "best efforts" to prevent inadvertent disclosure of such confidential information to any third party.

57.    Under the terms of the Agreement, the Remy Defendants expressly agreed that they would not use the confidential information in its own business, except to the extent necessary to evaluate and effect the "possible joint venture."

58.    The Agreement expressly provides that "if the parties decide not to proceed with the Proposed Transaction [a defined term in the Agreement], then each receiving party shall promptly return to the information providing party or destroy all Confidential Information and notes without retaining any copies thereof."

59. The Agreement also expressly provides that the receiving party, notwithstanding the destruction or return of confidential information and notes, will continue to be bound by the obligations of confidentiality.

60. The Agreement expressly provides that "unless and until a definitive agreement (between) the parties with respect to any Proposed Transaction *has been executed and delivered,"* the Agreement delineates the legal obligations of the parties.

61. After the signing of the Agreement in May 2003, without knowledge of the material information withheld by Remy and under the false belief that the parties were working toward a joint venture, Tecnomatic began to work with Remy on technology relating to complex stators and production lines for stators.

62. From May 2003 to May 2005, confidential information, by oral, written and through electronic information and through observation, was provided to Remy Defendants by Tecnomatic. Further, Remy expressly designated individuals to receive the forgoing information, including but not limited to Kevin Young, Stuart Perry, Terry Oaf, and Jim Spellman. Remy's request that these individual receive the confidential information was made in light of its admission that at that time "Remy designers don't have a lot of experience in this area."

63. The Remy Defendants, as well as those individuals designated by Remy to receive the confidential information, are bound by the non-disclosure requirements of the Agreement, including those relating to the intellectual property rights of Tecnomatic.

64. Despite Remy's representation, no joint venture was entered into by the Remy Defendants and Tecnomatic between May 2003 and May 2005. Upon information and belief,

the Remy Defendants never intended to enter into a joint venture with Tecnomatic in May 2003 to May 2005.

65.     During this time period it was always understood that Tecnomatic would retain and maintain its ownership of its intellectual property, including the intellectual property developed during the term of the Agreement.

66.     Tecnomatic at all times complied with its obligations under the Agreement.

67.     During the term of the Agreement, the Remy Defendants gained access to information indicating Tecnomatic had valuable technological know-how on complex stators and the manufacture of same.  Remy also learned that Tecnomatic had engineering expertise that Remy did not have.

68.     Upon information and belief, and as a reasonable opportunity for discovery will show, the Remy Defendants knew that unless Tecnomatic was led to believe it would be in a joint venture or other similar business relationship with one or more of the Remy Defendants, Tecnomatic could itself use – or could enable competitors of the Remy Defendants to develop or use – the Technology and/or to execute Remy's Confidential Strategy.

69.     Upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants breached the terms of the Agreement.

**G.     Remy's Extension Of The 2003 Mutual Confidentiality Agreement Through May 2007 Under False Pretenses**

70.     In August 2004, one or more of the Remy Defendants still had not disclosed material information to Tecnomatic, nor did Remy disclose that it had no intention of entering into a joint venture with Tecnomatic.

71.     In August 2004, one or more of the Remy Defendants continued to represent to Tecnomatic that the Remy Defendants were interested in entering into a joint venture with Tecnomatic.

72.     The Remy Defendants had a duty to disclose material information during this time period, and had a duty not to remain silent.

73.     In August 2004, one or more of the Remy Defendants, while continuing to withhold material information and during the time period when Remy was misrepresenting that it was interested in a joint venture with Tecnomatic, Remy, Inc. requested that the term of the Agreement be extended until May 2007.

**H.     The Extension Confidentiality Agreement**

74.     A copy of the Extension Confidentiality Agreement is attached hereto as <u>Exhibit D</u>.  The Extension Confidentiality Agreement was signed by Remy, Inc.'s then Vice President of Engineering.

75.     Under the terms of this Extension Confidentiality Agreement, "All Information", oral, written or through electronic information or observed" was deemed confidential information.

76.     Under the terms of the Extension Confidentiality Agreement, the Remy Defendants were obligated to exercise reasonable care to protect the confidential information disclosed there under.

77.     Under terms of the Extension Confidentiality Agreement, the Remy Defendants expressly agreed that they would not publish, copy, reverse engineer, disassemble, decompile or disclose any confidential information of the other party.

78.    Under terms of the Extension Confidentiality Agreement, the Remy Defendants expressly agreed that they will use "best efforts" to prevent inadvertent disclosure of such confidential information to any third party.

79.    Under terms of the Extension Confidentiality Agreement, the Remy Defendants expressly agreed that they would not use the confidential information in their own business, except to the extent necessary to evaluate and effect the "possible joint venture."

80.    The Extension Confidentiality Agreement expressly provides that "if the parties decide not to proceed with the Proposed Transaction, then each receiving party shall promptly return to the information providing party or destroy all Confidential Information and notes without retaining any copies thereof."

81.    The Extension Confidentiality Agreement expressly provides that the receiving party, notwithstanding the destruction or return of confidential information and notes, will continue to be bound by the obligations of confidentiality.

82.    The Extension Confidentiality Agreement expressly provides that "unless and until a definitive agreement (between) the parties with respect to any Proposed Transaction ***has been executed and delivered"*** the Extension Confidentiality Agreement delineates the legal obligations.

83.    After the signing of the Extension Confidentiality Agreement in August 2004, and without knowledge of the material information withheld by one or more of the Remy Defendants, and under the false belief that the parties were working toward a joint venture, Tecnomatic began to work with one or more of the Remy Defendants on technology relating to complex stators, stator winding technology and production lines for stators.

84.     From August 2004 to May 2007, confidential information, by oral or written and through electronic information and through observation, was provided to one or more of the Remy Defendants and Remy employees, including Kevin Young, Mark Stephenson, JJ Shives, Richard Van Sickle, Jim Spellman.

85.     The Remy Defendants and Remy designated individuals are bound by the non-disclosure requirements of the Extension Confidentiality Agreement, including intellectual property rights of Tecnomatic.

86.     No joint venture was entered into by the Remy Defendants and Tecnomatic between August 2004 and May 2007, and upon information and belief, the Remy Defendants never intended to enter into a joint venture with Tecnomatic between August 2004 and May 2007.

87.     Tecnomatic at all times complied with its obligations under the Extension Confidentiality Agreement.

88.     During this time period it was always understood that Tecnomatic would retain and maintain its ownership of its intellectual property, including the intellectual property developed during the period of the Extension Confidentiality Agreement.

89.     During the term of the Extension Confidentiality Agreement, one or more of the Remy Defendants and Remy designated individuals gained access to information establishing that Tecnomatic had valuable technological know-how relating to complex stators, stator winding technology and the manufacture of the same, and learned that Tecnomatic had engineering expertise that the Remy Defendants did not have.

90.     Also during this time period, and in particular in or about June 2005, Tecnomatic made a written request of Remy executive James Spellman, asking that Remy inform Tecnomatic of whether or not Remy intended to continue with the Phase II project.

**I.     Remy 2006 Change of Management**

91.     Between late 2005 and early 2006 one or more of the Remy Defendants were undergoing a change in management.  Those changes brought in John H. Weber, formerly with EaglePicher Corporation, as President and CEO of Remy International Inc., and John Pittas, also formerly with EaglePicher Corporation, as President of Remy, Inc.

92.     Upon information and belief, the EaglePicher Corporation maintains or maintained facilities in San Luis Potosi, the location of certain Remy Defendants in Mexico.

93.     Upon information and belief, and as a reasonable opportunity for discovery will show, the Remy Defendants, its employees and/or the Remy Defendants' new management either had a relationship with, or as part of the scheme set forth herein developed a relationship with, Eagle.

94.     At least as early as April 2006, John H. Weber, with a copy to Kevin Young and Rich Van Sickle (individuals with prior knowledge and involvement in the Remy Defendants' scheme) was informed that the hybrid stator project with Tecnomatic was very complicated and much different than other stators Remy manufactures today.

95.     During this 2006 time period, the Remy Defendants were also undertaking significant cost cutting and budgetary restrictions.

96.     Upon information and belief, and as a reasonable opportunity for discovery will show, in 2006 one or more of the Remy Defendants and its employees, including but not limited to Kevin Young, Joe Plomin, and Rich Van Sickle, were also concerned that Remy's major

hybrid motor customer would consider cutting out Remy as an unnecessary middle man, and that this hybrid motor customer would instead deal directly with Tecnomatic.

97. These same Remy Defendants' employees recognized that Tecnomatic had given certain financial and other considerations to the Remy Defendants in reliance on and as investment in the proposed joint venture, and in the false belief that Tecnomatic was working with Remy for future business together.

98. These same Remy employees recognized that the Remy Defendants' involvement in the stator development was limited, and that Tecnomatic developed the stator with very little or no on-sight product development input or assistance from Remy.

**J.    Remy's Undisclosed Intent To Cut Out Tecnomatic's Involvement In The Hybrid Project**

99. Also as part of the change in management, cost cutting, and concern over the potential loss of a significant customer, one or more of the Remy Defendants, upon information and belief and as a reasonable opportunity for discovery will show, decided to cut Tecnomatic out of the Hybrid Motor Project, and to attempt to disparage Tecnomatic's reputation in order to block Tecnomatic from participating in the United States' complex stator, stator winding and manufacturing systems for stators for hybrid motors marketplace.

100. The Remy Defendants failed to disclose their decision or intention to cut Tecnomatic out of the hybrid project, nor did the Remy Defendants disclose to Tecnomatic Remy's decision to cease all further consideration of the proposed "joint venture" with Tecnomatic.

101. Under the terms of the Agreement and the Extension Confidentiality Agreement, and its fiduciary duties, the Remy Defendants had a duty to make full disclosure of its intentions

to cut out and/or "reduce reliance" on Tecnomatic, as well as the Remy Defendants' decision not to further consider a joint venture.

102.     Upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants and its new management also recognized that Tecnomatic, and not the Remy Defendants, owned and held the valuable proprietary technology related to complex stators, stator winding technology, and stator manufacturing technology, and that all of this information was inaccessible to Remy as it was subject to the Extension Confidentiality Agreement and physically located at the Tecnomatic facility in Italy.

103.     Upon information and belief, and as a reasonable opportunity for discovery will show, the Remy Defendants knew that they could not cut Tecnomatic out of the hybrid project, and/or to cease all further consideration of the proposed "joint venture" with Tecnomatic or "reduce its dependence on Tecnomatic" before the Remy Defendants had an opportunity to access and misappropriate Tecnomatic's proprietary information related to complex stators, stator winding technology, and stator manufacturing technology.

**K.     Remy Plans To Access Tecnomatic Confidential Information Through Improper Means**

104.     As set forth in more particularity herein, the Remy Defendants thereafter took steps, using false and fraudulent representations, and under the false pretense of a possible joint venture and/or continued business dealings, to access and misappropriate Tecnomatic proprietary information.

**L.     Modifying Remy Internal Drawings To Copy Tecnomatic Stator Products**

105.     Upon information and belief, and as a reasonable opportunity for discovery will show, during the term of the Agreement and the Extension Confidentiality Agreement, one or more of the Remy Defendants and their employees, including but not limited to Kevin Young

18

and Mark Stephenson, as well as other Remy employees or agents known to or supervised by one or more of the Remy Defendants, modified Remy internal drawings relating to stator products to incorporate confidential information and proprietary information of Tecnomatic into Remy Defendants drawings.

**M.    Remy's False And Misleading Representations To Tecnomatic To Induce Shipment Of Manufacturing Equipment From Italy To Remy Mexico**

106.    Remy recognized that if it informed Tecnomatic of the Remy Defendants' decision to cut Tecnomatic out of the ongoing project(s), or to reduce its reliance on Tecnomatic, the Remy Defendants had insufficient independent knowledge, technology, or intellectual property ownership regarding complex stators, stator winding technology, and or manufacturing technology to produce the same.

107.    The Remy Defendants needed to access and take Tecnomatic's proprietary information and know-how before it severed its relationship with Tecnomatic.

108.    In or about late 2005 through January 2006, the Remy Defendants, Remy management and Remy employees, including but not limited to Brenda Alford and Kevin Young, developed a private "negotiation strategy" wherein Remy would falsely represent the potential of future business with Tecnomatic in order to obtain compliance and cooperation from Tecnomatic.

109.    At the time of the Remy Defendants' execution of the "negotiation strategy," the Remy Defendants were attempting to convince Tecnomatic to "lease" and then deliver to Remy's facilities in Mexico a first line of equipment.

110.    Upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants and Remy executives and/or employees, including Rich Van Sickle, David Muir, Carol Mineart, Brian Richardson, Joe Plomin, Joni Kirby, Robert

19

Lawson and Brenda Alford, perceived the possession of the Tecnomatic equipment in Mexico as gaining some strategic "leverage" over Tecnomatic.

111.    In this 2006 time period, the Remy Defendants had an undisclosed intent not to use Tecnomatic on a Phase II line of equipment or on future business, and a further undisclosed intent to copy Tecnomatic equipment, and/or "refigure" Tecnomatic equipment.

112.    On January 31, 2006, Remy and Tecnomatic agreed to a lease of the phase I Tecnomatic equipment at the Remy facility in Mexico.  Under the terms of the lease, Remy had no ownership of the equipment, nor did it have the right or ability to encumber the equipment.

113.    Upon information and belief, and as a reasonable opportunity for discovery will show, in or about January 2006, Remy, Inc. was insisting upon the lease of Tecnomatic equipment, while one or more of the Remy Defendants had an undisclosed intent to have the equipment copied and to give unauthorized individuals and entities access Tecnomatic's confidential information.

114.    After securing an agreement for a lease, and in furtherance of this intent, one or more of the Remy Defendants, through its employees, including but not limited to, Brenda Alford, began to redefine Remy, Inc.'s definition of "equipment readiness."

115.    Remy, Inc. was aware of the then current state of equipment readiness and insisted upon and approved shipment of the equipment to Remy's facility in Mexico before the end of 2006.  Tecnomatic was not in favor of Remy, Inc.'s decision to move the equipment to the Remy facility in Mexico, but relied on Remy's representations regarding equipment readiness, and the fact that the parties were operating under the confidentiality agreements in agreeing to ship the equipment to Remy Mexico by the end of 2006.

116.    As confirmed in the Remy Defendants' internal documentation, the Agreement and the Extension Confidentiality Agreement governed the parties exchanges during this 2006 time period.

117.    Both the Remy Defendants and Tecnomatic knew and understood that this highly complex proprietary equipment and tooling for such equipment was to require further confidential design and development work once it arrived in Mexico, particularly because the Remy Defendants failed to provide sufficient supplies of stator components to test the equipment prior to shipment.

118.    Tecnomatic, under the false belief and understanding that the two companies were continuing to work together to "consolidate their partnership" and without knowledge of one or more of the Remy Defendants' actual improper intent to copy Tecnomatic equipment and to eliminate reliance on Tecnomatic, agreed to deliver, *ex works*, Remy, Inc.'s shipment to Mexico, i.e., the leased Tecnomatic equipment at the then state of equipment readiness.

**N.    Remy's Demand for Technical Drawings Under False Pretext**

119.    Also in or about July 2006, after securing the "lease," and insisting upon 2006 delivery to Mexico of the leased equipment, and without disclosing its true intentions, one or more of the Remy Defendants, through and with the knowledge of its executives and employees, began to demand receipt of Tecnomatic's technical drawings.  Such employees and executives include, but are not limited to, Kevin Young, David Tocco, Brenda Alford, Stuart Perry, Craig Rutherford, and Rich Van Sickle.

120.    At the time Remy's demands were being made in or about July 2006, these employees and executives were aware of and were bound by the obligations arising from the Agreement and the Extension Confidentiality Agreement.

121.    At the time these demands were being made in or about July 2006, these employees and executives were informed and knew that the Remy Defendants had no contractual right to the drawings and that Tecnomatic's business practice was not to provide the drawings.

122.    At the time these demands were being made in or about July 2006, these employees and executives knew that the Remy Defendants had no intention of conducting further business with Tecnomatic, was attempting to limit Remy's dependence on Tecnomatic, and that Remy intended to copy the Tecnomatic equipment.

123.    One or more of the Remy Defendants and the aforementioned employees and/or executives had contractual, legal and fiduciary duties to make full disclosure of Remy's intentions when requesting these drawings.

124.    One or more of the Remy Defendants and the aforementioned employees and/or executives failed to comply with their obligations.

125.    On or about July 17, 2006, Tecnomatic President Giuseppe Ranalli, sent a written communication to Remy Defendants executive Rich Van Sickle, reminding him that providing drawings was not Tecnomatic's practice, but that drawings were being provided at Rich Van Sickle's personal request in an effort to further the relationship between Remy and Tecnomatic. Mr. Ranalli expressly stated "I hope we, Tecnomatic, do not regret this decision."

126.    Upon receipt of this communication from Mr. Ranalli, the Remy Defendants and Rich Van Sickle had an affirmative obligation to disclose their true intent not to use Tecnomatic, that there was no joint venture, and that the Remy Defendants and their management had decided not to continue to work with Tecnomatic.

127.    Neither the Remy Defendants nor their employees or executives made the required and necessary disclosures and instead accepted the proprietary documentation knowing that it was being provided under false pretenses.

128.    The drawing request and provision of the drawings were done under the terms of the Agreement and the Extension Confidentiality Agreement.

**O.    The Remy Defendants' Acceptance Of Confidential And Proprietary Information In Connection With The Set Up And Installation Of The Leased Equipment Under False Pretense**

129.    The leased equipment in its then state of development was, as demanded by Remy, Inc., installed in Remy's facility in Mexico between December 2006 and January 2007.

130.    Unbeknownst to Tecnomatic, upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants had set up a "confidential" internal meeting to discuss alternative sourcing of Phase II equipment.  upon information and belief, the following Remy employees or executives were required to participate in and attend the meeting: Brenda Alford, David Muir, David Tocco, Joani Kirby, Waqas Sherwani, Rich Van Sickle, Mark Stephenson, Terry Oaf and Americo Cruz.

131.    Upon information and belief and as a reasonable opportunity for discovery will show, the participants in this January 2007 meeting created and developed a further plan to: (a) fraudulently mislead Tecnomatic into transferring its knowledge; (b) copy Tecnomatic's equipment for sourcing through a different supplier or internally; and, (c) have JJ Shives conduct a  review of patent possibility of Tecnomatic's intellectual property on this technology.

132.    Upon information and belief, and as a reasonable opportunity for discovery will show, this January 2007 covert meeting took place while Kevin Young and Americo Cruz were in Mexico directly working with Tecnomatic engineers on the set up and commissioning of the leased equipment.

133.    Upon information and belief, and as a reasonable opportunity for discovery will show, this January 2007 covert meeting took place while the Extension Confidentiality Agreement was in effect.

134.    The Remy Defendants failed to disclose the fact that this covert meeting was taking place, failed to disclose the discussions that took place during the covert meeting, and failed to disclose Remy's planned conduct as agreed upon during this meeting.

135.    Instead, the Remy Defendants continued to make false and misleading representations to Tecnomatic in order to induce Tecnomatic to transfer its proprietary knowledge to Remy Defendants and/or Remy employees.

**P.    Acts Of Misappropriation By The Remy Defendants, Eagle, Odawara and Others**

136.    Not withstanding the existence of the Agreement, Extension Confidentiality Agreement, and one or more of the Remy Defendants' fiduciary duties, upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants contacted Eagle and Odawara in or about January 2007 and requested that Eagle and Odawara mirror, duplicate and/or otherwise copy the Tecnomatic equipment.   The Eagle employees involved in these wrongful activities, upon information and belief and as a reasonable opportunity for discovery will show, include Dan Rippa and Jeff Stahl.

137.    Upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants and Eagle and Odawara employees and/or executives conspired to obtain access to Tecnomatic's proprietary information under false pretenses and to conceal those activities.   Upon further information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants provided

Eagle and Odawara with access to Tecnomatic confidential information in violation of the Extension Confidentiality Agreement.

**Q.    Remy, Through Its In-House Counsel, Fraudulently Conceals the Wrongful Acts Of Remy, Remy Employees and Executives and Eagle**

138.    Upon information and belief and as a reasonable opportunity for discovery will show, sometime between February 2007 and March 2007, one or more of the Remy Defendants and Eagle employees and/or management, and on information and belief Odawara employees and/or management, entered the Remy facility in Mexico, concealing their true identities from Tecnomatic, and began to photograph and otherwise access Tecnomatic's proprietary information and confidential information in violation of the Agreement and Extension Confidentiality Agreement.

139.    On March 26, 2007, counsel for Tecnomatic, Roger Blakely, sent a letter to Remy executive David Muir, Richard Van Sickle, and Joani Kirby, all attendees at the covert January 22, 2007 Remy meeting.  A copy of this letter is attached as Exhibit E.

140.    In this letter, the Remy Defendants and Remy executives and/or employees (all attendees at the covert meeting) were reminded of the confidential and proprietary nature of Tecnomatic's information and trade secrets, and that they could not be used for any other purpose.

141.    In this letter, the Remy Defendants and Remy executives and/or employees (all attendees at the covert meeting) were informed of the existence of Tecnomatic's patent applications.

142.    In this letter, the Remy Defendants and Remy executives and/or employees (all attendees at the covert meeting) were notified that the Tecnomatic equipment was being photographed by persons not known to Tecnomatic.

143.    Tecnomatic requested that the Remy Defendants immediately identify and provide the affiliation of the persons and entities permitted to photograph the Tecnomatic equipment, and further requested that Remy disclose the purpose of the photographs.   See Exhibit E.

144.    At the time the letter was sent, the Agreement and Extension Confidentiality Agreement were in effect and Remy had contractual, legal and fiduciary duties and obligations to fully disclose the information requested by Tecnomatic.

145.    Upon information and belief, and as a reasonable opportunity for discovery will show, the individuals that Remy permitted to have access and photograph the Tecnomatic equipment, including Eagle employees Rippa and Stahl, were not authorized to access Tecnomatic proprietary data.   Upon information and belief, said individuals knew that such information was being improperly accessed and that Remy had a duty to maintain the information confidential.

146.    Upon information and belief and as a reasonable opportunity for discovery will show, the individuals and/or entities that accessed the Tecnomatic confidential information were employed by, were executives of, and/or were affiliated with Eagle and/or Odawara.

147.    Upon information and belief and as a reasonable opportunity for discovery will show, the individuals and/or entities that accessed the Tecnomatic confidential information were doing so in order to copy Tecnomatic's equipment, and improperly access and use Tecnomatic confidential information to jumpstart their duplication of the Tecnomatic equipment.

148.    The Remy Defendants and their executives and/or employees, and the recipients of the letter attached as Exhibit E, including David Muir, Richard Van Sickle, and Joani Kirby, were aware of the improper purpose of the photographing as a result of, *inter alia*, their

participation in the January 2007 covert meeting. Remy Defendants and each of these individuals had an affirmative duty to make full disclosure in response to the request of Tecnomatic and its counsel.

149. Instead, the Remy Defendants and these individuals engaged in steps to conceal this improper activity and to actively and affirmatively misrepresent the true facts and circumstances surrounding the misappropriation then occurring.

150. Notwithstanding this duty, and in furtherance of the Defendants' ongoing concealment and fraud, Remy's Associate General Counsel JJ Shives sent a letter affirmatively misrepresenting the true facts and circumstances surrounding the misappropriation then occurring.

151. A copy of the Remy Defendants letter, signed by JJ Shives, is attached hereto as Exhibit F.

152. The letter contains knowing and intentional misrepresentations, including, but not limited to, the purpose and intended use of the photographs. Further, JJ Shives affirmatively stated that he had obtained assurances from Remy employees involved with the project that "Remy has no intention of replicating the Tecnomatic equipment or infringing upon any Tecnomatic intellectual property."

153. At least one former employee of Remy, Inc. has stated that JJ Shives' representation, with respect to that former employee, was false.

154. The letter contains representations constituting an active concealment of the wrongful acts of one or more of the Remy Defendants and their executives and employees.

155. The Eagle and/or Odawara photographing and the purported uses of those photographs as claimed by JJ Shives are subject to a duty to preserve and, upon information and

belief and as a reasonable opportunity for discovery will show, the photographs were not preserved.

156.    At the time of the acts of fraud, misrepresentation and concealment, one or more of the Remy Defendants was providing Tecnomatic confidential information to Eagle and, upon information and belief, Odawara, and possibly others in connection with the improper purpose of copying Tecnomatic equipment.

157.    One or more of the Remy Defendants and Remy executives and/or employees, including JJ Shives, had a legal, contractual, and fiduciary obligation not to make false or misleading representations regarding the actions then ongoing at the Remy' facility in Mexico and to preserve all evidence relating to such activities.

158.    The Defendants have direct, indirect and vicarious liability for the wrongful acts that occurred in relation to Tecnomatic's confidential information, including but not limited to, the Doe Defendants who will be individually named after discovery identifies said individuals and their roles.

**R.    Acts After The First Quarter 2007 Misappropriation And Concealment**

159.    One or more of the Remy Defendants and Remy executives and employees, while concealing their wrongful activities, and while misrepresenting their true intentions of copying, began to systematically request Tecnomatic drawings and the transfer of Tecnomatic knowledge.

160.    Obtaining such information without full disclosure is an obtaining of proprietary information under false pretext.

161.    One or more of the Remy Defendants and Remy executives and employees, while concealing its wrongful activities, and while misrepresenting its true intentions of copying, began

to systematically transfer Tecnomatic drawings and Tecnomatic confidential information to others, such as Eagle and Odawara that are not entitled to access or use such information.

162.    As a result of the access to and use of Tecnomatic confidential and proprietary information Eagle and, on information and belief, Odawara and others were able to shorten development, research and development, engineering and manufacturing time and to sell stator equipment to Remy that is a copy of and/or the result of the benefits of improper accessing and using of Tecnomatic confidential information.

### S.    Filing Patents Without Naming Tecnomatic Inventors

163.    Upon information and belief, and as a reasonable opportunity for discovery will show, Remy Defendants were preparing patent applications on the Tecnomatic inventions.

164.    As a result of the patent application process, one or more of the Remy Defendants recognized that Tecnomatic was the actual owner of the intellectual property, and one or more of the Remy Defendants could not file for patents until it obtained ownership of the intellectual property rights from Tecnomatic.  One or more of the Remy Defendants knew from prior discussions with Tecnomatic that Tecnomatic would not give up its intellectual property rights.

165.    One or more of the Remy Defendants began to file patent applications for the Tecnomatic inventions without informing Tecnomatic that such filings were being made, and without naming Tecnomatic individuals as the inventors on the patents.

166.    One or more of the Remy Defendants' filing of patent applications on Tecnomatic confidential information, or using Tecnomatic confidential information is a violation of the law, and a violation of the Agreement and the Extension Confidentiality Agreement.

167.    In or about April 2008, the Remy Defendants filed another patent application on Tecnomatic inventions in the name of Kevin Young and Mark Stephenson as inventors. The

patent application included on information and belief, information provided by Tecnomatic to Remy Defendants under the Agreement, in violation of its terms.

168.   The Remy Defendants did not name Tecnomatic or Tecnomatic individuals as inventors on the patent applications filed in the 2006 to 2009 time frame.   The patent applications should be corrected to include Tecnomatic individuals as inventors.

### T.   Remy Defendants Fail to Destroy or Return Confidential Information

169.   At the end of the Extension Confidentiality Agreement, the Remy Defendants had an obligation to destroy or return the Tecnomatic confidential information and a continuing obligation not to use such confidential information.

170.   The Remy Defendants did not comply with the terms of the Extension Confidentiality Agreement.

### U.   Remy Further Acts Upon Its Confidential Strategy

171.   After obtaining the technology, inventions and know-how of Tecnomatic, and filing patent applications on such technology, and while blocking Tecnomatic from developing technology with the Remy Defendants' competitors, the Remy Defendants began to execute their original confidential strategy to control the hybrid car industry through improper means.

172.   On May 12, 2008, the Remy Defendants "terminated" the overall relationship with Tecnomatic, including the Capital Lease. Remy thereafter took steps to get a full return of any money paid to Tecnomatic over the term of the Capital Lease.  In September 2008, Remy "revoked" certain purchase orders.

173.   Upon information and belief, and as a reasonable opportunity for discovery will show, the Remy Defendants continued to use Tecnomatic confidential information and concealed its use.

V.     **Remy's Misrepresentations To Customers, the Marketplace and
       In Its Grant Application**

174.   The Remy Defendants have made one or more misrepresentations of fact regarding the origin of its stator technology, and has falsely represented Tecnomatic confidential information, inventions, and technology as Remy Defendants technology.  See e.g. Exhibit A.

175.   Upon information and belief, and as a reasonable opportunity for discovery will show, the Remy Defendants hold themselves out publically as "specialists" or "go to motor makers" in this area for purposes of incentivizing others to outsource to Remy or become a customer of Remy.

176.   One or more of the Remy Defendants holds itself out to the public, in marketing, promotional and advertising material, including websites, accessible in this district, as an "Engineering Powerhouse," stating that their "engineering department" has developed numerous patented technologies behind the industries most efficient components, including "hairpin stator technology."

177.   One or more of the Remy Defendants have represented to others, including the press, for release into the commercial marketplace, that Remy has invented a new stator winding design that uses rectangular wire, rather than rounds wire, with windings that are arranged in multiple layers.

178.   One or more of the Remy Defendants represent in advertising and promotional material, available and accessible in this district through the Remy website, and on information and belief, through other disclosures, that Remy HVH250 Series Electric Motors have "award winning patented High Voltage Hairpin stator winding technology."

179.   One or more of the Remy Defendants has released white papers, accessible in this district through the Remy website, and on information and belief, through other means, that

"Remy off the shelf hybrid motors incorporate proprietary high voltage hairpin winding technology."

180.    One or more of the Remy Defendants has released white papers, accessible in this district through the Remy website, and on information and belief, through other means, that Remy HVH hybrid motors owe both their name and their exceptional performance to the propriety High Voltage Hairpin (HVH) stator windings, which at least one Remy former employee described as technology taken from Tecnomatic.  A true and correct copy of the white paper is attached as Exhibit G.

181.    On information and belief, and a reasonable opportunity for discovery will show, one or more of the Remy Defendants has been sending "reassuring letters" to influence decisions regarding outsourcing.

182.    One or more of the Remy Defendants continued to prosecute its patent applications filed in contravention of its agreements with Tecnomatic.

183.    One or more of the Remy Defendants prepared and filed the Grant application with the DOE and made material misrepresentations in the Grant application regarding the origination and ownership of the relevant technology, intellectual property development and, upon information and belief, other matters.

184.    One or more of the Remy Defendants began to issue white papers and advertisements and promotional material touting Remy as the innovator of the stator winding technology, all the while withholding the identity of Tecnomatic and its involvement in and creation of the stator winding technology.

185.    One or more of the Remy Defendants' acts and misrepresentations are false, misleading, and likely to mislead consumers and the public as to the true origin of the Remy technology.

186.    Tecnomatic has been materially harmed by the misrepresentations in the marketplace regarding the origination of the technology.

187.    Upon information and belief, the Defendants, acting individually and/or in concert, have entered into one or more joint ventures or business arrangements, contracts or transactions with others, that a reasonable opportunity for discovery will show are or could be directly, secondarily, and/or vicariously liable, or otherwise responsible for the damages caused to Tecnomatic.

188.    Upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants, collectively and/or in concert with others, has entered into or is about to enter into business arrangements with, including but not limited to: (a) General Motors; (b) ZAP, a California-based electric vehicle maker that owns a majority stake in a Chinese company; (c) MotoCzysz, an Oregon-based company; d) Cincinnati-based Advanced Mechanical Products; and, (e) Indianapolis-based Allison Transmission.

189.    One or more of the Remy Defendants recently obtained a federal grant for at least $60,000,000 from the DOE.  In doing so, one or more of the Remy Defendants made material misrepresentations to the DOE, relating to the origin and development of the material at issue in this Complaint for purposes of obtaining the Grant.

190.    One or more of the Remy Defendants have applied to the United States Patent office, for patents in the United States, and on information and belief, internationally, using the material at issue in the Complaint.

191.     One or more of the Remy Defendants also falsely and incorrectly represented in marketing and advertising materials via internet website(s) and otherwise, that it is the owner and originator of the material at issue in the Complaint, and has distributed said representations, internationally, including in this District.

## Count I

### Breach Of The 2003 Mutual Confidentiality Agreement

192.     Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

193.     One or more of the Remy Defendants has obligations under the 2003 Mutual Confidentiality Agreement.

194.     One or more of the Remy Defendants has breached those obligations in one or more ways set forth above.

195.     One or more of the Remy Defendants admits and acknowledges that irreparable harm to Tecnomatic will occur to Tecnomatic as a result of one or more of the Remy Defendants' breach and that monetary damages are difficult if not impossible to determine.

196.     Irreparable harm will occur to Tecnomatic as a result of the breach of the 2003 Mutual Confidentiality Agreement.

197.     There is no adequate remedy at law.

198.     Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count II

### Breach Of The Extension of the Confidentiality Agreement

199.     Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

200.     One or more of the Remy Defendants has obligations under the Extension Confidentiality Agreement.

201.     One or more of the Remy Defendants has breached those obligations in one or more ways described above.

202.     One or more of the Remy Defendants admits and acknowledges that irreparable harm to Tecnomatic will occur to Tecnomatic as a result of Remy's breach and that monetary damages are difficult if not impossible to determine.

203.     Irreparable harm will occur to Tecnomatic as a result of the breach of the Extension Confidentiality Agreement.

204.     There is no adequate remedy at law.

205.     Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

**Count III**

**Negligent Misrepresentation**

206.     Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

207.     One or more of the Remy Defendants has undertaken a course of business, profession, employment, with Tecnomatic in the transactions set forth herein ("Transactions") and one or more of the Remy Defendants has a pecuniary interest in such Transactions.

208.     One or more of the Remy Defendants supplied false information to Tecnomatic and/or failed to exercise reasonable care or competence in obtaining or communicating the information to Tecnomatic.

209.     Tecnomatic justifiably relied upon the false information of Remy in its business transactions with one or more of the Remy Defendants.

210.     Tecnomatic has suffered injury as a result of the acts or omissions of one or more of the Remy Defendants set forth above.

211.    Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of Defendants.

212.    There is no adequate remedy at law.

213.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count IV

### Actual Fraud

### Fraudulent Misrepresentation

214.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

215.    One or more of the Remy Defendants made one or more false statements of past or existing material fact.

216.    One or more of the Remy Defendants made statements knowing them to be false or recklessly without knowledge as to their truth of falsity.  All Defendants acted in concert with each other.

217.    One or more of the Remy Defendants made the statements to induce Tecnomatic to act upon them.

218.    Tecnomatic justifiably relied and acted upon the statements.

219.    Tecnomatic has suffered injury as a result of the acts or omissions of Defendants.

220.    Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of Defendants.

221.    There is no adequate remedy at law.

222.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count V

### Constructive Fraud

223.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

224.    One or more of the Remy Defendants owed Tecnomatic a duty due to one or more of the Remy Defendants' relationship with Tecnomatic.

225.    One or more of the Remy Defendants violated that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak existed.

226.    Tecnomatic justifiably relied and acted upon one or more of the Remy Defendants' actions.

227.    Tecnomatic party suffered injury as a proximate result thereof.

228.    One or more of the Remy Defendants gained an advantage at the expense of the Tecnomatic.

229.    Tecnomatic has suffered injury as a result of the acts or omissions of Defendants.

230.    Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of Defendants.

231.    There is no adequate remedy at law.

232.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count VI

### Misappropriation

### Trade Secrets

233.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

234.    Defendants acquired trade secrets and confidential information of Tecnomatic by improper means.

235.    Defendants used improper means to acquire knowledge of the trade secret.

236.    Defendants' disclosure or use of the trade secrets of Tecnomatic are without express or implied consent by Tecnomatic and have been used by Defendants and upon information and belief by its agents, joint venture partners, customers, and others who, at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or, (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

237.    Tecnomatic has suffered injury as a result of the acts or omissions of Defendants.

238.    Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of the Defendants.

239.    There is no adequate remedy at law.

240.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count VII

### Breach Of Fiduciary Duty

241.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

242.    There exists an actual, constructive or implied in law fiduciary relationship between one or more of the Remy Defendants and Tecnomatic.

243.    One or more of the Remy Defendants has breached its duty owed to Tecnomatic, and on information and belief the remaining defendants acted in concert with one or more of the Remy Defendants.

244.    Tecnomatic has been harmed.

245.    Tecnomatic has suffered injury as a result of the acts or omissions of Defendants.

246.    Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of Defendants.

247.    There is no adequate remedy at law.

248.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count VIII

### Federal Unfair Competition

249.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

250.    One or more of the Remy Defendants' acts constitute a violation of Federal Unfair Competition law.  On information and belief, the remaining defendants acted in concert with one or more of the Remy Defendants.

251.    Tecnomatic has been harmed.

252.    Tecnomatic has suffered injury as a result of the acts or omissions of Remy.

253.    Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of one or more of the Remy Defendants and, on information and belief, the remaining Defendants.

254.    There is no adequate remedy at law.

255.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count IX

### State Law Unfair Competition

256.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

257.    One or more of the Remy Defendants' acts constitute a violation of Illinois' Unfair Competition law.

258.    Tecnomatic has been harmed.

259.    Tecnomatic has suffered injury as a result of the acts or omissions of Defendants.

260.    Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of Defendants.

261.    There is no adequate remedy at law.

262.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count X

### Common Law Unfair Competition

263.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

264.    One or more of the Remy Defendants' acts constitute Unfair Competition under Illinois common law.

265.    Tecnomatic has been harmed.

266.    Tecnomatic has suffered injury as a result of the acts or omissions of Defendants.

267.    Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of Defendants.

268.    There is no adequate remedy at law.

269.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count XI

### False/Misleading Representation 43(a)

270.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

271.    One or more of the Remy Defendants' acts constitute false or misleading representations under 15 U.S.C. § 1125(a) because in connection with the Remy HVH Stator technology and products incorporating the same, one or more of the Remy Defendants uses a false designation of origin, false or misleading description of fact, and/or a false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by Tecnomatic, or in commercial advertising or promotion, the Remy Defendants misrepresent the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

272.    One or more of the Remy Defendants has made a false or misleading designation of origin, false or misleading description of fact, and/or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

273.    On or more of the Remy Defendants has made a false or misleading designation of origin, false or misleading description of fact, and/or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

274.    Tecnomatic's good will is likely to be lost or harmed and/or Tecnomatic is likely to be damaged by one or more of the Remy Defendants' acts.

275.    Consumers are likely to be confused, misled or deceived by Defendants' acts.

276.    Tecnomatic has been harmed.

277.    Tecnomatic has suffered injury as a result of the acts or omissions of Remy.

278.    Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of Remy.

279.    There is no adequate remedy at law.

280.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

## Count XII

### Correction of Inventorship

281.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

282.    One or more of the Remy Defendants has filed patent applications and/or obtained patents on inventions for which Tecnomatic individuals are the inventors or joint inventors.

283.    Tecnomatic employees are the inventor(s) or co-inventor on the patents because they contributed in a significant manner to the conception and or reduction to practice of the invention and made a contribution to the claimed invention that is significant in quality, when measured against the dimension of the full invention.

284.    The inventorship should be corrected under 35 USC §116 of the Patent Statute.

## Count XIII

### Interference with Actual or Perspective Contractual Relationship

285.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

286.    Tecnomatic had a valid and enforceable agreement with one or more of the Remy Defendants.  Defendants Eagle and Odawara knew about the agreement.

287.    Defendants Eagle and Odawara intentionally induced the Remy Defendants to breach the agreement.

288.    Defendants Eagle and Odawara were not justified in their actions.

289.    Tecnomatic was damaged as a result of the wrongful inducement to breach the Agreement.

290.    Tecnomatic has been harmed.

291.    Tecnomatic has suffered injury as a result of the acts or omissions of Eagle and Odawara.

292.    Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of Eagle and Odawara.

293.    There is no adequate remedy at law.

294.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

**<u>Count XIV</u>**

**Interference with Actual or Perspective Business Relationship**

295.    Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

296.    Tecnomatic had an actual and/or perspective business relationship with one or more of the Remy Defendants.

297.    Defendants Eagle and Odawara knew about the actual or perspective business relationship.

43

298.   Defendants Eagle and Odawara intentionally interfered with the actual or perspective business relationship in one or more ways set forth above.

299.   Defendants Eagle and Odawara were not justified in their actions.

300.   Tecnomatic was damaged as a result of the wrongful inducement to breach the Agreement.

301.   Tecnomatic has been harmed.

302.   Tecnomatic has suffered injury as a result of the acts or omissions of Eagle and Odawara.

303.   Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of Eagle and Odawara.

304.   There is no adequate remedy at law.

305.   Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

### Count XV

### Unjust Enrichment

306.   Paragraphs 1 to 191 are incorporated herein as if fully restated herein.

307.   A benefit has been bestowed upon Eagle and Odawara as a result of the above wrongful acts.

308.   Eagle and Odawara impliedly requested and received the benefit.

309.   Eagle and Odawara have been unjustly enriched and should be ordered to pay restitution.   Tecnomatic was damaged as a result of the wrongful inducement to breach the Agreement.

310.   Tecnomatic has been harmed.

311.    Tecnomatic has suffered injury as a result of the acts or omissions of Eagle and Odawara.

312.    Irreparable harm will occur to Tecnomatic as a result of the acts or omissions of Eagle and Odawara.

313.    There is no adequate remedy at law.

314.    Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief.

WHEREFORE Tecnomatic respectfully requests the following relief:

A.    Actual damages in the amount of $110,000,000 or an amount to be determined at trial;

B.    Disgorgement of Defendants' profits;

C.    Enhanced damaged in the amount of three times the actual damages;

D.    Punitive damages;

E.    Attorneys' fees and costs;

F.    Preliminary and permanent injunctive relief; and

G.    Any and all other relief that this Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Tecnomatic S.p.A. requests a trial by jury in this matter.

Dated: March 9, 2011                              Respectfully submitted,


                                                  BRYAN CAVE LLP

By: /s/ S. Patrick McKey

S. Patrick McKey
Kara E. F. Cenar
Paula L. Zecchini (*pro hac pending*)
Mariangela M. Seale
Donald A. Cole
BRYAN CAVE, LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601