UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

Tecnomatic, S.p.A.,                         )
                                            )
              Plaintiff,                     )
                                            )        1:11-cv-00991-SEB-MJD
       vs.                                   )
                                            )
Remy, Inc., Odawara Automation, Inc.,       )
Remy International, Inc., Delco Remy         )
Mexico, S.R.L. de C.V., Remy                )
Componentes S. de R.L. de C.V., and Does    )
1-10,                                       )
                                            )
              Defendants.                    )

**ORDER**


This cause is before the Court on a Motion to Dismiss [Docket No. 98] filed by

Remy Inc., Remy International Inc., Delco Remy Mexico, S.R.L. de C.V., and Remy

Componentes S. de R.L. de C.V. (collectively "Remy" or "the Remy Defendants").[1]

Specifically, Remy requests that this court dismiss the following of Plaintiff Tecnomatic

S.p.A.'s ("Tecnomatic's") claims against it: (Count I) breach of the 2003 Mutual

Confidentiality Agreement; (Count II) breach of the Extension of the Confidentiality

---

[1]The undersigned recently addressed motions to dismiss filed by the two other
Defendants in this action, Hanson Systems, LLC, d/b/a Eagle Technologies Group ("Eagle") and
Odawara Automation, Inc. ("Odawara").  Defendants' motions were granted with regard to the
misappropriation of trade secrets and tortious interference claims against them but denied with
regard to Plaintiff's unjust enrichment claim.  See Docket No. 230.  Eagle and Tecnomatic have
since reported a settlement. Docket No. 265.

Agreement; (Count III) negligent misrepresentation; (Count IV) actual fraud/fraudulent misrepresentation; (Count V) constructive fraud; (Count VI) misappropriation of trade secrets; (Count VII) breach of fiduciary duty; (Count VIII) federal unfair competition; (Count IX) state law unfair competition; (Count X) common law unfair competition; (Count XI) false/misleading representation 43(a); and (Count XII) correction of inventorship.  For the reasons detailed herein, Remy's motion is <u>GRANTED IN PART AND DENIED IN PART.</u>

## Factual Background[2]

Tecnomatic is an Italian corporation and is a recognized leader in the design, manufacture, and implementation of stators[3] and stator windings used in electric motors, as well as the production lines for such stators.  Compl. ¶ 10. As late as 2004, after having developed a strategy in or around 2002 to enter the hybrid automotive industry that makes use of such stators, Defendant Remy, a Delaware corporation with its principal place of business in Madison, Indiana, was still inexperienced with stator technology or its manufacturing systems.

In early 2002, Remy approached Tecnomatic to request that the company

---

[2]Portions of these facts were also discussed in the Court's March 29, 2012 Order granting and denying in part motions to dismiss filed by Defendants Eagle and Odawara.  <u>See</u> Docket No. 230.  We repeat many of these facts here and include certain additional facts relevant to our discussion of Remy's motion.

[3]According to Tecnomatic's Complaint, stators are a key component of electric motors used in various industries and are being used increasingly in the hybrid automotive industry. Compl. ¶ 21.

"present" on its stator technology. Remy did not disclose its intent to enter into this field at the time it made this request. In response to Remy's initial approach, Tecnomatic refused to provide Remy with access to its proprietary information without contractual assurances from Remy to preserve the confidentiality of its intellectual property. Compl. ¶ 44.

Approximately one year later, in 2003, Remy approached Tecnomatic about the possibility of a "joint venture" between their companies. Based on this possibility, Tecnomatic's then-president entered into the 2003 Mutual Confidentiality Agreement in order to facilitate the exchange of "confidential information." The Agreement defines confidential information as "all information (whether communicated orally or in writing or through electronic means or observed), records, notes, or other documents or material concerning [Remy] or Tecnomatic, as applicable, or either of their operations" and "all reports analyses, notes or other information that are based on, contain or reflect any Confidential Information." Compl. Ex. C. The Agreement further specifies that such confidential information exchanged between them would be treated as follows:

> Each of the parties agrees that (a) it will treat all Confidential Information of the other party with the same degree of care it accords to its own Confidential Information, and each of the parties represents that it exercises reasonable care to protect its own Confidential Information; (b) it will not publish, copy, reverse, engineer, disassemble, decompile or disclose any Confidential Information of the other party and it will use best efforts to prevent inadvertent disclosure of such Confidential Information to any third party; and (c) it will not use the Confidential Information in its own business, except to the extent necessary to evaluate and effect the Proposed Transaction.

Id.  In the event that either party thereafter decided not to proceed with the joint venture, the Agreement specified that "each receiving party [of the confidential information] shall promptly return to the information-providing party or destroy all Confidential Information and Notes without retaining any copies thereof."  Id.

The term of this Agreement extended from May 2003 to May 2005.  After it was executed, Tecnomatic, allegedly operating on the basis of the false impression that the parties were proceeding towards a joint venture, began to work with Remy on technology relating to complex stators and production lines.  The Complaint alleges that Remy never had any intention of entering into such a joint venture with Tecnomatic, intendeding only "to gain access to and learn about Tecnomatic's know-how and proprietary information relating to stators and stator winding technology, as well as the manufacture of lines to build the same." Compl. ¶¶ 49-50.  The Complaint also alleges that Remy feigned interest in the joint venture with Tecnomatic in order to prevent Tecnomatic from using its own technology or enabling Remy's other competitors to benefit from that technology. Compl. ¶ 68.

From May 2003 to May 2005, Tecnomatic provided Remy access to its confidential information regarding stators and their manufacture by certain designated Remy employees, including Kevin Young, Stuart Perry, Terry Oaf, and James Spellman. Compl. ¶ 62.  During this period, employees for both Remy and Tecnomatic understood that Tecnomatic would retain ownership of its own intellectual property as well as any intellectual property developed during the term of the Agreement.

As of August 2004, Remy was continuing to misrepresent its intentions to create a joint venture with Tecnomatic, prompting the parties to agree to extend the term of Agreement until May 2007 (the "Extension Confidentiality Agreement"). Compl. ¶ 73. In all relevant respects, the terms of the Extension Confidentiality Agreement remained unchanged from the parties' 2003 Agreement. Compl. Ex. D. Pursuant to the extension of the agreement between the parties, Tecnomatic was to continue to provide access to its confidential information to certain Remy employees, including Kevin Young, Mark Stephenson, JJ Shives, Richard Van Sickle, and James Spellman. Id. at 84. The Complaint further alleges that Remy (and, specifically, Kevin Young and Mark Stephenson), after receiving this information, modified Remy's internal drawings to incorporate aspects of Tecnomatic's confidential information. In or around June 2005, Tecnomatic expressly inquired of Remy executive, James Spellman, whether Remy intended to continue with the "Phase II project."[4]

Sometime in late 2005 and early 2006, Remy underwent a change in management. The new individuals managing Remy had a "relationship" with former Defendant Eagle, a Michigan limited liability corporation.[5] During this time period, Remy also undertook significant cost cutting and budgetary restrictions at its plant. Id. at 95. Remy also

---

[4]The Complaint does not explain what the "Phase II project" was. We assume at this early juncture in this litigation that it is the name of the joint venture that Tecnomatic believed it was working toward with Remy.

[5]The type of business Eagle engages in is unclear from the face of Tecnomatic's Complaint.

became concerned around this time period that one of its major hybrid customers might begin dealing directly with Tecnomatic, thereby cutting out Remy as the "middle man." Id. at 96. Despite these concerns, Remy did not disclose to Tecnomatic that it had no intention of ever entering into a joint venture with Tecnomatic. Id. at 100. Also, as a part of these changes at Remy, the decision was made to exclude Tecnomatic from participating in the "Hybrid Motor Project," and it began to disparage Tecnomatic's reputation in order to hinder its participation in the United States' hybrid motors marketplace. Id. at 99. Remy nonetheless recognized that Tecnomatic owned and possessed valuable proprietary information that was inaccessible to Remy by virtue of the Extension Confidentiality Agreement. Remy was reluctant to do anything to sour its relationship with Tecnomatic before it had an opportunity to access and misappropriate such information. Id. at 102-03; 107. Thus, in order to ensure Tecnomatic's continued cooperation with Remy, the Complaint alleges that Remy management and employees developed an undisclosed "negotiation strategy" by which Remy would continue to mislead Tecnomatic into believing there was real potential for future business between them. Id. at 108.

It is further alleged that part of Remy's motivation for continuing its efforts to convince Tecnomatic of the possibility of a future relationship was to induce Tecnomatic to lease and deliver a line of equipment to Remy's facility in Mexico. Id. at 109. On January 31, 2006, Remy and Tecnomatic agreed to a lease of the "Phase I" Tecnomatic equipment at the Remy facility in Mexico. The parties shared a common understanding

that this was highly complex proprietary equipment and that further confidential design and development work would need to continue once it arrived in Mexico in part because Remy had failed to provide certain components required to test the equipment before it was shipped to Mexico. Tecnomatic agreed to deliver the equipment at its then state of readiness to Remy only because it was unaware of Remy's true intention to copy the equipment and eliminate reliance on Tecnomatic. Id. at 11.

In July 2006, Remy's executives and employees began to demand access to Tecnomatic's technical drawings. Although Tecnomatic's President, Guiseppe Ranalli, informed Remy that releasing such drawings was not consonant with Tecnomatic's ordinary practice, their release was permitted to Remy's Rich Van Sickle in an effort to maintain good relations between the two companies. Ranalli stated at that time, "I hope, we, Tecnomatic, do not regret this decision." Id. at 125.

Based on the agreement between Remy and Tecnomatic, the leased equipment was installed in Remy's facility in Mexico between December 2006 and January 2007. As Tecnomatic engineers set up the leased equipment in Mexico, certain Remy employees allegedly participated in a "covert meeting" in an effort to develop a plan to "(a) fraudulently mislead Tecnomatic into transferring its knowledge; (b) copy Tecnomatic's equipment for sourcing through a different supplier or internally; and, (c) have [Remy counsel] JJ Shives conduct a review of patent possibility of Tecnomatic's intellectual property on this technology." Id. at 131.

Eagle and Odawara's involvement in these events did not occur until

approximately January 2007, when one or more of the Remy Defendants enlisted Eagle and Odawara to "mirror, duplicate and/or otherwise copy the Tecnomatic equipment." Compl. ¶ 136. The Eagle and Odawara employees then allegedly conspired with Remy to obtain access to Tecnomatic's proprietary information. Tecnomatic maintains that these attempts to improperly access its confidential information were in violation of the Extension Confidentiality Agreement then in effect between itself and Remy. Id. at 137.

Sometime between February 2007 and March 2007, employees, executives, or other individuals affiliated with Remy, Eagle, and Odawara are accused of having surreptitiously entered the Remy facility in Mexico to photograph and otherwise obtain Tecnomatic's proprietary and confidential information, in clear violation of both the Agreement and the Extension Confidentiality Agreement. When these acts occurred, Tecnomatic asserts that the individuals whom Remy had allowed to access Tecnomatic's proprietary information knew that their accessing such information to copy Tecnomatic's equipment was improper. Id. at 145-147.

In a letter dated March 26, 2007, Tecnomatic's counsel, Roger Blakely, sent a letter to Remy executives, David Muir, Richard Van Sickle, and Joani Kirby, stating in relevant part:

> Tecnomatic has provided Remy, Inc. with copies of drawings, manuals and other documents containing Tecnomatic proprietary information relating to production equipment for the production of electric motors for vehicles. This proprietary information is properly marked as proprietary, and was provided to Remy, Inc. for Remy, Inc.'s use solely for the operation and maintenance of equipment purchased from Tecnomatic. Any other use of this information is a misappropriation of Tecnomatic's

trade secrets.

It has come to our client's attention that between February 22 and March 2 of this year, during the Tecnomatic system commissioning and start up, the system was being photographed by persons not known to our client's employees. We ask that you advise us of the identity and affiliation of the persons who were permitted to photograph the Tecnomatic system and the purpose of those photographs.

In addition, please note that the equipment and its use are the subject of numerous pending applications for U.S. patents. Included are applications for process patents. When issued, an importation of motors or vehicles with motors manufactured on similar equipment provided by anyone other than Tecnomatic will constitute infringement of these patents. In that regard, please note subsection (g) of section 271 "Infringement of patent" of Title 35 of the U.S. Code which provides as follows:

> (g) Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.

Tecnomatic expects Remy to respect Tecnomatic's rights under U.S. Patent laws and trade secret laws just as Remy would expect someone else to respect Remy's rights. Accordingly Tecnomatic expects Remy to not provide drawing or other documentation or allow pictures to be taken of its equipment that would disclose Tecnomatic trade secrets. Tecnomatic further expects Remy to not import motors or vehicles containing motors into the U.S. manufactured with processes that infringe Tecnomatic's U.S. Patents when they issue.

Compl. Ex. E. Tecnomatic alleges that all the recipients of this letter attended the January

2007 "covert meeting" and thus were aware of Remy's strategy to improperly copy

Tecnomatic's technology.

On May 9, 2007, Remy's counsel, JJ Shives, responded to Tecnomatic's March

26, 2007 letter, as follows:

> Thank you for your recent letter regarding equipment purchased by Remy Inc. from Tecnomatic Group SpA of Teramo, Italy.

> Remy has no intention of violating Tecnomatic's intellectual property rights. However, if you truly believe that a potential infringement is occurring, please provide a list detailing: (1) all pending and issued patents related to the equipment; and (2) descriptions of specific aspects of equipment covered by Tecnomatic intellectual property.

> Remy currently takes photographs of its equipment for multiple purposes, including within limitation staffing efficiencies, takt time studies, plant layout planning, and materials flow improvements. However, I have been assured by the Remy employees responsible for this project that Remy has no intention of replicating the Tecnomatic equipment or infringing upon any Tecnomatic intellectual property.

> Additionally, it has come to my attention that during their recent visits to Remy's facility in San Luis Potosi, representatives from Tecnomatic were seen examining and takes notes on confidential and proprietary Remy production assembly equipment not related to the Tecnomatic equipment nor within their scope of authority for entering Remy's facility. Remy would also expect Tecnomatic to respect Remy's rights under United States trade secret laws in the same manner Tecnomatic has request (sic) Remy to respect its rights.

Compl. Ex. F. Since the commencement of this litigation, at least one former Remy employee has admitted that Shives's statement regarding Remy's lack of intention to replicate Tecnomatic's equipment was false. Compl. ¶ 153.

Following the March 2007 incident referenced in the Blakely letter to Remy executives, Tecnomatic alleges that Remy continued to "systematically transfer" Tecnomatic drawings and other confidential information to Eagle and Odawara thereby enabling these entities "to shorten development, research and development, engineering

and manufacturing time and to sell stator equipment to Remy that is a copy of and/or the result of the benefits of improper accessing and using of Tecnomatic confidential information." Id. at 161-62.

Remy terminated its relationship with Tecnomatic on May 12, 2008. Id. at 172. Thereafter, Remy attempted to have Tecnomatic refund the money Remy had paid to Tecnomatic over the term of the "Capital Lease," which we assume refers to the lease of the Tecnomatic equipment to the Remy facility in Mexico. Remy also revoked certain purchase orders in September 2008. Since the termination of its relationship with Tecnomatic, Remy has held itself out to potential business partners, the United States Patent office, and to the public as the inventor of its stator technology, which, in actuality, says Tecnomatic, belongs to it. Id. at 174-85. Tecnomatic alleges that it as well as the public have been harmed by these misrepresentations regarding the ownership and origination of its technology. Id. at 185-86.

Tecnomatic also alleges that Remy used the information related to Tecnomatic's inventions in preparing patent applications in an attempt to claim ownership of the intellectual property. These applications, prepared between 2006 and 2009, included no references to Tecnomatic or its employees as the inventors of the technology. Id. at 168. Remy allegedly knew as it prepared the patent applications that Tecnomatic was the true owner of the intellectual property. More specifically, the Complaint alleges that in or around April 2008, Remy filed a patent application on Tecnomatic inventions that named Kevin Young and Mark Stephenson as inventors.

In sum, Tecnomatic alleges that "after obtaining the technology, inventions and know-how of Tecnomatic, and filing patent applications on such technology, and while blocking Tecnomatic from developing technology with the Remy Defendants' competitors, the Remy Defendants began to execute their original confidential strategy to control the hybrid car industry through improper means." Id. at 171.

Tecnomatic originally filed this lawsuit in the Northern District of Illinois.[6] Remy's requested transfer of the Illinois case to this district was granted, the judge noting that our district "is clearly the more convenient venue for the parties and witnesses, and because transfer to [this district] will promote judicial efficiency and the interest of justice." Venue here was also deemed proper as to all defendants, given that the "convenience" factors of 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a) weighed in favor of this district.[7] The case arrived on our docket on July 26, 2011. Docket No. 72. We

_____

[6]Remy filed its own lawsuit in this district against Tecnomatic alleging claims for breach or avoidance of contract and breaches of express and implied warranties on September 12, 2008. Case No. 1:08-01227-SEB-MJD. The Indiana cause of action was consolidated with the Illinois case when it was transferred to our district in September 2011. See Docket No. 129.

[7]Section 1406(a) provides for transfers to cure want of venue: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Wade v. Farmers Ins. Group, No. 95-2957, 1996 U.S. App. LEXIS 23393, at *7 n. 2 (7th Cir. Aug. 29, 1996)(quoting § 1406(a)). The requirements of a transfer pursuant to 28 U.S.C. 1404 are less stringent and allow a court to transfer a case where the moving party can establish that (1) venue is proper in the transferor district; (2) venue is proper in the transferee district; and (3) the transferee district is more convenient for both the parties and witnesses; and (4) transfer would serve the interest of justice. Gueorguiev v. Max Rave, LLC, 526 F. Supp. 2d 853, 856 (N.D. Ill. 2007).

(continued...)

have ruled that Indiana (as opposed to Illinois) law governs Tecnomatic's state law claims.  Docket No. 230 at 13.

## Discussion

Remy has filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand the requirements of Federal Rules of Civil Procedure 8 and 12(b)(6).  Id.  "[A]t some point, the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."[8]  Killingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 619 (7th Cir. 2007) (quoting Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007)) (internal quotations omitted)).

---

[7](...continued)

[8]Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a). Under Seventh Circuit law, the statement must be sufficient "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Hillingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 618 (7th Cir. 2007) (internal citations omitted).

A party moving to dismiss nonetheless bears a weighty burden. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563 (citing Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) ("[At the pleading stage] the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.")). In addressing a Rule 12(b)(6) motion, we treat all well-pleaded factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in the light most favorable to the non-movant. Lee v. City of Chicago, 330 F.3d 456, 459 (7th Cir. 2003); Szumny v. Am. Gen. Fin., 246 F.3d 1065, 1067 (7th Cir. 2001).

I.      **Counts I and II: Breaches of the 2003 Mutual Confidentiality Agreement and the 2004 Extension to the Confidentiality Agreement**

Tecnomatic's Complaint alleges that Remy breached its obligations to Tecnomatic pursuant to both the 2003 Mutual Confidentiality Agreement and the 2004 Extension Agreement (the "Confidentiality Agreements"). Remy maintains that Tecnomatic's Complaint is too vague to put it fairly on notice of the claims against it because Tecnomatic fails to "identify the particular aspect of Remy's technology that Tecnomatic lays claim to" or how Remy acquired this technology. Furthermore, Remy argues that Tecnomatic's breach of contract claims relying on allegations regarding Remy's misuse of equipment bought or leased from Tecnomatic should fail because the terms of the Confidentiality Agreements do not cover equipment bought or leased by separate

contract. Tecnomatic rejoins that its Complaint sufficiently identifies the technology used by Remy in violation of the Agreements and points out that the following specific actions (as alleged in the Complaint) constitute the alleged contractual breaches:

- Remy's incorporation of Tecnomatic's drawings into its own drawings for use in its business (Compl. ¶¶ 105);

- obtaining copies of Tecnomatic's drawings for improper business use (Compl. ¶¶ 119-28);

- disclosing confidential information regarding Tecnomatic's stator technology to Defendants Eagle and Odawara (Compl. ¶¶ 136-38, 145-47, 155-56, 161-62);

- failing to destroy Tecnomatic's confidential information following termination of the Extension Agreement (Compl. ¶¶ 169-70);

- the use of Tecnomatic's confidential information in ways unnecessary to evaluate and effect the proposed joint venture (Compl. ¶¶ 174-84, 190);

- filing patent applications based on Tecnomatic's confidential information (Compl. ¶¶ 166, 190); and

- using Tecnomatic's confidential information to secure a $60,000,000 grant from the Department of Energy (Compl. ¶¶ 8, 183, 189).

We agree with Tecnomatic that its Complaint gives Remy sufficient notice of the breach of contract claims against it. As laid out above, the term "Confidential Information," as it is used in both agreements, is defined very broadly and the

Confidentiality Agreements narrowly specify the acceptable uses of such information. Compl. Ex. C. Furthermore, the Agreements specify that in the event "the parties decide not to proceed with the Proposed Transaction, then each receiving party shall promptly return to the information-providing party or destroy all Confidential Information and Notes without retaining any copies thereof." Id. The actions by Remy as Tecnomatic has alleged, if true, could well constitute breaches of the terms of the agreements.

We find no merit to Remy's argument that Tecnomatic's Complaint insufficiently defines the information it claims Remy used improperly in violation of the Confidentiality Agreement. Remy urges that, to satisfy the standards of Twombly, Tecnomatic is required to allege what the protected information was, how Remy got that information, and how it was misused. Remy Reply at 5. Our review of the Complaint causes us to conclude that is precisely what Tecnomatic's Complaint does in terms of alleging that Remy obtained information related to Tecnomatic's stators and their manufacture under the guise of working toward a possible joint venture with the company and used it, instead, in the ways laid out above. Although much of the Complaint refers generally to Tecnomatic's "confidential information", it also contains more specific allegations regarding the subject matter of that confidential information and/or the medium by which Remy allegedly acquired it. See e.g., Compl. ¶ 8 (alleging Remy's use of a photograph of a stator developed on Tecnomatic's "winding process"); ¶¶ 106-07 (alleging Remy's need to access Tecnomatic's proprietary information "regarding complex stators, stator winding technology, and or manufacturing technology to produce the same"); ¶¶119-128

(alleging the receipt of technical drawings with the intent to copy Tecnomatic equipment); ¶¶ 138 (alleging the photography of Tecnomatic's leased equipment); ¶ 159-61(alleging the transfer of Tecnomatic drawings to third parties that enabled Remy to purchase stator equipment making use of Tecnomatic's confidential information); ¶ 180 (alleging that "high voltage hairpin stator windings" technology was taken from Tecnomatic). Remy cites no authority for the proposition that Tecnomatic's Complaint should fail because it does not identify "the particular aspect of Remy's technology" or the "specific method, technique, capability, process or other sort of information" that Tecnomatic claims Remy misused. As Remy concedes, Tecnomatic has identified the subject-matter of the allegedly misused information, i.e. stators and their manufacture; nothing more is required in order to put Remy on notice of the claims against it. See e.g., Tamayo v. Blagojevich, 526 F.3d 1074, 1084-85 (7th Cir. 2008).

Finally, we disagree with Remy's contention that its actions related to the leased equipment may not be in violation of the Confidentiality Agreements because a separate contract provided the terms of that lease. Tecnomatic has not alleged a breach of the lease agreement. Thus, the fact that it did not attach a copy of that lease agreement to the Complaint is irrelevant. Furthermore, if the equipment was leased to Remy in the manner Tecnomatic alleges, it is plausible that Remy's attempts to copy the design of that equipment or to allow co-Defendants Eagle and Odawara to copy it ran afoul of the

confidentiality agreements between the parties.[9]

## II.     Count III: Negligent Misrepresentation

Count III of Tecnomatic's Complaint is a claim for negligent misrepresentation against Remy. Specifically, Tecnomatic maintains that Remy affirmatively misrepresented its plans for a joint venture with Tecnomatic, its reasons for photographing Tecnomatic's equipment, and its plans to use Tecnomatic's intellectual property in its own business. Tecnomatic Resp. at 29. Remy argues that Tecnomatic's negligent misrepresentation claim fails given that the tort has only limited application in Indiana. The elements of the tort of negligent misrepresentation are found in Restatement (Second) of Torts § 552(1) (1977), which states in relevant part:

> (1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or

---

[9]Remy also argues that Tecnomatic's allegations regarding "information about Tecnomatic's information" cannot support a breach of contract claim. For example, Tecnomatic alleges that Remy "gained access to information indicating Tecnomatic had valuable technological know-how on complex stators and manufacture of same" as well as "engineering expertise that Remy did not have." As Remy points out, according to the Complaint itself, knowledge of Tecnomatic's technological know-how and expertise was recognized worldwide. Compl. ¶¶ 10, 29. Thus, Remy argues that this type of information does not qualify as "Confidential Information" as that term is defined by the Confidentiality Agreement. Tecnomatic does not address this argument – likely because the purpose of these allegations appears to be to establish Remy's purpose for feigning interest in a joint venture, as opposed to supporting a breach of contract theory. However, we do agree with Remy that such allegations cannot support a breach of contract claim. Thus, Tecnomatic's claims fail to the extent Tecnomatic bases its breach of the confidentiality agreement claims on Remy's misuse of information regarding Tecnomatic's reputation as a leader in the areas of stators and engineering expertise.

competence in obtaining or communicating the information.

In <u>U.S. Bank, N.A. v. Integrity Land Title Corp.</u>, the Indiana Supreme Court discussed the tort of negligent misstatement and held that such a claim may be possible in the context of professionals giving opinions: "A professional may owe a duty to a third party with whom the professional has no contractual relationship, but the professional must have actual knowledge that such third person will rely on his professional opinion." 929 N.E.2d 742, 747 (Ind. 2010)(citing <u>Thomas v. Lewis Eng'g, Inc.</u>, 848 N.E.2d 758, 760 (Ind. Ct. App. 2006)). The Court continued, ruling that the title company owed a duty to the lender in certifying clear title to the real property at issue because it knew that the lender would rely on the information provided. Despite Tecnomatic's urging, we cannot agree that the <u>U.S. Bank</u> holding extends this cause of action to allegations such as those before us. First, Remy and Tecnomatic had entered into contracts, which established the relative expectations of the parties. Thus, any harm incurred by Tecnomatic can be remedied by money damages available based on the contractual terms. <u>U.S. Bank, N.A.</u>, 929 N.E.2d at 745 (noting that if there had been a contract between the parties, "the parties in all likelihood would be relegated to their contractual remedies"); <u>Rollander Enters. v. H.C. Nutting Co.</u>, 2011 Ind. App. Unpub. LEXIS 926, at *26-27 (Ind. Ct. App. July 8, 2011). Second, unlike the relationship between the title company and the lender in <u>U.S. Bank</u>, there is no allegation here that Remy played an advisory role vis-a-vis Tecnomatic or that Remy received compensation based on the alleged misrepresentations, or rendered any "professional opinions." Rather, as discussed below with regard to

Tecnomatic's constructive fraud and breach of fiduciary duty claims, these two companies operated on relatively equal footing in contemplating their possible joint venture. Tecnomatic cites no authority, nor has our own research disclosed any, to support the position that a negligent misrepresentation claim arises under the facts alleged in Tecnomatic's Complaint. Thus, this claim must be dismissed with prejudice.

### III. Count IV: Actual Fraud

The majority of the allegations marshalled by Tecnomatic in support of its fraud claim are based upon Remy's alleged misrepresentation that Remy intended to pursue a joint venture with Tecnomatic. Tecnomatic alleges that, in truth, Remy feigned an interest in such a joint venture in order to induce Tecnomatic to share its confidential information with Remy – to which Tecnomatic ultimately agreed but only consistent with the terms of the Confidentiality Agreements. Tecnomatic further alleges that, in the March 26, 2007 response letter, Remy falsely represented to Tecnomatic that the photographs taken of Tecnomatic's equipment had been taken only for "staffing efficiencies, takt time studies, plant layout planning, and materials flow improvements," when, in actuality, the photographs were taken in order to facilitate the copying of Tecnomatic's equipment, in violation of the Confidentiality Agreements. Compl. ¶¶ 138-58; Compl. Ex. F. We address below whether these allegations are actionable.

The elements of a claim for actual fraud under Indiana law are: "(1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to

deceive, (5) was rightfully relied upon by the complaining party, and (6) which

proximately caused the injury or damage complained of." Mudd v. Ford Motor Co., 2006

U.S. App. LEXIS 9368, at *5 (7th Cir. Mar. 28, 2006)(quoting Doe v. Howe Military Sch.,

227 F.3d 981, 990 (7th Cir. 2000)). Remy argues that Tecnomatic's Complaint fails to

state a claim for actual fraud because the only allegedly fraudulent statements made by

Remy were expressions of intent regarding future conduct, which are not actionable under

Indiana law.[10] The Seventh Circuit has explained:

> An assertion of "past or existing fact" is a statement in which the content "is
> susceptible of 'exact knowledge' at the time the statement is made." But
> opinions, promises of future conduct, and statements of intent do not rise to
> the level of assertions of fact under Indiana law. In some jurisdictions, a
> statement of a present intention or state of mind will support a claim of
> actual fraud. But Indiana has explicitly rejected that rule.

Id. at *5-6 (citations omitted).

The Supreme Court of Indiana discussed this rule in Sachs v. Blewett, 206 Ind.

151 (Ind. 1993). In Sachs, the defendants were the winning bidders on property sold at an

auction by the claimant. When defendants failed to make payments for the property, the

claimant brought a fraud claim alleging that defendants had never intended to comply

with the agreement to purchase the property. The breach of the oral agreement was

unenforceable due to the constraints of the statute of frauds.

---

[10]Remy also argues that Tecnomatic's fraud claim fails because it is not stated with
sufficient particularity and because Tecnomatic has failed to allege detrimental reliance.
Because we agree with Remy that Tecnomatic has failed to allege a misrepresentation of past or
existing fact, we do not consider any alternative grounds requiring the claim's dismissal.

As Tecnomatic argues here, the claimant in Sachs contended that "a state of mind is a fact, and that a misrepresentation as to an intention to carry out a contract is a misrepresentation of a fact upon which an action for fraud may be predicated." Id. at 156. But the Court rejected this argument, explaining:

> It was the failure of the appellants to carry out their contract to purchase the real estate which caused the damage. The damage would have resulted whether the appellants' failure was due to an honest inability to comply or a mischievous preconceived design not to do so. But the law did not require the appellants to carry out their agreement, and fraud cannot be predicated upon a failure to do that which there is no legal obligation to do.

> An intention not to do that which the law does not require to be done, is not illegal, and such a negative intention cannot be the basis of an action for fraud unless there is also involved the breach of some other duty. It is not alleged that the appellants owed any duty to the appellee except such as was predicated upon their unenforcible oral contract.

> A person is presumed to intend what is ordinarily and reasonably implied by his agreement. If the appellants' contract to buy had been in writing, they would be responsible in damages for its breach, regardless of their good or bad intention at the time it was made. But the action would arise out of the contract and not in tort. Since the contract was not in writing, the breach of it cannot be made the basis of an action, and the fact that at the time it was made they did not intend to carry it out, makes their liability for the breach no greater than if they had intended to comply with it.

Id. at 158.

Clearly, Tecnomatic's allegations that Remy misrepresented its intention to consider a joint venture with Tecnomatic are not misrepresentations of past or existing facts under the holding in Sachs. It was the alleged breach of the Confidentiality Agreement that caused the damage to Tecnomatic. As in Sachs, such damage would have resulted whether or not Remy had genuinely intended to consider a joint venture or had

intended to comply with the terms of the Confidentiality Agreement. Thus, to the extent that Tecnomatic's fraud claim is based upon the alleged misrepresentation of Remy's intentions with regard to a joint venture, it must be dismissed.

As mentioned above, Tecnomatic also alleges that Remy (specifically, Remy's General Counsel, J.J. Shives) misrepresented the purpose for which the photographs of Tecnomatic's equipment were taken. The letter from Remy to Technomatic stated, "Remy currently takes photographs of its equipment for multiple purposes, including without limitation staffing efficiencies, takt time studies, plant layout planning, and materials flow improvements. However, I have been assured by the Remy employees responsible for this project that Remy has no intention of replicating the Tecnomatic equipment or infringing upon any Tecnomatic intellectual property." Compl. Ex. F. We agree with Remy's assessment that the first sentence regarding the purposes for which Remy might take photographs of equipment is not, as Tecnomatic urges, a misrepresentation of the purposes for which the photographs of the Tecnomatic equipment were taken. Indeed, this statement says nothing about the purposes for which Remy took the photographs of the equipment at issue. The second sentence in Exhibit F is also non-actionable. First, as discussed above, a misrepresentation regarding Remy's intentions is not actionable, pursuant to Sachs. Second, while Shives's representation of having been assured of Remy's intentions by certain Remy employees could theoretically be considered a representation of past or existing fact, the truth or falsity of this aspect of the statement is clearly inconsequential.

## IV. Counts V and VII: Constructive Fraud and Breach of Fiduciary Duty

Under Indiana law, claims for constructive fraud and for breach of fiduciary duty require allegations of a fiduciary relationship or one of trust and confidence between the parties.[11] "A fiduciary relationship does not exist unless there is a relationship of trust and confidence between the parties. A confidential relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." No Baloney Mktg., LLC v. Ryan, 2010 U.S. Dist. LEXIS 30296, at *50-51 (S.D. Ind. 2010)(Barker J.) (citing Paulson v. Centier Bank, 704 N.E.2d 482, 490 (Ind. Ct. App. 1998)). "Examples of common relationships where Indiana courts have recognized the potential for a fiduciary duty include 'relations of attorney and client, principal and agent, husband and wife, and parent and child.'" Zusy v. Int'l Med. Group, Inc., 500 F. Supp. 2d 1087, 1099 (S.D. Ind. 2007) (Hamilton J.) (quoting Sanders v. Townsend, 582 N.E.2d 355, 358 (Ind. 1991)).

Remy argues that Tecnomatic's claims for constructive fraud and breach of fiduciary duty fail because there is no special relationship between the parties that would

---

[11]The elements of a constructive fraud claim are: "(i) a duty owing by the party accused of the misconduct to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or by remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party accused of the misconduct at the expense of the complaining party." In re Scahill, 767 N.E.2d 976, 979 (Ind. 2002). The elements of a breach of fiduciary duty claim are "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." Metals & Additives Corp. v. Hornedo, 2011 Ind. App. Unpub. LEXIS 1001, at *16 (Ind. Ct. App. July 28, 2011) (citing Farmers Elevator Co. of Oakville v. Hamilton, 926 N.E.2d 68 (Ind. Ct. App. 2010)).

support a claim that Remy owed a fiduciary duty to Tecnomatic.  Tecnomatic maintains that a fiduciary relationship between the parties did exist based upon the confidentiality agreements between them and their work together over the course of several years.[12]  For the reasons detailed below, we are not persuaded by Tecnomatic's arguments that such allegations amount to a fiduciary relationship.

Tecnomatic's Complaint contains no allegations of any confidential relationship between the parties.  Rather, the allegations reflect a contractual relationship between them and that they are two similarly situated companies, both of whom stood to gain in terms of some commercial benefit by entering into their agreement with each other.  The fact that Remy and Tecnomatic shared confidential information with each other in the course of operating pursuant to those contracts or that the relationship spanned a period of several years does not transform what is clearly their arms-length relationship into a fiduciary one.  Comentis, Inc. v. Purdue Research Found., 765 F. Supp. 2d 1092, 1111 (N.D. Ind. 2011); Allison v. Union Hosp., Inc., 883 N.E.2d 113, 123 n.6 (Ind. Ct. App. 2008) (confidentiality provisions in a contract between the parties do not render the entire relationship confidential).  Finally, we find unavailing Tecnomatic's argument regarding

---

[12]Tecnomatic also argues that it would be premature at this stage in the litigation for the Court to determine whether a fiduciary relationship existed between the parties because such an inquiry is necessarily fact-specific.  We agree with Tecnomatic that, in some cases, such an inquiry may be premature at this early stage in the litigation.  However, where, as here, even the claimant's allegations do not plausibly support the existence of a fiduciary relationship, dismissal of a claim based on that relationship is appropriate.  See e.g., Razdan v. General Motors Corp., 2000 U.S. App. LEXIS 21446, at *11-12 (7th Cir. Aug. 18, 2000)(affirming the district court's Fed. R. Civ. Pro. 12(b)(6) dismissal of a breach of fiduciary duty claim for failure to sufficiently plead the existence of a fiduciary relationship).

Remy's "position of superiority due to its unique knowledge about the true circumstances underlying its transactions with Tecnomatic." Although a fiduciary relationship may conceivably arise out of a course of dealing in which the party with knowledge provides information on which the other party relies, see A.I. Credit Corp. v. Legion Ins. Co., 265 F.3d 630, 635-36 (7th Cir. 2001), the only knowledge Tecnomatic imputes to Remy is its disingenuous intentions to consider a joint venture. These statements regarding Remy's state of mind concerning future actions are not actionable under Indiana law. Mudd v. Ford Motor Co., 178 Fed. Appx. 545, 548 (7th Cir. 2006).

Having failed to allege a fiduciary relationship between itself and Remy, Technomatic's claims for constructive fraud and breach of fiduciary duty must also be dismissed.

### V.    Count VI: Trade Secret Misappropriation

Count VI of Tecnomatic's Complaint alleges that Remy's actions constituted trade secret misappropriation. Given our previous decision that Indiana law applies to all of Tecnomatic's state law claims, we consider the sufficiency of these allegations under the Indiana Uniform Trade Secret Act ("IUTSA"), Ind. Code § 24-2-3, *et. seq.*[13] Remy makes the following arguments in support of its contention that Tecnomatic has failed to

---

[13]In our previous decision granting in part and denying in part motions to dismiss filed by Defendants Eagle and Odawara, we ruled that Tecnomatic had failed to state a claim for trade secret misappropriation because the claim was untimely pursuant to IND. CODE § 24-2-3-7, which requires a claim to be filed within three years of its accrual. Docket No. 230 at 17. Remy does not raise the statute of limitations as a defense against Tecnomatic's claim against it and, thus, we do not consider at this time whether it might bar the claim against Remy.

state a claim for trade secret misappropriation: (1) Tecnomatic has not provided Remy with fair notice of what trade secrets Tecnomatic claims Remy misappropriated; (2) Tecnomatic has failed to allege the misappropriation of a "trade secret" as that term is defined under the IUTSA; (3) Tecnomatic has failed to allege "misappropriation" because the Complaint does not specify the particulars of when or how Remy acquired the alleged trade secrets. Remy makes these arguments both in relation to what Remy refers to as the general "unspecified" confidential information that it allegedly misappropriated as well as to trade secrets embodied in the specific equipment that Remy leased[14] from Tecnomatic. For the reasons detailed below, we disagree with Remy's arguments and, thus, deny its motion as it relates to Tecnomatic's trade secret misappropriation claim.

As with Tecnomatic's breach of contract claims, Remy once again argues that Tecnomatic has failed to specifically identify the allegedly misappropriated trade secret information such that the Complaint fails to provide Remy with sufficient notice of the claim against it. However, "[c]ourts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation." Romary Assocs., Inc. v. Kibbi LLC, Case No. 1:10-cv-376, 2011 U.S. Dist. LEXIS 75194, at *13 (N.D. Ind. June 17, 2011) (quoting Dick Corp. v. SNC-Lavalin Constructors, Inc., No. 04 C 1043, 2004 U.S. Dist. LEXIS 26767, 2004 WL 2967556, at *9 (N.D. Ill. Nov. 24, 2004)). "The

---

[14]There appears to be some disagreement over whether the equipment was sold or leased to Remy. However, at this stage of the litigation, we will assume the truth of the allegations in the Complaint, which indicate that the equipment was leased. Compl. ¶ 112.

query is whether the allegations provide the defendants with notice as to the substance of the claims." Id. As stated above with regard to Tecnomatic's breach of contract claims, Tecnomatic's Complaint alleges that Remy obtained information related to Tecnomatic's stators and their manufacture under the guise of working toward a possible joint venture. Furthermore, although much of the Complaint refers to Tecnomatic's "confidential information" generally, it also contains more specific allegations revealing the subject matter of the confidential information and/or the medium by which that information came to Remy. See e.g., Compl. ¶ 8 (alleging Remy's use of a photograph of a stator developed on Tecnomatic's "winding process"); ¶¶ 106-07 (alleging Remy's need to access Tecnomatic's proprietary information "regarding complex stators, stator winding technology, and or manufacturing technology to produce the same"); ¶¶119-128 (alleging the receipt of technical drawings with the intent to copy Tecnomatic equipment); ¶¶ 138 (alleging the photography of Tecnomatic's leased equipment); ¶ 159-61(alleging the transfer of Tecnomatic drawings to third parties that enabled Remy to purchase stator equipment making use of Tecnomatic's confidential information); ¶ 180 (alleging that "high voltage hairpin stator windings" technology was taken from Tecnomatic). At this stage in the litigation, these allegations are sufficient to put Remy on notice of Tecnomatic's trade secret misappropriation claim.

Remy also argues that Tecnomatic has failed to allege that its trade secret information was "misappropriated" pursuant to the IUTSA because the Complaint does not provide "particulars of when or how Remy acquired the "Technology." Def.'s Mem.

at 10.  The IUTSA defines "misappropriation" as follows:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>> (A) Used improper means to acquire knowledge of the trade secret;
>> (B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

IND. CODE § 24-2-3-2.  Tecnomatic alleges that Remy acquired knowledge of its trade secret information by misrepresenting that it was considering a joint venture with the company and that, despite the assurances Remy gave to Tecnomatic in the confidentiality agreements, Remy took the following actions in violation of those agreements:

- incorporating Tecnomatic's drawings into Remy's own drawings for use in its business (Compl. ¶¶ 105-07);

- obtaining copies of Tecnomatic's drawings for improper business use (Compl. ¶¶ 119-28);

- disclosing confidential information regarding Tecnomatic's stator technology to Defendants Eagle and Odawara (Compl. ¶¶ 136-38, 145-47, 155-56, 161-62);

- failing to destroy Tecnomatic's confidential information following termination of the Extension Agreement (Compl. ¶¶ 169-70);

- using Tecnomatic's confidential information in ways unnecessary to evaluate and effect the proposed joint venture (Compl. ¶¶ 174-84, 190);

- filing patent applications based on Tecnomatic's confidential information (Compl. ¶¶ 166, 190); and

- using Tecnomatic's confidential information to secure a $60,000,000 grant from the Department of Energy (Compl. ¶¶ 8, 183, 189).

In light of this specificity, we cannot agree with Remy's argument that Tecnomatic has failed to sufficiently allege that Remy used improper means to acquire and/or use a trade secret belonging to Tecnomatic.

Remy also contends that Tecnomatic has failed to state a claim for trade secret misappropriation because it has failed to allege that a "trade secret," as that term is defined by the IUTSA, was misappropriated.[15] "What constitutes trade secret information is a determination for the court to make as a matter of law." M.K. Plastics Corp. v. Rossi, 838 N.E.2d 1068, 1075 (Ind. Ct. App. 2005). Tecnomatic alleges that its propriety

---

[15] IND. CODE § 24-2-3-2 defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Remy maintains that Tecnomatic has failed to allege that the misappropriated information has economic value, is not readily ascertainable by proper means, or is protected by reasonable efforts to maintain its secrecy.

technology is a "valuable company asset and provides [it] with a business advantage" over its competitors. Compl. ¶¶ 32, 41. Again, at this stage in the litigation, we find that these allegations sufficiently establish that Tecnomatic's trade secret information derives value from not being generally known or readily ascertainable. Furthermore, Tecnomatic asserts that it refused to provide Remy with access to "its know-how and information . . . without contractual assurances from Remy related to the confidentiality and protection of Tecnomatic's proprietary information." Compl. ¶ 44. These claims suffice to allege that Tecnomatic made reasonable efforts to maintain the secrecy of its trade secret information. Comentis, Inc. v. Purdue Research Found., 765 F. Supp. 2d 1092, 1100 (N.D. Ind. 2011) (citing Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp., 759 N.E.2d 239, 246 (Ind. App. 2001)).

Finally, Remy argues that Tecnomatic has failed to allege that stator manufacturing equipment and operating materials that were leased was a protected trade secret or that Remy misappropriated it. Def.'s Mem. at 10-12. We see no distinction between the trade secrets gleaned from the leased equipment and the other trade secret information discussed above. Furthermore, as discussed above, the fact that this equipment may have been subject to a lease agreement does not indicate or establish that the confidentiality agreements between the parties did not also apply to it. This Count stands as pled.

### VI. Count VIII: Federal Unfair Competition

Count VIII of Tecnomatic's Complaint alleges that Remy's actions constituted a

violation of "Federal Unfair Competition law." Compl. ¶ 250. As Remy notes, however, courts have never recognized a federal common law claim for general unfair competition. International Order of Job's Daughters v. Lindeberg and Co., 633 F.2d 912, 915 (9th Cir. 1980), *cert. denied*, 452 U.S. 941, 101 S. Ct. 3086, 69 L. Ed. 2d 956 (1981) ("the "parties have apparently assumed the existence of a general common law governing all trademark infringement cases brought in federal court. This assumption is incorrect. Save as an outgrowth of federal statutory or constitutional law, there is no federal common law.") Tecnomatic does not dispute Remy's argument and, thus, has waived any opposition to the claim's dismissal.

## VII.   Count IX and X: State Law or Common Law Unfair Competition

Counts IX and X of Tecnomatic's Complaint allege that Remy's actions constitute a violation of Illinois' unfair competition law and Illinois common law. Compl. ¶¶ 257, 264. It is unclear either from the Complaint or Tecnomatic's response brief how, if at all, these are separate claims. Furthermore, as discussed in our previous order granting in part and denying in part the motions to dismiss filed by Defendants Odawara and Eagle, Indiana (as opposed to Illinois) law governs Tecnomatic's state law claims. Docket No. 230 at 13.

"Indiana courts have created a cause of action for unfair competition, defined as 'the attempt to create confusion concerning the source of the unfair competitor's goods.'" Felsher v. Univ. of Evansville, 755 N.E.2d 589, 598 (Ind. 2001) (quoting Westward Coach Mfg. Co. v. Ford Motor Co., 388 F.2d 627, 633 (7th Cir. 1968)). It has been

considered "'a subspecies of the class of torts known as tortious interference with business or contractual relations'"[16] and has been construed broadly to include "any conduct, the natural and probable tendency and effect of which is to deceive the public so as to pass off the goods or business of one person as and for that of another . . . ." Felsher, 755 N.E.2d at 598 (quoting William L. Prosser, Prosser, Law of Torts, 956 (4th ed. 1971) and Hartzler v. Goshen Churn & Ladder Co., 55 Ind. App. 455, 464, 104 N.E. 34, 37 (1914)). Unfair competition evokes questions of fact, namely, "whether or not . . . the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business." Felsher, 755 N.E.2d at 598 (citation and quotations omitted).

Here, Tecnomatic alleges that Remy has engaged in a pattern of deception by holding itself out as the inventor, developer, and owner of technology that it improperly acquired from Tecnomatic. Compl. ¶¶ 174-84. However, this sort of deception is not the type that Indiana courts recognize as constituting unfair competition. Indiana courts recognize such a cause of action where a defendant is confusing customers as to the origin of the goods sold by it – in other words, where defendant is passing off its goods as

---

[16]The elements of tortious interference with business relations are: (1) the existence of a business relationship; (2) defendant's knowledge of that relationship, (3) intentional interference with the relationship through unlawful acts; (4) absence of justification; (5) and damages. Meridian Fin. Advisors, Ltd. v. Pence, 763 F. Supp. 2d 1046, 1063 (S.D. Ind. 2011). The elements of tortious interference with contract are: (1) a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement to break the contract; and (4) lack of justification. Id.

that of the claimant. Hartzler v. Goshen Churn & Ladder Co., 104 N.E. 34, 37 (Ind. Ct. App. 1914); see also Internat'l News Serv. v. Associated Press, 248 U.S. 215, 258 (1918) (Brandeis, J., dissenting) ("In the 'passing off' cases (the typical and most common case of unfair competition), the wrong consists in fraudulently representing by word or act that defendant's goods are those of plaintiff.") However, Tecnomatic has not claimed that Remy attempted to pass off its technology as that of Tecnomatic when, in actuality, it was Remy's own. To the contrary, Tecnomatic alleges that Remy is claiming to have developed the technology itself. Tecnomatic directs us to no Indiana cases expanding the tort of unfair competition to cover such circumstances, nor has our own research disclosed any such cases.[17] Although we acknowledge that the Felsher court spoke to the broad construction of a claim for unfair competition, we decline to expand the scope of this cause of action to cover Tecnomatic's allegations without clear direction from an Indiana court to do so.[18] Accord Pence, 763 F. Supp. 2d at 1064, n. 18; Ind. Grocery Co.,

---

[17]The closest match between Tecnomatic's allegations and a cognizable claim under Indiana law is a claim for "reverse palming off," which occurs when a party "directly misappropriates the services or goods of another by removing the name or trademark on another party's product and selling that product under a name chosen by the wrongdoer." Beacham v. MacMillan, Inc., 837 F. Supp. 970, 977 (S.D. Ind. 1993)(J., Barker) (citations omitted). However, Tecnomatic has not alleged that Remy removed any name or trademark from its product. Rather, Tecnomatic alleges that Remy manufactured the technology it is selling, albeit based on information it wrongfully acquired from Tecnomatic.

[18]Our decision to decline Tecnomatic's invitation to expand the meaning of unfair competition in Indiana is consistent with the Hartzler court's explanation of the rationale supporting the cause of action. That court explained:

Relief against unfair competition is properly afforded upon the ground that one
(continued...)

, 684 F. Supp. 561, 580-81 (S.D. Ind. 1988).

## VIII. Count XI: False/Misleading Representation 43(a)

Count XI of Tecnomatic's Complaint alleges that Remy made false or misleading

representations in violation of § 43(a)(1)(A) and (B) of the Lanham Act, 15 U.S.C. §

1125(a)(1)(A).[19] "There are two bases of liability under the Lanham Act: (1) false

representations concerning the origin, association or endorsement of goods or services

through the wrongful use of another's distinctive mark, name, trade dress or other device

(otherwise known as "false association" or "false endorsement") and (2) false

---

[18](...continued)
who has built up a good will and reputation for his goods or business is entitled to all the benefits therefrom. Such good will is property, and like other property is protected against invasion. The deception of the public injures the proprietor of the business by diverting his customers and depriving him of sales which he otherwise would have made.

Hartzler, 104 N.E. at 37 (quoting 38 Cyc. 760). Such a rationale would not exist for an unfair competition claim pursuant to the construction urged by Tecnomatic.

[19]This section reads as follows: (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

representations in advertising concerning the qualities of goods or services ("false advertising").  L.S. Heath & Son v. AT & T Info. Sys., 9 F.3d 561, 575 (7th Cir. 1993).

Neither Tecnomatic's Complaint nor its response brief makes clear which type of claim Tecnomatic is asserting against Remy.  The Complaint merely states that Remy's actions constitute a violation of § 43(a)(1)(A) and (B) of the Lanham Act, thereafter reciting the language of that statute, which is insufficient pursuant Rule 8, Fed. R. 8(a)(2).  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Remy's response brief identifies a federal grant that Remy allegedly recently obtained from the Department of Energy ("DOE") and "other misleading representations" as the "misleading representation in marketing and promotional items [used by Remy] to unfairly compete in the marketplace."  These "other misrepresentations" were apparently made *to* the DOE in order to obtain the grant as well as misrepresentations of fact about the alleged performance of its motors contained in a Remy advertisement, a copy of which is attached to Tecnomatic's Complaint as Exhibit A.  According to its response brief, Tecnomatic's theory of its injury is that "[t]he same customers, contracts, and the [DOE] Grant that Remy procured while falsely holding itself out as the inventor developer, and innovator of Tecnomatic's stator winding technology would all have gone to Tecnomatic" but for Remy's misrepresentations.  Resp. at 35.  This theory of recovery is sometimes referred to as a "reverse passing off" claim in violation of the Lanham Act.[20]

---

[20]The United States Supreme Court has explained that "passing off" or palming off
(continued...)

First, Remy argues that Tecnomatic's Complaint fails to identify any designation it has used that was likely to suggest Tecnomatic's endorsement of Remy, precluding any claim of false endorsement or association pursuant to § 43(a)(1)(A). Tecnomatic offers no response to this argument.[21]

The Seventh Circuit has stated as follows:

[A] product's physical design can not be deemed inherently distinctive, so that to prevail under § 43(a) the producer must demonstrate "secondary meaning"--in other words, that consumers understand the design elements to signify the goods' origin and not just its attributes. Otherwise, the Court thought, it would be too easy to use the expense and risk of litigation to dissuade rivals from using their right to reverse-engineer and copy products, which they may do down to the last detail unless a feature of the product is protected by patent, copyright, or trademark law.

Trademark law is designed to reduce the costs customers incur in learning who makes the product, and this also helps sellers obtain rewards from producing goods of consistent quality, for consumers will find it easier to find and buy goods with which they have been satisfied in the past. So when trade dress implies the product's origin it is protected as a trademark (unless it also is functional); but when consumers value the feature for its own sake rather than as a badge of origin, it may be copied freely.

Bretford Mfg. v. Smith Sys. Mfg. Corp., 419 F.3d 576, 579 (7th Cir. 2005)(citations omitted). Originators of products have other protections under the law such as patents

---

[20](...continued)
occurs when a producer misrepresents his own goods as those of another. "Reverse passing off" is where the producer misrepresents someone else's goods or services as his own. Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 27 n. 1 (2003).

[21]Tecnomatic asserts in its response brief that Remy uses a federal grant that it obtained from the DOE and images of the American flag in a manner that misleads customer's as to the federal government's endorsement of its products and services. Resp. at 33. However, Tecnomatic has failed to allege any protectable right in the images which would or do indicate the government's endorsement of Remy's products.

and copyrights that justify limiting trademark protection to features that, in and of themselves, signify to consumers the source of the innovation. Id. at 580 (citing Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 214 (2000)).

In this case, there is no allegation that the stator technology allegedly used by Remy signaled Tecnomatic as the source of that technology. In other words, as discussed above with regard to Tecnomatic's unfair competition claim, Tecnomatic does not complain that the technology Remy allegedly passed off as its own was endorsed in some way by Tecnomatic. To the contrary, the gravamen of Tecnomatic's Complaint is that Remy unfairly acquired customers, contracts, and a grant from the United States Department of Energy as a result of its wrongful appropriation of Tecnomatic's technology. If Remy arguably had achieved such acquisitions by use of some descriptive mark belonging to Tecnomatic, a cause of action for reverse passing off might exist. Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986 (7th Cir. 2004)(holding that the claimant could have a trademark infringement claim for "reverse confusion" if the claimant could show confusion by consumers concerning the source of the products sold by the defendant based on the use of a valid trademark held by the claimant). However, the wrongful appropriation alleged by Tecnomatic was not of some descriptive mark but, rather, of the actual features of the product or credit for the creation of the product. While Tecnomatic may have redress for these wrongs pursuant to its other claims, § 43(a)(1)(A) provides no such remedy. See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003)(holding that the Lanham Act does not create a cause of action for the use

of otherwise unprotected works and inventions without attribution); <u>Contractual</u> <u>Obligation Prods., LLC v. AMC Networks, Inc.</u>, 546 F. Supp. 2d 120, 130 n.4 (S.D.N.Y. 2008)("Lanham Act § 43 (a)(1)(A)'s prohibition on false claims of origin cannot be extended to false claims of the creation of inventive or communicative works.").  Thus, it is clear that 'reverse passing off' claims brought under Lanham Act § 43 (a)(1)(A) cannot focus on allegedly false claims of authorship, invention or creation.")(quoting Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 27:77.1 (4th ed. 2007)).

In order to defeat Remy's motion with regard to its § 43(a)(1)(B) false advertising claim, Tecnomatic's Complaint must allege the following:

> (1) the defendant made a false statement of fact about its product or another's product in a commercial advertisement, (2) the statement has a tendency to deceive or actually deceived a substantial segment of its audience, (3) the deception is material, that is, it is likely to influence purchasing decisions, (4) the defendant caused its false statement to enter interstate commerce, and (5) the plaintiff has been or is likely to be injured as a result, either by direct diversion of sales from itself to defendant or by a loss of good will that is associated with its products.

<u>Doctor's Data, Inc. v. Barrett</u>, Case No. 10 C 03795, 2011 U.S. Dist. LEXIS 134921 (N.D. Ill. Nov. 22, 2011)(citing <u>Hot Wax, Inc. v. Turtle Wax, Inc.</u>, 191 F.3d 813, 819 (7th Cir. 1999)).  According to Tecnomatic's response brief, the false statement of fact upon which this claim is based is that Remy's "HVH patented winding technology provides more power and torque density than any other competitor" and "provides customers with better continuous power than any other motor on the market."  Resp. at 34-35 (citing

Compl. Ex. A).[22]  Tecnomatic maintains that discovery will show that these statements are false.  Id.  Furthermore, Tecnomatic specifically alleges that Remy has falsely held itself out to the public as the developer/inventor of "hairpin stator technology," "a new stator winding design that uses rectangular wire . . . with windings that are arranged in multiple layers," and the "Remy HVH hybrid motors."  Compl. ¶¶ 176-77, 180.

Remy contends that Tecnomatic has failed to plead that it is in competition with Remy and, thus, has failed to allege that it "is or is likely to be damaged" as is required for recovery under that section.  L.S. Heath & Son, 9 F.3d at 575 ("In order to have standing to allege a false advertising claim . . . the plaintiff must assert a discernible competitive injury.")  Remy maintains that because Tecnomatic does not offer its products in the United States, it is not one of its competitors and that Tecnomatic's Complaint alleges only vague potential for injury, as opposed to a *likelihood* of injury.

We cannot agree with Remy that Tecnomatic has failed to allege that it was one of Remy's competitors.  Tecnomatic alleges that Remy's motivation for feigning interest in a joint venture with it was to prevent Tecnomatic from using its inventions, technology and trade secrets in competition with Remy.  Compl. ¶¶ 41, 68.  Tecnomatic has also alleged that Remy was concerned that its customers may begin going directly to

---

[22]Tecnomatic also argues that statements Remy made to the DOE in order to procure the grant constitute misleading advertising.  However, it is clear that these statements were not made in a commercial advertisement and, thus, are not actionable pursuant to § 43(a)(1)(B).  Hot Wax, Inc., 191 F.3d at 819. Furthermore, to the extent that Tecnomatic argues that Remy's use of the DOE grant is misleading, we must disagree.  Tecnomatic does not allege that the DOE did not, in fact, give Remy the grant.  Thus, no matter how it was acquired, it is not false for Remy to represent that the acquisition has occurred.

Tecnomatic for its hybrid motor needs, cutting Remy out of the transaction as an unnecessary "middle man," Compl. ¶ 96, the implication of which is, of course, that Remy was concerned that Tecnomatic would compete with it. see also Compl. ¶ 99 (alleging that Remy attempted "to block Tecnomatic from participating in the United States' complex stator, stator windong and manufacturing systems for stators for hybrid motors marketplace"). In the context of this motion to dismiss, these allegations are sufficient to allege competition between Tecnomatic and Remy.

We do agree with Remy, however, that Tecnomatic's Complaint has failed to allege a likelihood of injury as a result of Remy's misleading statements. As Remy points out, Tecnomatic has not alleged any lost sales or goodwill and the paragraphs that Tecnomatic cites in support of its argument (in its response brief) that "the same customers, contracts, and the Grant that Remy procured while falsely holding itself out as the inventor, developer, and innovator of Tecnomatic's stator winding technology would all have gone to Tecnomatic . . ." do not support that argument whatsoever. Resp. at 35 (citing Compl. ¶¶ 33, 171, 181). In light of this pleading deficiency, we shall dismiss Tecnomatic's § 43(a)(1)(B) false advertising claim without prejudice.

## IX.    Count XII: Correction of Inventorship

Count XII of Tecnomatic's Complaint purported to state a claim for correction of inventorship. However, as Remy has pointed out, the language of Patent Act § 116 vests the Director of the U.S. Patent Office, as opposed to the district courts, with responsibility for addressing corrections in inventorship. Tecnomatic interposed no response to Remy's

argument and, thus, has waived any opposition to the claim's dismissal.

## Conclusion

In summary, Remy's motion to dismiss is <u>GRANTED</u> with regard to the following claims: negligent misrepresentation (Count III); actual fraud (Count IV); constructive fraud (Count V); breach of fiduciary duty (Count VII); unfair competition (Counts VIII, IX, and X); false/misleading representation pursuant to the Lanham Act (Count XI); and correction of inventorship (Count XII). All of these claims are dismissed with prejudice, except for Tecnomatic's Lanham Act claim (Count XI), which Tecnomatic may attempt to refashion in accordance with the Court's ruling. Remy's motion is <u>DENIED</u> with regard to the breach of contract claims (Counts I and II), except to the extent that Tecnomatic based its claim on Remy's misuse of information regarding Tecnomatic's reputation as a leader in the areas of stators and engineering expertise; and its trade secret misappropriation claim (Count VI).

IT IS SO ORDERED.

Date:_____06/22/2012_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

David M. Allen
FAEGRE BAKER DANIELS LLP - Chicago
david.allen@faegrebd.com

Kara E. F. Cenar
BRYAN CAVE LLP
kara.cenar@bryancave.com

Donald  Cole
Byan Cave LLP.
donald.cole@bryancave.com

Charles D. Cooper
THOMPSON HINE LLP
chad.cooper@thompsonhine.com

Ryan Michael Hurley
FAEGRE BAKER DANIELS LLP - Indianapolis
ryan.hurley@FaegreBD.com

David P. Irmscher
FAEGRE BAKER DANIELS LLP - Indianapolis
david.irmscher@faegrebd.com

Thomas A. Knoth
THOMPSON HINE LLP
tom.knoth@thompsonhine.com

S. Patrick McKey
BRYAN CAVE LLP
patrick.mckey@bryancave.com

Patrick David Murphy
BOVERI MURPHY RICE  LLP
pmurphy@bmrllp.com

Nicholas W. Myles
THOMPSON HINE LLP
nicholas.myles@thompsonhine.com

Fred Anthony Paganelli
TAFT STETTINIUS & HOLLISTER LLP
paganelli@taftlaw.com

Charles P. Rice
BOVERI MURPHY RICE, LLP
crice@bmrllp.com

Munjot  Sahu
FAEGRE BAKER DANIELS LLP - Indianapolis
munjot.sahu@faegrebd.com

Mariangela M. Seale
BRYAN CAVE LLP
merili.seale@bryancave.com

Andrew C. Warnecke
Bryan Cave LLP
andrew.warnecke@bryancave.com

Scott A. Weathers
THE WEATHERS LAW OFFICE
scott@sawlaw.net

Joseph H. Yeager Jr
FAEGRE BAKER DANIELS LLP - Indianapolis
jay.yeager@FaegreBD.com

Paula L Zecchini
BRYAN CAVE LLP
paula.zecchini@bryancave.com