UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| REMY, INC., | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) | |
| TECNOMATIC, S.P.A., | ) ) | Consolidated Civil Action |
| Defendant. | ) ) | 1:11-cv-0991-SEB-MJD |
| | ) | |
| TECNOMATIC, S.P.A., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| REMY INC., REMY INTERNATIONAL, INC., DELCO REMY MEXICO, S.R.L. DE C.V., ODAWARA AUTOMATION, INC., RICHARD VAN SICKLE, MARK STEPHENSON, KEVIN YOUNG, STUART PERRY, AND DOES 1 - 5, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**SECOND AMENDED COMPLAINT**

For its second amended complaint against Remy, Inc., Remy International, Inc., Remy Componentes S. de R.L. de C.V. (collectively, "Remy" or the "Remy Defendants"), Odawara Automation, Inc. ("Odawara Automation"), Richard Van Sickle ("Van Sickle"), Mark Stephenson ("Stephenson"), Kevin Young ("Young"), Stuart Perry ("Perry"), (collectively the "Individual Defendants") and Does 1 through 5, inclusive (Remy, Odawara, the Individual Defendants, and Does 1 through 5 are collectively referred to herein as "Defendants"), Tecnomatic S.p.A. ("Tecnomatic") states as follows:

## I.  INTRODUCTION

1.      This Second Amended Complaint is based upon a series of acts by which the Remy Defendants, in conjunction with the other Defendants, wrongfully obtained, disclosed and/or used Tecnomatic information and property.

2.      At times relevant to the Amended Complaint, the automotive market was evolving towards the use of hybrid motors.

3.      Remy projected the hybrid market to be $500,000,000.00 annually by 2015.

4.      Most hybrid vehicles do not require a conventional starter or alternator, which was the bread and butter of Remy's products.

5.      Thus, Remy concluded it needed to get into hybrid technology to maintain a product presence for the future.

6.      The EP8 Motor project referred to herein was one of Remy's first projects through which it attempted to enter into the hybrid market.

7.      Stators are a key component of electric motors used in various industries; most notably in the automotive industry for hybrid electric vehicles.

8.      Remy admits that prior to the EP8 motor project,  "all of Remy's bar-wound stators had been of what we call two-row design.  The EP8 stator was a four-row design and up until this time Remy had not experienced a four-row design."

9.      Remy admits that the EP8 stator was "unlike anything" Remy had made before. Remy only had experience producing more conventional stators in the past, but the complexity and size of the EP8 stator made it unlike anything Remy had ever produced.

2

10.     Young, a Remy employee, wrote in an internal Remy communication: "Remy played only a small part in the development of the bar wound EP8 stator. Tecnomatic developed the stator with very little, or no on site product development assistance.  Tecnomatic built the stator and Remy modified the drawings to match."

11.     The technology, which one or more of the Remy Defendants holds out as their proprietary High Voltage Hairpin ("HVH") stator winding technology, has been confirmed by at least one Remy former employee to have been created by Tecnomatic.  A copy of a Remy International, Inc. brochure distributed via its internet website and otherwise is attached as Exhibit A.

12.     Remy's internal documents disclose, and Remy former employee Perry testified, that at the time Remy initially approached Tecnomatic, Tecnomatic was the "only known source" for the unique hairpin twist application. Exhibit B, Perry Dep. at 177-178.

13.     Remy admits that it was not involved in the conception, design, development, or manufacture of the equipment referred to in this Amended Complaint.

14.     At the time of the EP8 development work, and even though Remy was issuing purchase order for equipment, Remy was having financial difficulties, and could not afford to buy the initial (phase I) equipment from Tecnomatic, nor could it afford to buy additional (phase II) equipment it needed to meet its projections.  Under false pretense, Remy proposed to "lease" the equipment.  Remy considered the "lease" of this equipment as a removal of a "barrier" to Remy's entry into the hybrid market.  Remy employee Richard Van Sickle considered getting the Tecnomatic equipment in Remy's possession "leverage."

3

15.    Despite its duties and obligations to Tecnomatic, prior to shipment of the "leased" equipment, Remy began plans to improperly use the leased Tecnomatic equipment and other Tecnomatic information with Defendant Odawara and former Defendant Eagle for other business purposes, including to build other/additional equipment.

16.    The Remy Defendants, and one or more of the Individual Defendants working in collusion with Odawara, former Defendant Hanson Systems, LLC d/b/a Eagle Technologies Group ("Eagle"), and possibly others, acquired, disclosed and/or used Tecnomatic's confidential information and property to copy and otherwise misappropriate the Technology.

17.    Eagle was retained to provide, among other things a "twister."  Eagle was provided access to Tecnomatic's manufacturing equipment and various physical components of Tecnomatic's equipment and tooling and Tecnomatic's manuals, drawings, and software.  Mark Stephenson and Kevin Young, both individuals that had access to Tecnomatic's information provided under the MCA worked with Eagle on the copied twister.

18.    Attached as Exhibit J is a true and correct copy of a Declaration of Dan Hanson, President of Eagle, authenticating a list of Tecnomatic materials in Eagle's possession that were obtained by Eagle from Remy.  This list indicates that Remy provided Eagle with, at a minimum, Tecnomatic drawings, manuals, software, photographs, videos, and twister cam profiles. Upon information and belief, discovery will lead to evidence of additional items the Remy Defendants and one or more of the Individual Defendants provided to Eagle, including physical components and access to

4

actual machines. Tecnomatic had no knowledge that this information and property was provided to Eagle.

19.     Odawara was engaged to provide a slot liner, welder and swedger machine. Mark Stephenson, Kevin Young, Greg Geoffman, and Ron Gentry, all individuals who had access to Tecnomatic's information under the MCA worked directly with Odawara. David Tocco, Lloyd Ford and Leroy Phillips, individuals who had access to Tecnomatic's information under the MCA also worked directly with Odawara.  Attached as Exhibit K is true and correct copy of the face of two (2) discs of Tecnomatic information and property that were provided by Remy to Odawara.  These discs indicate Odawara was provided with at least Tecnomatic drawings, manuals, videos, and other information. Upon information and belief, discovery will lead to evidence of additional items provided by the Remy Defendants and one or more of the Individual Defendants to Odawara, including access to physical machines.  Tecnomatic did not know this specific information and property was provided to Odawara.

20.     Remy Defendants and Eagle and Odawara undertook acts to conceal their actions and such disclosure and use from Tecnomatic.  The Remy Defendants colluded with Odawara and others to reproduce, in whole or in part, the Technology.  Each were acting in concert with Remy.

21.     One or more Remy Defendants obtained and are using at least $60,000,000.00 (sixty million dollars) in taxpayer grant money (the "Grant") from the United States Department of Energy ("DOE") pursuant to the American Recovery and Reinvestment Act of 2009 and the Energy Policy Act of 2005.

22.     A copy of the DOE Detailed Business Plan and the DOE Project Narrative

are attached as Exhibits H and I, respectively. In the Grant application and elsewhere, Remy claims ownership and intended use of proprietary stator technology, stator winding technology, and other related manufacturing technology that the Remy Defendants misappropriated and otherwise wrongfully obtained from Tecnomatic (the "Technology").

23.    According to numerous press releases issued by one or more of the Remy Defendants, as well as by their purported joint ventures and/or business partners, Remy has entered into various business relationships using the Technology.  In these press releases, as well as in the Grant application, one or more of the Remy Defendants holds itself out as the originator, inventor and developer of the Technology.

24.    One or more of the Remy Defendants, through its officers and employees, including, but not limited to, Remy's in-house counsel, J.J. Shives, Young, and Stephenson, also knew or should have known that Tecnomatic had pending certain patent applications for the Technology, that Remy was bound by the terms of the MCA and extensions thereto, as well as other legal and equitable duties owed to Tecnomatic with respect to the Technology.

25.    All acts alleged herein were done willfully, knowingly and intentionally by the Defendants with the knowledge and intent that Tecnomatic would be harmed.

26.    Exhibits C and D contain Remy Defendants' acknowledgement that a breach of the MCA would cause irreparable injury to Tecnomatic for which the determination of damages would be nearly impossible to establish.

27.     Further, the concealment by the Defendants of their wrongful conduct, constitutes the concealment of a known injury to Tecnomatic and of a known risk of loss or devaluation of the value of the information and property disclosed.

## II.     JURISDICTION AND VENUE

28.     Plaintiff Tecnomatic S.p.A. is a company located in Corropoli, Italy. Tecnomatic is a world recognized leader in the design, manufacture, and implementation of stators and stator windings used in electric motors, as well as the design, manufacture, and implementation of production lines for the manufacture of stators.  As an Italian company, and according to Italian law, all inventions conceived, designed and developed by individuals employed by the Italian company become the property of the Italian company.

### **Remy Defendants**

29.     Defendant Remy, Inc. is a Delaware corporation with a principal place of business in Madison County, Indiana.  Remy, Inc. is in the business of, among other things, producing a new generation of electric motors unveiled in October 2009, and supplying the same to the hybrid and electric motor vehicle markets.

30.     Defendant Remy International, Inc. is a Delaware corporation with a principal place of business in Madison County, Indiana.  Upon information and belief, Remy International, Inc. owns 100% of Remy, Inc.

31.     Remy representatives represented that Defendant Delco Remy Mexico, S.R.L. de C.V. changed its name to Remy Automotive Mexico, S. de R.L. de C.V. on August 1, 2004 and later merged into Defendant Remy Componentes S. de R.L. de C.V. on January 1, 2005.

32.    Defendant Remy Componentes S. de R.L. de C.V. is a Mexican company organized under the laws of the United Mexican States domiciled in the City of San Luis Potosi, Mexico.   Upon information and belief, it is owned by Remy International Holdings, Inc. (0.2222% direct and 99.99998% indirect through Remy Mexico Holdings, S. de R.L. de C.V., Remy Alternators Inc., Remy International Inc., Remy Comercializadora, S. de R.L. de C.V. and a Netherlands B.V.).   Remy Componentes S. de R.L. de C.V. maintains its principal place of business in San Louis Potosi, Mexico.

33.    Defendant Remy International Holdings, Inc. has its principal place of business at 2902 Enterprise Drive, Anderson, Indiana 46013.

34.    The Individual Defendants are either current or former executives and/or employees of the Remy Defendants.  Shives was Remy's general counsel.

### Odawara

35.    Defendant Odawara Automation, Inc. is an Ohio corporation with its principal place of business in Tipp City, Ohio.

36.    Odawara has disclosed in 2012 that it is in possession of two computer discs of videos, drawings, manuals and other technical information that bears Tecnomatic's name, logo, and ownership and privacy statements.

37.    The two discs, disclosed for the first time in 2012, are unique physical items that Odawara knew were solely in Odawara's possession.

38.    Odawara was requested to return these physical items to their rightful owner and has refused.

39.    On March 11, 2011, Odawara was subpoenaed in the earlier action to produce information about what Tecnomatic Information it received from Remy.

8

Odawara's response acted to conceal evidence of Tecnomatic information in its possession custody or control.  Shortly after receiving the subpoenas Odawara entered into an "indemnification" agreement and thereafter Odawara never disclosed in response to the subpoenas its possession of the discs.

40.    Odawara conspired with Remy Defendants to undertake the acts it undertook.

## Individual Defendants

41.    Van Sickle is an individual who is a citizen of Indiana residing in Noblesville, Indiana.

42.    Van Sickle committed, counseled, advised, abetted, and/or assisted the other Defendants in the commission of one or more of the acts alleged herein.  This Defendant made misrepresentations and/or knowingly assisted in the acts set forth herein.  At the time of his acts set forth herein, Van Sickle was in a management position and was the supervisor of Stephenson, Young, Perry and Terry Oaf ("Oaf") and reported to management. Van Sickle acted in concert with Stephenson, Young, Perry and Oaf, and Remy Defendants to gather and provide Tecnomatic drawings, manuals and information to Eagle and Odawara.  Van Sickle also obtained A256 drawings from Tecnomatic and accepted them in connection with partnership with Tecnomatic. Van Sickle's co-conspirator Stephenson sent the "A256" drawings to Eagle.

43.    Van Sickle is also identified by Remy as personally conferring with Shives prior to Shives sending his letter, which is attached hereto as Exhibit F.  Van Sickle thus has also personally participated in the acts of concealment of Remy.

44.    Young is an individual who is a citizen of Indiana residing in Fairmount, Indiana.

45.    Young personally committed, counseled, advised, abetted, and/or assisted the other Defendants in the commission of one or more of the acts alleged herein.  This Defendant made misrepresentations and/or knowingly assisted in the acts set forth herein. Young was personally involved in forwarding Tecnomatic drawings to others, and specifically forwarded Tecnomatic drawings that Remy obtained through the issuance of a purchase order issued by Remy Mexico, cancelled by Remy International, and used by Remy, Inc., through Young, for Remy, Inc.  A copy of Young's email is attached as Exhibit L.  Discovery will likely show Young has been and is involved in other projects using technology and information he learned from work with and access to Tecnomatic information.

46.    Young wrongly testified that no drawings were sent to Eagle.  Young's testimony concealed Remy Defendants' acts.

47.    Perry is an individual who is a citizen of Indiana residing in Anderson, Indiana.

48.    Perry personally committed, counseled, advised, abetted, and/or assisted the other Defendants in the commission of one or more of the acts alleged herein.  This Defendant made misrepresentations and/or knowingly assisted in the acts set forth herein. Perry was directly involved in making copies of Tecnomatic information and was personally involved in making the copy of the Tecnomatic software that is referred to in Exhibit M.

49.     Perry wrongfully and evasively testified about what his and Remy's acts were and Perry's testimony concealed Remy's acts.

50.     Perry wrongfully and evasively testified in the earlier case that he had no Tecnomatic related documents in his possession, thereby concealing the fact that he continued to posses Tecnomatic information post termination of his employment with Remy.

51.     Perry is in possession of the Tecnomatic information even though he is no longer employed by Remy.

52.     Stephenson is an individual who is a citizen of Indiana residing in Indiana.

53.     Stephenson personally committed, counseled, advised, abetted, and/or assisted the other Defendants in the commission of one or more of the acts alleged herein. This Defendant made misrepresentations and/or knowingly assisted in the acts herein. Stephenson, who is not a degreed engineer, was held out as Remy's "lead engineer" on the projects with Eagle and Odawara, and Stephenson was directly involved in making copies of Tecnomatic information, sending that information to others including Eagle and Odawara,  and was personally involved in distributing the copy of the Tecnomatic software that is referred to in Exhibit M.  Discovery will likely show Stephenson has been and is involved in other projects using technology and information he learned from working with and access to Tecnomatic information.

54.     On information and belief, and as a reasonable opportunity for discovery will show, additional acts, and acts of concealment by the Defendants.

11

**The Doe Defendants**

55.     Defendants Does 1 through 5 are businesses and/or individuals residing in unknown locales in both Mexico and the United States, and doing business in connection with the Remy Defendants, Odawara and/or Eagle.

**Eagle**

56.     Hanson Systems, LLC d/b/a Eagle Technologies Group is a Michigan limited liability corporation with its principal place of business in Bridgman, Michigan.

57.     Prior to Eagle's relationship with Remy and receipt of the Tecnomatic information, Eagle represents that it had never manufactured a twister for a stator, nor had it manufactured equipment for a stator production line.

58.     Eagle entered into certain business relationships with Remy, Inc. and Remy International, Inc. relating to production equipment for complex stators.

59.     Remy provided Eagle with certain components and information of Tecnomatic in connection with the business relationship with Remy, concerning certain production equipment for complex stators.

60.     Eagle accessed and/or utilized the Tecnomatic Information in relation to its business with Remy, General Motors ("GM"), and ATW Automation, Inc. ("ATW").

61.     The project numbers for the Eagle business relating to the Remy, GM and ATW projects are as follows:

06150  Hungary – Remy - Twister
07018  Mexico – Remy - Twister
07087  Mexico – Remy Spare Tooling
09216  Lab Twister – Remy
10017  GM Electric Motor (Lab Twister)
10034  ATW GM Wire Forming Lines
10054  Remy EP8 Motor Retrofit
10122  Remy 250 – 410

10155  ATW GM Twisters
10173  ATMW BM CNC Z Forming Dies
10179  Remy Lab Twist Tooling for 250 & 410
11004  Remy Wire form
11021  REMY HVH HVH250 DIES
11025  Remy SLP Rev Twist
11035  REMY SLP Wedge Backup
11095  GM Manual Press Strip and Form
11120  ATW Cutoff Dies
11126  Remy 250 Dies Duplicate

Hereinafter, the "Eagle Projects."

62.    Notably, the archival history of Eagle's website establishes a number of dramatic changes in the business offerings made by Eagle both prior to and after Defendants' acts of misappropriation as alleged herein; specifically, prior to 2008, Eagle's website contained no hybrid references. *Cf.* Eagle's current website at http://www.eagletechnologies.com/ with Eagle's archived website for the time period of 2005-2008, which contains no hybrid references, at http://waybackmachine.org/*/http://www.eagletechnologies.com/.

63.    This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 because the allegations asserted herein present federal questions.  This Court also has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332 due to the diversity of the parties.

64.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.  This Court has personal jurisdiction over the parties because the Defendants conduct substantial business in this judicial district.

### III.   FACTS COMMON TO ALL COUNTS

**A.   The Remy Defendants' Inexperience With Stator Technology**

65.   Stators are a key component of electric motors used in various industries. As relevant here, electric motors are increasingly being used in the hybrid automotive industry.

66.   As late as 2004, Remy made a number of public admissions regarding its inexperience with stator technology.  In or about 2004, Remy generally admitted that: a) it did not have a manufacturing system that could bend rectangular wire into a hairpin or "U" shape; b) it did not have a manufacturing system that would insert wires into a 60-slot cylindrical steel base referred to as a lamination stack; c) it did not have a manufacturing system that could twist wires in a manner necessary to generate electrical current; and d) it did not have a manufacturing system that would weld twisted wires into place.

67.   Further, Remy publicly admitted that as late as May 2005, it did not have a manufacturing system that would enable Remy to build complex stators in an automated manner.

**B.   Tecnomatic's Worldwide Recognition For Complex Stator Technology, Stator Winding Technology And System Design Capabilities**

68.   Tecnomatic is an internationally recognized inventor, developer, and creator of stator technology, stator winding technology, as well as the equipment used to manufacture stators.

69.   Tecnomatic has developed, invented, and owns proprietary information, patents and patent applications, in addition to specialized know-how relating to stator technology, stator winding and stator manufacturing.  Inventions conceived, designed,

and/or developed by Tecnomatic employees are owned by Tecnomatic pursuant to Italian law.

70.   Tecnomatic keeps its proprietary information confidential and takes all necessary steps to maintain its confidentiality.

71.   Tecnomatic has invested much time, money and effort in identifying and developing its confidential proprietary technology and information.  This technology and information is a valuable company asset and provides Tecnomatic with a business advantage.

72.   Tecnomatic has been in the stator business since 1973 and, upon information and belief, well before Remy's entry into the complex stator component business of the hybrid/electric automotive industry.

73.   In fact, Remy publicly admitted that in or around 2004 it was aware of Tecnomatic's experience and expertise in designing systems to produce four-row hairpin stators.

74.   Remy also publicly admitted that it had knowledge of Tecnomatic's experience in designing systems to produce stators and that Tecnomatic had designed such systems for Remy's competitors.

**C.    Remy's Undisclosed Plan To Access And Misappropriate Tecnomatic's Technology**

75.   In or around 2002, one or more of the Remy Defendants developed a strategy to enter the hybrid automotive industry, and to commercially and advantageously position itself in this industry while improperly blocking competitors from this industry (hereinafter collectively "Confidential Strategy").

76.     As publicly admitted in or around 2002, Remy lacked the technological knowledge and ability to develop key complex stator components for the hybrid motor industry.  As such, Remy could not independently develop the same in a timeframe ahead of anticipated customer demand or competitors, as required to execute its Confidential Strategy.

77.     In or around 2002, Remy was unable to independently develop sufficient complex stator technology using its own resources, and/or could not do so in a manner timely enough for potential customer demand, or ahead of competitor activity, as required to execute the Confidential Strategy.

78.     Prior to 2002, one or more of the Remy Defendants learned of Tecnomatic and its reputation in the stator and the stator winding industries, as well as manufacturing technologies regarding the same.  The Remy Defendants also learned of Tecnomatic's experience with four-row/flat wire stators.

79.     Prior to 2002, at Remy's request, Tecnomatic presented a quote for flat wire winding stators to former Remy employees David Fulton ("Fulton") and Oaf.

80.     One or more of the Remy Defendants knew that unless it engaged Tecnomatic in a "relationship" that would have the effect of influencing Tecnomatic to forebear working with others in the hybrid industry or stator/stator winding industry, Tecnomatic would likely use its proprietary confidential information and the Technology, including inventions, know-how, technology and trade secrets, in competition with the Remy Defendants and Remy's Confidential Strategy.

16

**D.      Remy's 2002-2003 Contact With Tecnomatic**

81.    Upon information and belief, in early 2002, Remy approached Tecnomatic under false pretenses and requested that Tecnomatic "present" on its stator technology and capabilities.

82.    During this initial time period, the Remy Defendants withheld and did not disclose their true intent and material information about Remy's Confidential Strategy.

83.    During the same time period, Tecnomatic refused to provide access to its know-how and information, even at the presentation level, without contractual assurances from Remy related to the confidentiality and protection of Tecnomatic's proprietary information.

**E.      Remy's 2003 "Possible Joint Venture" Representations**

84.    In 2003, Remy, Inc. (then doing business as Delco Remy, Inc.) attempted to gain access to Tecnomatic's know-how, proprietary information and material, representing that it was interested in a "possible joint venture" with Tecnomatic (hereinafter the "Hybrid Motor Project").

85.    Despite representations to the contrary, the Remy Defendants had no intention to enter into a joint venture with Tecnomatic, nor did their Confidential Strategy indicate an intent to enter into such a relationship.

86.    Based upon Remy, Inc.'s representation in 2003 that it would be willing to enter into a possible joint venture with Tecnomatic, Remy, through its then president, induced Tecnomatic to enter into the Agreement in order to facilitate the exchange of "confidential information," a term defined in the Agreement.

87.    At the time Remy made these representations, one or more of the Remy Defendants, withheld material information about their Confidential Strategy, and further

withheld material information about their true intention regarding the exchange of information in connection with a "possible joint venture."

88.     Further, at the time Remy, Inc. made these representations, upon information and belief, the Remy Defendants had no intention of entering into a joint venture with Tecnomatic.

89.     At the time Remy, Inc. made the representations regarding a "possible joint venture," one or more of the Remy Defendants intended to gain access to and learn about Tecnomatic's know-how and proprietary information relating to stators and stator winding technology, as well as the manufacture of lines to build the same.

90.     Due to Remy's representation regarding a "possible joint venture" in connection with the disclosure of confidential information sought by one or more of the Remy Defendants, Remy had an obligation to fully disclose its plans and intentions, as well as a duty not to remain silent on material issues.

### F.       The 2003 Mutual Confidentiality Agreement

91.     Based on and in reliance upon the aforementioned representations of Remy, Inc. and its officer(s), including reliance on one or more of the Remy Defendants' nondisclosure of material information, Tecnomatic signed the MCA in May 2003.  A copy of the Agreement is attached as Exhibit C.  The "term" of the MCA was from May 2003 to May 2005.

92.     Under the terms of the MCA "all Information," oral, written or through electronic information or observed, was deemed to be "confidential information."

93.     Under the terms of the MCA, the Remy Defendants were obligated to exercise reasonable care to protect all such confidential information disclosed by Tecnomatic.

94.     Under the terms of the MCA, the Remy Defendants expressly agreed that they would not publish, copy, reverse engineer, disassemble, decompile or disclose any confidential information of the other party.

95.     Under the terms of the MCA, the Remy Defendants expressly agreed that they would use "best efforts" to prevent inadvertent disclosure of such confidential information to any third party.

96.     Under the terms of the MCA, the Remy Defendants expressly agreed that they would not use the confidential information in their own business, except to the extent necessary to evaluate and effect the "possible joint venture."

97.     The MCA expressly provides that "if the parties decide not to proceed with the Proposed Transaction [a defined term in the MCA], then each receiving party shall promptly return to the information providing party or destroy all Confidential Information and notes without retaining any copies thereof."

98.     The MCA also expressly provides that the receiving party, notwithstanding the destruction or return of confidential information and notes, will continue to be bound by the obligations of confidentiality.

99.     The Remy Defendants and one or more of the Individual Defendants knew that the Remy Defendants or one or more of the Individual Defendants had disclosed Tecnomatic information to Odawara and Eagle, yet failed to investigate such disclosure and/or were negligent in their investigation and failed to obtain return of the Tecnomatic information, or to inform Tecnomatic.  As a result a substantial amount of Tecnomatic information entrusted to Remy Defendants remained in the possession of Eagle and Odawara.

100.   The MCA expressly provides that "unless and until a definitive agreement (between) the parties with respect to any Proposed Transaction **has been executed and delivered,"** the Agreement delineates the legal obligations of the parties.

101.   After the signing of the MCA in May 2003, without knowledge of the material information withheld by Remy, and under the false belief that the parties were working toward a joint venture, Tecnomatic began to work with Remy on technology relating to complex stators and production lines for stators.

102.   From May 2003 to May 2005, confidential information, by oral, written and through electronic information and through observation, was provided to Remy Defendants by Tecnomatic.   Further, Remy expressly designated individuals to receive the forgoing information, including but not limited to Young, Perry, Oaf, and Jim Spellman ("Spellman").   Remy's request that these individual receive the confidential information was made because of Remy's assertion that at that time "Remy designers don't have a lot of experience in this area."

103.   The Remy and Individual Defendants, as well as those individuals designated by Remy to receive the confidential information, are bound by the non-disclosure requirements of the Agreement, including those relating to the intellectual property rights of Tecnomatic. The Individual Defendants knew of the existence of the terms of the MCA and individually ratified their acceptance to be bound by the terms thereof.

104.   Despite Remy's representation, no joint venture was entered into by the Remy Defendants and Tecnomatic between May 2003 and May 2005.   However, the

Remy Defendants never intended to enter into a joint venture with Tecnomatic in May 2003 to May 2005.

105.  During this time period it was always understood that Tecnomatic would retain and maintain its ownership of its intellectual property, including the intellectual property developed during the term of the MCA.

106.  Tecnomatic at all times complied with its obligations under the MCA.

107.  During the term of the MCA, the Remy Defendants and the Individual Defendants gained access to information indicating Tecnomatic had valuable technological know-how on complex stators and the manufacture of same.  Remy and the Individual Defendants also learned that Tecnomatic had engineering expertise that Remy did not have.

108.  The Remy Defendants were aware that unless Tecnomatic was led to believe it would be in a joint venture or other similar business relationship with one or more of the Remy Defendants, Tecnomatic could itself use – or could enable competitors of the Remy Defendants to develop or use – the Technology and/or to execute Remy's Confidential Strategy.

109.  Upon information and belief, and as a reasonable opportunity for discovery will show, one or more of the Remy Defendants and/or Individual Defendants breached the terms of the MCA.

### G.  Remy's Extension Of The 2003 Mutual Confidentiality Agreement Through May 2007 Under False Pretenses

110.  In August 2004, one or more of the Remy Defendants still had not disclosed material information to Tecnomatic, nor did Remy disclose that it had no intention of entering into a joint venture with Tecnomatic.

111.   In August 2004, one or more of the Remy Defendants continued to represent to Tecnomatic that the Remy Defendants were interested in entering into a joint venture with Tecnomatic.

112.   The Remy Defendants had a duty to disclose material information during this time period, and had a duty not to remain silent.

113.   In August 2004, one or more of the Remy Defendants, while continuing to withhold material information and during the time period when Remy was misrepresenting that it was interested in a joint venture with Tecnomatic, Remy, Inc. requested that the term of the MCA be extended until May 2007.

**H.      The Extension Confidentiality Agreement**

114.   A copy of the Extension Confidentiality Agreement ("ECA") is attached hereto as Exhibit D.

115.   Under the terms of this ECA, "All Information," oral, written or through electronic information or observed" was deemed confidential information and the Remy Defendants were obligated to exercise reasonable care to protect the confidential information disclosed there under. The Individual Defendants knew or should have known of the existence of the terms of the MCA and individually ratified their acceptance to be bound by the terms thereof.

116.   Under the terms of the ECA, the Remy Defendants expressly agreed that they would not publish, copy, reverse engineer, disassemble, decompile or disclose any confidential information of the other party.

117.   Under the terms of the ECA, the Remy Defendants expressly agreed that they would use "best efforts" to prevent inadvertent disclosure of such confidential information to any third party.

22

118.   Under the terms of the ECA, the Remy Defendants expressly agreed that they would not use the confidential information in their own business, except to the extent necessary to evaluate and effect the "possible joint venture."

119.   The ECA expressly provides that "if the parties decide not to proceed with the Proposed Transaction, then each receiving party shall promptly return to the information providing party or destroy all Confidential Information and notes without retaining any copies thereof."

120.   The ECA expressly provides that the receiving party, notwithstanding the destruction or return of confidential information and notes, will continue to be bound by the obligations of confidentiality.

121.   The ECA expressly provides that "unless and until a definitive agreement (between) the parties with respect to any Proposed Transaction *has been executed and delivered"* the ECA Agreement delineates the legal obligations.

122.   After the signing of the ECA in August 2004, and without knowledge of the material information withheld by one or more of the Remy Defendants, and under the false belief that the parties were working toward a joint venture, Tecnomatic began to work with one or more of the Remy Defendants and Individual Defendants on technology relating to complex stators, stator winding technology and production lines for stators.

123.   From August 2004 to May 2007, confidential information, by oral or written and through electronic information and through observation, was provided to one or more of the Remy Defendants and Remy employees, including Young, Stephenson, Shives, Van Sickle, Perry and Spellman.

23

124.   The Remy Defendants' designated individuals are bound by the non-disclosure requirements of the ECA including intellectual property rights of Tecnomatic.

125.   No joint venture was entered into by the Remy Defendants and Tecnomatic between August 2004 and May 2007 because the Remy Defendants never intended to enter into a joint venture with Tecnomatic between August 2004 and May 2007.

126.   Tecnomatic has at all times complied with its obligations under the ECA.

127.   During this time period it was always understood that Tecnomatic would retain and maintain its ownership of its intellectual property, including the intellectual property developed during the period of the ECA.

128.   During the term of the ECA one or more of the Remy Defendants, Individual Defendants and Remy designated individuals gained access to information establishing that Tecnomatic had valuable technological know-how relating to complex stators, stator winding technology and the manufacture of the same, and learned that Tecnomatic had engineering expertise that the Remy Defendants did not have.

129.   Also during this time period, and in particular in or about June 2005, Tecnomatic issued a written request to Spellman, asking that Remy inform Tecnomatic of whether or not Remy intended to continue with the Phase II project.

**I.      Remy 2006 Change Of Management**

130.   Between late 2005 and early 2006 one or more of the Remy Defendants were undergoing a change in management.  Those changes brought in John H. Weber ("Weber") as President and CEO of Remy International Inc. and John Pittas as President of Remy, Inc.

131.   The Remy Defendants, its employees and/or the Remy Defendants' new management either had a relationship with, or as part of the scheme set forth herein

24

developed a relationship with, Eagle.   Van Sickle had a prior relationship with an employee at Eagle.

132.   At least as early as April 2006, Weber, with a copy to Young and Van Sickle, was informed that the hybrid stator project with Tecnomatic was very complicated and much different than other stators Remy manufactures today.

133.   During this 2006 time period, the Remy Defendants were also undertaking significant cost cutting and budgetary restrictions.

134.   In 2006 one or more of the Remy Defendants and its employees, including but not limited to Young, Joe Plomin ("Plomin"), and Van Sickle, were concerned that Remy's major hybrid motor customer would consider cutting out Remy as an unnecessary middle man, and that this hybrid motor customer would instead deal directly with Tecnomatic.

135.   These same Remy Defendants' employees, including Young, recognized that Tecnomatic had given certain financial and other considerations to the Remy Defendants in reliance on and as an investment in the proposed joint venture, and in the false belief that Tecnomatic was working with Remy for future business together.

136.   These same Remy employees recognized that the Remy Defendants' involvement in the stator development was limited, and that Tecnomatic developed the stator with very little or no on-sight product development input or assistance from Remy.

J.     **Remy's Undisclosed Intent To Cut Out Tecnomatic's Involvement In The Hybrid Project**

137.   Also as part of the change in management, cost cutting, and concern over the potential loss of a significant customer, one or more of the Remy Defendants decided to cut Tecnomatic out of the Hybrid Motor Project, and to attempt to disparage

Tecnomatic's reputation in order to block Tecnomatic from participating in the United States complex stator, stator winding and manufacturing systems for stators for hybrid motors marketplace.

138.   The Remy Defendants and one or more of the Individual Defendants failed to disclose their decision or intention to cut Tecnomatic out of the Hybrid Motor Project, nor did the Remy Defendants disclose to Tecnomatic Remy's decision to cease all further consideration of the proposed "joint venture" with Tecnomatic.

139.   Under the terms of the MCA and the ECA, and its fiduciary and other duties of good faith and fair dealings, the Remy Defendants and one or more of the Individual Defendants had a duty to make full disclosure of its intentions to cut out and/or "reduce reliance" on Tecnomatic, as well as the Remy Defendants' decision not to further consider a joint venture.

140.   One or more of the Remy Defendants and its new management and one or more of the individual Defendants also recognized that Tecnomatic, and not the Remy Defendants, owned and held the valuable proprietary technology related to complex stators, stator winding technology, and stator manufacturing technology, and that all of this information was inaccessible to Remy as it was subject to the ECA and physically located at the Tecnomatic facility in Italy.

141.   The Remy Defendants and one or more of the Individual Defendants knew that they could not cut Tecnomatic out of the Hybrid Motor Project, and/or to cease all further consideration of the proposed "joint venture" with Tecnomatic or "reduce its dependence on Tecnomatic" before the Remy Defendants had an opportunity to access and misappropriate Tecnomatic's proprietary information related to complex stators,

stator winding technology, and stator manufacturing technology without jeopardizing the Remy Defendant's business objectives going forward.

### K.   Remy Plans To Access Tecnomatic Confidential Information Through Improper Means

142.   As set forth in more particularity herein, the Remy Defendants, Shives, Van Sickle, Stephenson, Perry, and Oaf, thereafter took steps, using false pretext and misrepresentations, and under the false pretense of a possible joint venture and/or continued business dealings, to access and misappropriate Tecnomatic proprietary information.

### L.   Modifying Remy Internal Drawings To Copy Tecnomatic's Stator Technology

143.   During the term of the MCA and ECA, one or more of the Remy Defendants and/or their agents and/or employees, and one or more of the Individual Defendants, modified Remy internal drawings relating to stator products to incorporate confidential information and proprietary information of Tecnomatic into Remy Defendants' drawings.

### M.   Remy's False And Misleading Representations To Tecnomatic To Induce Shipping the Manufacturing Equipment To Remy Mexico

144.   Remy recognized that if it informed Tecnomatic of the Remy Defendants' and one or more of the Individual Defendants, decision to cut Tecnomatic out of the ongoing Hybrid Motor Project(s), or to reduce its reliance on Tecnomatic, the Remy Defendants had insufficient independent knowledge, technology, or intellectual property ownership regarding complex stators, stator winding technology, and or manufacturing technology to produce the same.

27

145.  The Remy Defendants and one or more of the Individual Defendants needed to access and take Tecnomatic's proprietary information and know-how before it severed its relationship with Tecnomatic.

146.  In or about late 2005 through January 2006, the Remy Defendants, Remy management and Remy employees, and one or more of the Individual Defendants including, but not limited to, Young, developed a private "negotiation strategy" wherein Remy would falsely represent the potential of future business with Tecnomatic in order to obtain compliance and cooperation from Tecnomatic.

147.  At the time of the Remy Defendants' execution of the "negotiation strategy," the Remy Defendants were attempting to convince Tecnomatic to lease and then deliver to Remy's facilities in Mexico a first line of equipment ("Phase I").

148.  One or more of the Remy Defendants and Remy executives and/or employees, including Van Sickle, David Muir ("Muir"), Plomin, Joni Kirby (Kirby"), and Brenda Alford ("Alford"), perceived the possession of the Tecnomatic equipment in Mexico as gaining some strategic "leverage" over Tecnomatic.

149.  During this 2006 time period, the Remy Defendants and one or more of the Individual Defendants had an undisclosed intent not to use Tecnomatic on a Phase II line of equipment or on future business, and had a further undisclosed intent to copy the Tecnomatic equipment, and/or "refigure" the Tecnomatic equipment.

150.  On January 31, 2006, Remy and Tecnomatic agreed to a lease of the Phase I Tecnomatic equipment at the Remy facility in Mexico.  Under the terms of the lease, Remy had no ownership of the equipment, nor did it have the right or ability to encumber the equipment.

151.   In or about January 2006, Remy, Inc. was insisting upon the lease of Tecnomatic equipment, while one or more of the Remy Defendants and one or more of the Individual Defendants had an undisclosed intent to have the equipment copied and to give unauthorized individuals and entities access to Tecnomatic's confidential information.

152.   After securing an agreement for a lease, and in furtherance of this intent, one or more of the Remy Defendants, through its employees, including but not limited to, Alford, began to redefine Remy, Inc.'s definition of "equipment readiness."

153.   Remy, Inc. and one or more of the Individual Defendants were aware of the then current state of equipment readiness, yet insisted upon and approved shipment of the equipment to Remy's facility in Mexico before the end of 2006.  Tecnomatic was not in favor of Remy, Inc.'s decision to move the equipment to the Remy facility in Mexico, but relied on Remy's representations regarding equipment readiness and the fact that the parties were operating under the MCA and ECA in agreeing to ship the equipment to Remy in Mexico by the end of 2006.

154.   As confirmed in the Remy Defendants' internal documentation, the MCA and ECA governed the parties' exchanges during this 2006 time period.

155.   Both the Remy Defendants and Tecnomatic and one or more of the Individual Defendants knew and understood that this highly complex proprietary equipment and tooling for such equipment was to require further confidential design and development work once it arrived in Mexico, particularly because the Remy Defendants failed to provide sufficient supplies of stator components to test the equipment prior to shipment.

156. Tecnomatic, under the false belief and understanding that the two companies were continuing to work together to "consolidate their partnership" and without knowledge of one or more of the Remy Defendants' actual improper intent to copy Tecnomatic equipment and to eliminate reliance on Tecnomatic, agreed to deliver, *ex works*, the leased Tecnomatic equipment in the then state of equipment readiness.

### N.    Remy's Pretextual Demands For Technical Drawings

157.  Also in or about July 2006, after securing the lease, and insisting upon 2006 delivery to Mexico of the leased equipment, and without disclosing its true intentions, one or more of the Remy Defendants, through and with the knowledge of its executives and employees, and one or more of the Individual Defendants began to demand receipt of Tecnomatic's technical drawings.  Such employees and executives include, but are not limited to, Young, David Tocco ("Tocco"), Alford, Perry, Rutherford, and Van Sickle.

158.  At the time Remy's demands were being made in or about July 2006, these employees and executives were aware of and were bound by the obligations arising from the MCA and ECA.

159.  At the time these demands were being made in or about July 2006, these employees and executives were informed and knew that the Remy Defendants had no contractual right to the drawings and that Tecnomatic's business practice was not to provide the drawings.

160.  At the time these demands were being made in or about July 2006, these employees and executives knew that the Remy Defendants and one or more of the Individual Defendants including Van Sickle, Stephenson, Young and Perry, had no intention of conducting further business with Tecnomatic, that Remy was attempting to

limit Remy's dependence on Tecnomatic, and that Remy intended to copy the Tecnomatic equipment.

161.  One or more of the Remy Defendants and the aforementioned employees and/or executives had contractual, legal and fiduciary and other duties, including good faith and fair dealings, to make full disclosure of Remy's intentions when requesting these drawings.

162.  One or more of the Remy Defendants and the aforementioned employees and/or executives and the individual Defendants failed to comply with their obligations.

163.  On or about July 17, 2006, Tecnomatic President Giuseppe Ranalli, sent a written communication to Remy executive Van Sickle, reminding him that providing drawings was not Tecnomatic's practice, but that drawings were being provided at Van Sickle's personal request in an effort to further the relationship between Remy and Tecnomatic.  Mr. Ranalli expressly stated "I hope we, Tecnomatic, do not regret this decision."

164. Upon receipt of this communication from Mr. Ranalli, the Remy Defendants and Van Sickle had an affirmative obligation to disclose their true intent to not engage Tecnomatic for Phase II, that there was no joint venture, and that the Remy Defendants and their management had decided not to continue to work with Tecnomatic. These Defendants had an obligation not to accept drawings and technical information under the specter of the parties' "partnership" when Remy Defendants and Van Sickle knew there was to be no partnership.

165.   Neither the Remy Defendants nor their employees or executives made the required and necessary disclosures and instead accepted the proprietary documentation knowing that it was being provided under false pretenses.

166.   The drawing requests by the Remy Defendants were made, and the Tecnomatic drawings were supplied by Tecnomatic, pursuant to the terms of the MCA and ECA.

O.   **The Remy Defendants' Acceptance Of Confidential And Proprietary Information In Connection With The Set Up And Installation Of The Leased Equipment Under False Pretense**

167.   The leased equipment in its then state of development was, as demanded by Remy, installed in Remy's facility in Mexico between December 2006 and January 2007.

168.   Unbeknownst to Tecnomatic, one or more of the Remy Defendants set up a "confidential" internal meeting to discuss alternative sourcing of Phase II equipment, and "new phase II" equipment.  The following Remy employees or executives were required to participate in and attend the meeting: Alford, Muir, Tocco, Kirby, Van Sickle, Stephenson, Oaf and Americo Cruz ("Cruz").

169.   The participants in this January 2007 meeting created and developed a further plan to: (a) mislead Tecnomatic into transferring its knowledge; (b) copy Tecnomatic's equipment for sourcing through a different supplier or internally; and, (c) have Shives conduct a review of the possibility of patenting Tecnomatic's intellectual property on this technology.

170.   This January 2007 covert meeting took place while Young and Cruz were in Mexico directly working with Tecnomatic engineers on the set up and commissioning of the leased equipment.

171.   This January 2007 covert meeting took place while the ECA was in effect.

172.   The Remy Defendants and one or more of the Individual Defendants failed to disclose the fact that this covert meeting was taking place, failed to disclose the discussions that took place during the covert meeting, and failed to disclose Remy's planned conduct as agreed upon during this meeting.

173.   Instead, the Remy Defendants and one or more of the Individual Defendants continued to make false and misleading representations to Tecnomatic in order to induce Tecnomatic to transfer its proprietary knowledge to Remy Defendants and/or Remy employees and/or one or more of the Individual Defendants.

**P.   Acts Of Misappropriation By The Remy Defendants, Eagle, Odawara And Others**

174.   Notwithstanding the existence of the MCA, ECA and other duties, one or more of the Remy Defendants contacted Eagle and Odawara in or about January 2007 to request that Eagle and Odawara mirror, duplicate and/or otherwise copy the Tecnomatic equipment.   The Eagle employees involved in these wrongful activities include Dan Rippa ("Rippa") and Jeff Stahl ("Stahl").

175.   One or more of the Remy Defendants and Eagle and Odawara employees and/or executives and one or more of the Individual Defendants, in particular Van Sickle, Stephenson and Perry, conspired to obtain access to Tecnomatic's proprietary information under false pretenses and to conceal those activities.   One or more of the Remy Defendants and one or more of the Individual Defendants provided Eagle and Odawara with access to Tecnomatic confidential information in violation of the ECA and or knew such information was being or had been provided.

**Q.   Remy, Through Shives Concealed The Wrongful Acts of Remy And Eagle**

176.   Between February 2007 and March 2007, one or more of the Remy

Defendants and Eagle and Odawara employees and/or management entered the Remy facility in Mexico, concealing their true identities from Tecnomatic, and began to photograph and otherwise access Tecnomatic's proprietary and confidential information in violation of the MCA and ECA.

177.   On March 26, 2007, counsel for Tecnomatic sent a letter to Muir, Van Sickle, and Kirby, all attendees at the covert January 22, 2007 Remy meeting.  A copy of this letter is attached as Exhibit E.

178.   In this letter, the Remy Defendants and Remy executives and/or employees were reminded of the confidential and proprietary nature of Tecnomatic's information and trade secrets, and that they could not be used for any other purpose.

179.   In this letter, the Remy Defendants and Remy executives and/or employees were informed of the existence of Tecnomatic's patent applications.

180.   In this letter, the Remy Defendants and Remy executives and/or employees were notified that the Tecnomatic equipment was being photographed by persons not known to Tecnomatic.

181.   Tecnomatic requested that the Remy Defendants immediately identify and provide the affiliation of the persons and entities permitted to photograph the Tecnomatic equipment, and further requested that Remy disclose the purpose of the photographs.  *See* Exhibit E.

182.   At the time the letter was sent, the MCA and ECA were in effect and the Remy Defendants and the Individual Defendants had contractual, legal and other duties, including good faith and fair dealings and obligations to fully disclose the information requested by Tecnomatic.

183.   The individuals that Remy permitted to have access and photograph the Tecnomatic equipment, but whose identity was concealed from Tecnomatic, included at least Eagle employees Rippa and Stahl, Odawara and Odawara's agent, Tag McGough ("McGough").   They were not authorized to access Tecnomatic confidential information. Said individuals knew that such information was being improperly accessed and that Remy had a duty to maintain the information as confidential.

184.   The individuals and/or entities accessing the Tecnomatic confidential information were employed by, were executives of, and/or were affiliated with Eagle and/or Odawara.

185.   The individuals and/or entities accessing the Tecnomatic confidential information were doing so in order to copy Tecnomatic's equipment, and improperly access and use Tecnomatic confidential information to jumpstart their duplication of the Tecnomatic equipment.

186.   The Remy Defendants and their executives and/or employees, and the recipients of the letter attached as Exhibit E, including Muir, Van Sickle, and Kirby, were aware of the improper purpose of the photographing as a result of, *inter alia*, their participation in the January 2007 covert meeting and other information.   Remy Defendants and each of these individuals had an affirmative duty to make full disclosure in response to the request of Tecnomatic and its counsel.

187.   Instead, the Remy Defendants, one or more of the Individual Defendants, and these individuals engaged in steps to conceal this improper activity and to actively and affirmatively misrepresent the true facts and circumstances surrounding the misappropriation then occurring and concealing these actions.

188.   Notwithstanding this duty, and in furtherance of the Defendants' ongoing concealment and misrepresentations, Shives sent a letter affirmatively misrepresenting the true facts and circumstances surrounding the misappropriation then occurring.

189.   A copy of the Remy Defendants letter, signed by Shives, is attached hereto as Exhibit F.

190.   The letter contains intentional misrepresentations, including, but not limited to, the purpose and intended use of the photographs.  This is contrary to the Remy Defendants' known conduct then taking place. Further, Shives affirmatively stated that he had obtained assurances from Remy employees involved with the project that "Remy has no intention of replicating the Tecnomatic equipment or infringing upon any Tecnomatic intellectual property." At the time of making this statement Remy had already transmitted the very items identified in Blakely's letter. The letter also concealed the actual acts that had taken or were taking place, including the acts specifically inquired into by Tecnomatic.

191. At least one former employee of Remy, Inc. has stated that Shives' representation, with respect to that former employee, was false.  Most other employees identified as having been involved with the project stated Shives never spoke to them. Remy has recently represented that Shives only spoke with Van Sickle. Van Sickle stated that he had "no recollection" of having such a conversation with Shives.

192. In addition to affirmative misrepresentations, the letter contains representations constituting an active concealment of the wrongful acts of one or more of the Remy Defendants and their executives and employees and one or more of the

Individual Defendants. Such acts concurrently occurring at the time of Shives representation are alleged in later paragraphs of this Amended Complaint.

193. The photographs taken, provided to or otherwise obtained by Eagle and/or Odawara are subject to a duty to preserve and, upon information and belief and as a reasonable opportunity for discovery will show, the photographs were not preserved by Remy.

194. At the time of the acts of misrepresentation and concealment, one or more of the Remy Defendants, Van Sickle, Stephenson, Young and Perry were, without knowledge or approval of Tecnomatic, providing Tecnomatic confidential information to Eagle, Odawara and possibly others in connection with the improper purpose of copying Tecnomatic equipment.

195. One or more of the Remy Defendants and Remy executives and/or employees, including Shives, and one or more of the Individual Defendants, had legal, contractual, and other obligations not to make false or misleading representations regarding the actions then ongoing at the Remy' facility in Mexico and to preserve all evidence relating to such activities.

196. The Defendants have direct, indirect and vicarious liability for the wrongful acts that occurred in relation to Tecnomatic's confidential information, including but not limited to, the Individual Defendants, Odawara and the Doe Defendants who will be individually named after discovery identifies said individuals and their roles.

197. Remy Defendants and the Individual Defendants were willfully negligent in handling of the Tecnomatic Confidential information.

### R.     Acts After The First Quarter 2007 Misappropriation And Concealment

198.   One or more of the Remy Defendants and Remy executives and employees, and Van Sickle, Stephenson, Perry, and Oaf while concealing their wrongful activities, and while misrepresenting their true intentions of copying, began to systematically request Tecnomatic drawings and the transfer of Tecnomatic knowledge from Tecnomatic to them.

199.   Obtaining such information without full disclosure is an obtaining of proprietary information under false pretense.

200.   One or more of the Remy Defendants and Remy executives and employees, and Van Sickle, Stephenson, Perry, and Oaf while concealing their wrongful activities, and while misrepresenting its true intentions of copying, began to systematically transfer Tecnomatic drawings and Tecnomatic confidential information to others, such as Eagle and Odawara that are not entitled to access or use such information.

201.   As a result of the access to and use of Tecnomatic confidential and proprietary information, Eagle and Odawara and others were able to shorten development, research and development, engineering and manufacturing time and to sell stator equipment to Remy that is a copy of and/or the result of the benefits of improper accessing and using of Tecnomatic confidential information.

### S.     Filing Patents Without Naming Tecnomatic Inventors

202.   Upon information and belief, and as a reasonable opportunity for discovery will show, Remy Defendants, Shives, Young and Stephenson were preparing patent applications on the Tecnomatic inventions.

203.  As a result of the patent application process, one or more of the Remy Defendants recognized that Tecnomatic was the actual owner of the intellectual property, and one or more of the Remy Defendants could not file for patents until it obtained ownership of the intellectual property rights from Tecnomatic.  One or more of the Remy Defendants knew from prior discussions with Tecnomatic that Tecnomatic would not give up its intellectual property rights.

204.  One or more of the Remy Defendants, Shives, Young and Stephenson began to file patent applications for the Tecnomatic inventions without informing Tecnomatic that such filings were being made, and without naming Tecnomatic individuals as the inventors on the patents.

205.  One or more of the Remy Defendants, Shives, Young and Stephenson filing of patent applications on Tecnomatic confidential information, or using Tecnomatic confidential information is a violation of the law, and a violation of the MCA and ECA.

206.  In or about April 2008, the Remy Defendants filed another patent application on Tecnomatic inventions in the name of Young and Stephenson as inventors. The patent application includes information provided by Tecnomatic to Remy Defendants under the mutual confidentiality MCA in violation of its terms.

207.  The Remy Defendants list this patent application as one of the in-kind assets in the application to the Department of Energy.  *See* Exhibit I p. Remy-00027706. The Remy Defendants did not name Tecnomatic or Tecnomatic individuals as inventors on the patent applications filed in the 2006 to 2009 time frame.

**T.     Remy Defendants Fail to Destroy Or Return Confidential Information**

208.   At the end of the ECA the Remy Defendants and the individual Defendants had an obligation to destroy or return the Tecnomatic confidential information and a continuing obligation not to use such confidential information.

209.   The Remy Defendants and the individual Defendants did not comply with the terms of the ECA.

**U.     Remy Further Acts Upon Its Confidential Strategy**

210.   After obtaining the technology, inventions and know-how of Tecnomatic, and filing patent applications on such technology, and while blocking Tecnomatic from developing technology with the Remy Defendants' competitors, the Remy Defendants began to execute their original Confidential Strategy to control the hybrid car industry through improper means.

211.   On May 12, 2008, the Remy Defendants purportedly terminated the overall relationship with Tecnomatic, including the lease.  Remy thereafter took steps to get a full return of any money paid to Tecnomatic over the term of the lease.  In September 2008, Remy "revoked" certain purchase orders.

212.   The Remy Defendants and one or more of the Individual Defendants continued to use Tecnomatic confidential information and concealed its use.

**V.     Remy's Misrepresentations To Customers, The Marketplace and In Its Grant Application**

213.   The Remy Defendants have made one or more misrepresentations of fact regarding the origin of its stator technology, and has falsely represented Tecnomatic confidential information, inventions, and technology as Remy Defendants technology. *See e.g*. Exhibit A.

40

214.   The Remy Defendants hold themselves out publicly as "specialists" or "go to motor makers" in this area for purposes of incentivizing others to outsource to Remy or become a customer of Remy.

215.   One or more of the Remy Defendants holds itself out to the public, in marketing, promotional and advertising material, including websites, accessible in this district, as an "Engineering Powerhouse," stating that their "engineering department" has developed numerous patented technologies behind the industries most efficient components, including "hairpin stator technology."

216.   One or more of the Remy Defendants have represented to others, including the press, for release into the commercial marketplace, that Remy has invented a new stator winding design that uses rectangular wire, rather than rounds wire, with windings that are arranged in multiple layers.

217.   One or more of the Remy Defendants represent in advertising and promotional material, available and accessible in this district through the Remy website, and on information and belief, through other disclosures, that Remy HVH250 Series Electric Motors have "award winning patented High Voltage Hairpin stator winding technology."

218.   One or more of the Remy Defendants has released white papers, accessible in this district through the Remy website, and on information and belief, through other means, that "Remy off the shelf hybrid motors incorporate proprietary high voltage hairpin winding technology."

219.   One or more of the Remy Defendants has released white papers, accessible in this district through the Remy website, and on information and belief, through other

means, that Remy HVH hybrid motors owe both their name and their exceptional performance to the propriety High Voltage Hairpin (HVH) stator windings, which at least one Remy former employee described as technology taken from Tecnomatic.  A true and correct copy of the white paper is attached as Exhibit G.

220.   On information and belief, and a reasonable opportunity for discovery will show, one or more of the Remy Defendants has been sending "reassuring letters" to influence decisions regarding outsourcing.

221.   One or more of the Remy Defendants, Shives, Young and Stephenson continued to prosecute its patent applications filed in contravention of its agreements with Tecnomatic.

222.   One or more of the Remy Defendants and one or more of the Individual Defendants prepared and filed the Grant application with the DOE and made material misrepresentations in the Grant application regarding the origination and ownership of the relevant technology, intellectual property development and, upon information and belief, other matters.

223.   One or more of the Remy Defendants began to issue white papers and advertisements and promotional material touting Remy as the innovator of the stator winding technology, all the while withholding the identity of Tecnomatic and its involvement in and creation of the stator winding technology.

224.   One or more of the Remy Defendants' and one or more Individual Defendants acts and misrepresentations are false, misleading, and likely to mislead consumers and the public as to the true origin of the Remy technology.

225.   Upon information and belief, the Defendants, acting individually and/or in concert, have entered into one or more joint ventures or business arrangements, contracts or transactions with others, that a reasonable opportunity for discovery will show are or could be directly, secondarily, and/or vicariously liable, or otherwise responsible for the damages caused to Tecnomatic.

226.   One or more of the Remy Defendants, collectively and/or in concert with others, has issued press releases stating that it entered into or is about to enter into business arrangements with, including but not limited to: (a) General Motors; (b) ZAP, a California-based electric vehicle maker that owns a majority stake in a Chinese company; (c) MotoCzysz, an Oregon-based company; d) Cincinnati-based Advanced Mechanical Products; and, (e) Indianapolis-based Allison Transmission.

227.   One or more of the Remy Defendants recently obtained a federal Grant for at least $60,000,000 from the DOE.  In doing so, one or more of the Remy Defendants and/or one or more of the Individual defendants made material misrepresentations to the DOE, relating to the origin and development of the material at issue for purposes of obtaining the Grant.  *See, e.g*., Exhibits H and I.

228.   One or more of the Remy Defendants and Young and Stephenson have applied to the United States Patent Office, for patents in the United States, and on information and belief, internationally, using the material at issue.

229.   One or more of the Remy Defendants also falsely and incorrectly represented in marketing and advertising materials via internet website(s) and otherwise, that it is the owner and originator of the material at issue, and has distributed said representations internationally and within this District.

### W.    Additional General Allegations

230.  The transfer of Tecnomatic information from Remy to Eagle and/or Odawara was part of a concealed continuous course of conduct that included breaches of the MCA, ECA, false, misrepresentative and/or misleading representations made by Remy, and the individually named Defendants, over the Course of time (the "Course of Conduct").  A reasonable opportunity for discovery will likely show additional acts.

231.  The Defendants' Course of Conduct was not disclosed to Tecnomatic and was undertaken without the knowledge or authorization of Tecnomatic.  Most of the referenced Course of Conduct was discovered during discovery in taking place in 2012.

232.  In August 2006, Dave Tocco, Van Sickle, Perry and Oaf exchanged emails about using Eagle and Odawara, instead of Tecnomatic, for equipment because Remy "count not afford the Tecnomatic System for multiple systems."  Tecnomatic was not told of this information.

233.  In September 2006, Stephenson was sent to Tecnomatic's facility in Italy to "oversee" the work done and Tecnomatic's equipment.

234.  As part of this Course of Conduct on Oct 3, 2006, Van Sickle requested that Remy obtain the Tecnomatic equipment in Remy's possession for leverage.

235.  As part of this Course of Conduct, in October 2006 Oaf asked requested the Tecnomatic manuals in electronic format.

236.  As part of this Course of Conduct in December 2006 Oaf again requested the Tecnomatic manuals in a specific format.

237.  In response to Oaf's demands, and without knowledge or Remy's intention to use the manuals for purposes other than as intended or expressly stated in the manuals,

the Tecnomatic manuals were uploaded on December 22, 2006.  Oaf was told of user name/pass code.

238.   Remy made more than the single copy of the manuals.

239.   On or about December 22, 2006 Oaf sent the manual access information to Young and Stephenson, and Silvestre Mendoza.

240.   Remy and one or more of the Individual Defendants sent the Tecnomatic manuals to Eagle and Odawara.  *See* Exhibit J List of Tecnomatic information in Eagle's possession; *see also* Exhibits K and L.

241.   As part of this Course of Conduct, in or around January 30, 2007 Van Sickle coordinated Eagle's viewing the Tecnomatic equipment in Mexico.

242.   As part of this Course of Conduct, in or around January 30, 2007 Stephenson was designated as the "lead engineer."

243.   As part of this Course of Conduct, in or around January 30, 2007 Van Sickle instructed Stephenson to begin collecting videos, pictures, and other materials for on-location review.

244.   As part of this Course of Conduct, in or around January 31, 2007 videos were made of machines performing certain operations, specifically; OP 10, OP 20, OP 30, OP 90, OP 100, OP 110, OP 120, OP 130, OP 140, and OP 230.

245.   These videos were provided to Odawara.

246.   As part of this Course of Conduct, in or around February 4, 2007 Remy and/or Van Sickle began obtaining requests for quotations, which included Eagle and Odawara.

247.  As part of this Course of Conduct, in or around February 5, 2007 Van Sickle began coordinating production with potential suppliers, including Eagle and Odawara.

248.  As part of this Course of Conduct, in or around February 2007 Eagle arrived in Mexico to view the Tecnomatic production line and technology.

249.  As part of this Course of Conduct, in or around February 2007 Remy directed Oaf to surreptitiously obtain drawings from Tecnomatic.

250.  As part of this Course of Conduct, on or around February 7, 2007 Eagle was in Mexico and was given access to Tecnomatic equipment.

251.  As part of this Course of Conduct, on or around February 7, 2007 Eagle was permitted to photograph and videotape Tecnomatic equipment.

252.  As part of this Course of Conduct, on or around February 7, 2007 Stephenson instructed Perry to copy all the information on Tecnomatic machines.

253.  Attached as Exhibit J is a list of Tecnomatic information that was provided by Remy to Eagle and which is in Eagle's possession.

254.  As part of this Course of Conduct, on or around February 8, 2007 Odawara met with Remy to coordinate the reproduction of the Tecnomatic equipment.

255.  As part of this Course of Conduct, on or around February 9, 2007 Odawara requests McGough to assist Odawara in the acts addressed herein and McGough signed a confidential disclosure agreement with Odawara.

256.  As part of this Course of Conduct, on or around February 9, 2007 Odawara wrote to its parent corporation requesting funding for the project.

257.  As part of this Course of Conduct, on or around February 9, 2007 Odawara informs its parent that Remy advised Odawara that it could copy existing tooling.

258.  Odawara used the fact that it could copy the existing tooling as a selling point to indicate that both time and engineering resources could be saved.

259.  In February 2007, Odawara represents to its parent that it has cash flow problems and no longer has a line of credit with its bank.

260.  In February 2007 Odawara asked its parent for financial support for the Remy project.  On information and belief and a reasonable opportunity for discovery will show, Odawara's parent corporation provided the requested funding.

261.  As of February 2007 Odawara had no experience with the twisting of wires for stators.

262.  As part of the Course of Conduct, and as part of Remy's conduct with respect to the Tecnomatic twister machine, Stephenson was attempting to obtain Tecnomatic drawings on this machine and tooling.

263.  As part of the Course of Conduct, on or about February 13, 2007 Oaf advised Stephenson the only drawings Remy has on Tecnomatic twist tooling is assemblies for spare parts, manuals and a gamma bench.  Oaf advised Stephenson that this information will be placed on the G drive.

264. As part of the Course of Conduct, on or about February 14, 2007 Stephenson made a copy of certain copyrighted Tecnomatic drawings, sent a zip file of twist bench A256 drawings to Eagle, and represented that the drawings are the same as the production tooling.

265.   The A256 drawings were obtained pursuant to Van Sickle's request for such drawings and were provided pursuant to Van Sickle request solely for furtherance of the partnership between Tecnomatic and Remy.

266.   At no time did Remy request or inform Tecnomatic that these drawings would be disclosed to third parties or be used by Remy for any purpose other than the proposed partnership between Tecnomatic and Remy.

267.   As part of the Course of Conduct, on or about February 16, 2007 Remy considered using the "synergies of EP8" to leverage for DCX.

268.   As part of the Course of Conduct, on or about February 17 Odawara Automation sent a letter to the President of Odawara Engineering stating, again, that Remy advised Odawara that it could copy tooling: "Remy is doing these exact processes and will allow OA to review and copy existing tooling where it is practical."

269.   As part of the Course of Conduct, on or about February 19, 2007 Stephenson met with Odawara to discuss the request for quotation.

270.   As part of the Course of Conduct, on or about February 22, 2007 Odawara personnel and McGough visited the Remy facility in Mexico to inspect the Tecnomatic line.

271.   The February 22-24 time frame was the specific time frame that Tecnomatic's counsel inquired about the photography and inspections taking place at the Remy Mexico facility.

272.   Attached as Exhibit K is a copy of the face of the discs that Remy provided to Odawara.

273.   Attached as Exhibit L is an email from Young to Stahl providing Tecnomatic drawings to Eagle.

274.   As part of this Course of Conduct, in or around February 23, 2007 Remy created a disc of information to provide to Odawara.  On this disc was a video Perry took of Tecnomatic slot liner equipment (OP 10) when Perry was in Italy in 2006 and subject to the MCA.  Perry provided this video to Van Sickle in 2006, who falsely represented to Tecnomatic then that the OP 10 video was taken "for equipment readiness purposes."  At no time did Remy, Van Sickle, Perry or others inform Tecnomatic that the video was to be used for any other purpose or to be given to Odawara.

275.   As part of the Course of Conduct, on or about February 23, 2007 the Odawara disc establishes that the Tecnomatic information "Italian documentation" was copied onto a disc that was then given to by Remy to Odawara.  The disc included manuals, assembly drawings and other information.

276.   As part of the Course of Conduct, on or about February 23, 2007 Eagle met with Remy in Anderson, Indiana.

277.   As part of the Course of Conduct, on or about February 27, 2007 an email was circulated stating that Stephenson was to be at Odawara in March 2007.

278.   As part of the Course of Conduct, on or about March 3, 2007 Odawara revised its response to the request for quotation to Remy.

279.   As part of the Course of Conduct, on or about March 8, 2007 Remy advised Odawara that Odawara was "in it" for the slot liner, swedger, and welder.

280.   As part of the Course of Conduct, on or about March 9, 2007 Stephenson met with Eagle.

281.  As part of the Course of Conduct, on or about March 9, 2007 Stephenson advised Eagle: "We have many photos and videos of the existing machines along with operation manuals that have assembly drawings, all that are great references."

282.   As part of the Course of Conduct, on or about March 9, 2007 Stephenson advised Eagle that he would be in Mexico the week of March 25th and will take videos and pictures of existing equipment for quoting purposes.

283.  As part of the Course of Conduct, on or about March 9, 2007, on information and belief and a reasonable opportunity for discovery will show, Remy advised Odawara that Remy personnel would again visit the Remy Mexico facility.

284.  As part of the Course of Conduct, on or about March 12, 2007 Odawara provided Remy with pricing and quotes based upon Odawara's analysis of the existing tooling and drawings.

285.  As part of the Course of Conduct, on or about March 19, 2007 Remy issued a letter notifying Odawara that it had been awarded business pursuant to the request for quotation.

286.  Shives was copied on the March 19, 2007 letter sent to Odawara thereby confirming Shives' personal knowledge of Odawara's involvement before Shives sent the letter concealing the acts being undertaken by Remy.

287.  As part of the Course of Conduct, on or about March 20-22, 2007 Stephenson visited Eagle.

288.  As part of the Course of Conduct, on or about March 22, 2007 Remy conducted a kick-off meeting at Odawara.   At this kickoff meeting Odawara requests

"English translation of BOM"; and Stephenson tells Odawara to take another look at prints for "specifications not present."

289.   As part of the Course of Conduct, on or about March 23, 2007 Eagle began to "outline information needed from Mexico while Mark Stephenson is there."

290.   As part of the Course of Conduct, on or about March 25, 2007 Stephenson was to visit Remy's Mexico facility to taking photographs and video of the conductor forming operation for Eagle.

291.   On or about March 26, 2007, Tecnomatic's then counsel issued the letter to Remy regarding photography and videotaping taking place at that site.  The timeframe for the photographing incident referenced in this letter was when Remy, but not Tecnomatic, knew Odawara was in Mexico taking photographs.

292.   At the time the letter was sent on March 26, 2007 Remy had already sent Tecnomatic's manuals, drawings, documentations, A256 drawings, photographs and videos and other materials to Eagle and Odawara.

293.   The Shives response letter states: "Remy currently takes photographs of its equipment for multiple purposes, including without limitation staffing efficiencies, takt time studies, plant layout planning, and materials flow improvements.  However, I have been assured by Remy employees responsible for this project that Remy has no intention of replicating the Tecnomatic Equipment or infringing upon any Tecnomatic intellectual property."

294.   Shives' representations were false and/or misleading representations of present facts.  At the time these statements were made both Eagle and Odawara had

already photographed and been given access to the Tecnomatic equipment for purposes other than those represented by Shives.

295.   Shives letter concealed the activities set forth above.

296.   The MCA contains Remy's agreement and acknowledgement that if the MCA were breached, irreparable damage to the injured party would occur and money damages for such breach may be difficult if not impossible to determine.  *See* Exhibit C.

297.   Shives letter concealed the Remy Defendants, Shives, Van Sickle, Young Perry and Stephenson's knowledge of the irreparable damage then being done to Tecnomatic.

298.   At no time did Shives inform Tecnomatic of the actual activities being undertaken with respect to Tecnomatic information.

299.   At no time did Shives correct his representations to Tecnomatic.

300.   Notwithstanding the receipt of the Tecnomatic's' inquiry, Remy continued with and concealed its Course of Conduct.

301.   As part of the Course of Conduct, on or about March 27, 2007 Oaf requested B603 drawings from Tecnomatic and then sent them to Young and Stephenson.

302.   Specifically, Tecnomatic drawing B603-000-18-025 was asked for by Eagle.

303.   As part of the Course of Conduct, on or about March 28, 2007 Eagle drafted a list of Tecnomatic information that Eagle requested that Remy obtain for it. Among the things requested were sample comb tooling, missing A256 drawings and "Getting Italian Twist Program."

304.   As part of the Course of Conduct, on or about March 29, 2007 Oaf sent the entire set of A256 drawings to Stephenson.

305.   As part of the Course of Conduct, on or about March 29, 2007 Stephenson made an unauthorized copy of the A256 drawings and forwarded them to Eagle.

306.   As part of the Course of Conduct, on or about April 13, 2007 Odawara held a meeting, notes of which reflect Odawara's intent to "Combine best aspects of Tecnomatic."   These notes also reflect that Remy was to provide Odawara with Tecnomatic's specifications regarding the oil to be used on its line.

307.   As part of the Course of Conduct, on or about April 16, 2007 Eagle confirmed that it had asked "Mark Stephenson to get Italian twist program."

308.   As part of the Course of Conduct, on or about April 17, 2007 Perry asked for the B604 drawings and  B605 drawings from Tecnomatic and then sent them to Stephenson.

309.   As part of the Course of Conduct, on or about April 17, 2007 Stephenson then sent the drawings received from Perry to Eagle.

310.   As part of the Course of Conduct, on or about April 18, 2007 Eagle noted that the  "Cam profiles for vertical motion not on drawings" provided to it by Remy.

311.   Remy thereafter, as part of the Course of Conduct, obtained that specific information from Tecnomatic.

312.   As part of the Course of Conduct, on or about April 19, 2007 Perry obtained and made copies of the Tecnomatic PLC twister software for purposes of transmitted the software to Eagle.  Perry made at least two unauthorized copies of the Tecnomatic software.

313.   As part of the Course of Conduct, on or about April 19, 2007 Perry sent a zip file of the PLC software to Stephenson and represented to Stephenson that Perry "has on memory stick if doesn't work"

314.   The zip file of the PLC software Perry sent to Stephenson was not the copy of the program on the Twister machine but instead, on information and belief and a reasonable opportunity for discovery will show, was taken from the laptop of a Tecnomatic technician without authorization or permission from Tecnomatic and/or without informing Tecnomatic that it has was being sent to Stephenson in the United States or Eagle.

315.   At no time was Perry, Stephenson or Remy authorized to obtain a copy of Tecnomatic software from Tecnomatic machines or to share it with third parties.

316.   On information and belief and a reasonable opportunity for discovery will show that the version of the software that Perry sent to Stephenson amounts to conversion in addition to violation of other laws.

317.   Shives' letter concealed the conduct of Remy, Perry and Stephenson with respect to the Tecnomatic software.

318.   Shives' letter concealed Remy, Perry and Stephenson's acts with respect to the memory stick.

319.   Concealment is a type of spoliation of evidence.  The Shives concealment has lead to spoliation of at least the Perry stick drive and on information and belief to spoliation of other evidence.

320.   As part of the Course of Conduct, on or about April 20, 2007 Eagle obtained from Remy Tecnomatic's drawing regarding the inner portion of the twister.

321.   As part of the Course of Conduct, on or about April 23, 2007 Eagle noted: "Mark to get Italian twist program "if possible Terry is working on this" Remy to bring new twist tool to Eagle to verify if Gamma tooling is correct."

322.   As part of the Course of Conduct, on or about April 24, 2007 Oaf sent Stephenson two drawing examples on which Eagle could replace the title block.

323.   As part of the Course of Conduct, on or about April 24, 2007 Stephenson sent the zip file of the Tecnomatic PLC twister software to Eagle – twice.

324.   As part of the Course of Conduct, on or about April 25, 2007 Stephenson sent European steel designations information to Eagle.

325.   As part of the Course of Conduct, on or about April 26, 2007 Odawara requested that Remy get Tecnomatic's oil specifications.

326.   As part of the Course of Conduct, on or about April 27, 2007 Young had knowledge of Eagle using Tecnomatic gamma prints.

327.   As part of the Course of Conduct, on or about April 30, 2007  Eagle was provided with drawings for the inner portion of the twisting tool.

328.   As part of the Course of Conduct, on or about April 30 2007 Young was to provide Eagle the profile from existing cam.

329.   As part of the Course of Conduct, on or about April 30 2007 Stephenson was to obtain a video of existing wire brush.

330.   As part of the Course of Conduct, on or about May 1, 2007 the Tecnomatic specification for oil was sent by Remy to Odawara.

331.   As part of the Course of Conduct, on or about May 4, 2007 Eagle expressed concern to Remy about ownership of the drawings.  However, Eagle later noted that

representations from Remy indicated that "customer assures us there is no concern for modifying Italian drawings. Remy has paid for these drawings."  Remy's representation to Eagle regarding the payment for the drawings was false.

332.   Both Muir and Van Sickle believed at the time of the actions, that Remy did not have ownership of the drawings.

333.   As part of the Course of Conduct, on or about May 8, 2007 Stephenson was still working on obtaining video of the induction strip for Eagle.

334.   On or about May 9, 2007 the Shives letter was sent in response to the Tecnomatic's inquires regarding photographing and inspections taking place at Remy's Mexico facilities.

335.   The Shives letter was false and misleading as to past and present existing facts.  Specifically, Shives did not talk to all Remy employees involved in the project, Shives failed to include material information about Remy's actual activities, and Shives concealed Remy and the Individual Defendants' activities.

336.   Shives letter further concealed that irreparable harm that was occurring to Tecnomatic.

337.   In furtherance of Remy's concealment of its activities, and as part of the Course of Conduct, on or about May 10, 2007 Stephenson requested that Eagle change title block from Tecnomatic's title block to a Remy Title block "to avoid any confusion regarding design and/or conflicts with Tecnomatic."

338.   In furtherance of Remy's concealment of its activities, and as part of the Course of Conduct, on or about May 11, 2007 Eagle changed the Tecnomatic prints replacing the title blocks.

339.   On information and belief and a reasonable opportunity for discovery will show, additional acts occurred as part of the Course of Conduct.

## COUNT I

### Breach of the Mutual Confidentiality Agreement

### (Against Remy Defendants, Young, Stephenson, Van Sickle, and Perry)

340.   Paragraphs 1 to 339 are incorporated herein as if fully restated herein.

341.   The MCA is a valid, enforceable agreement between Tecnomatic, the Remy Defendants, and the Individual Defendants – who, on information and belief, ratified and/or agreed to be bound by it.

342.   One or more of the Remy Defendants and the Individual Defendants have obligations under the MCA.

343.   One or more of the Remy Defendants and one or more of the Individual Defendants have  breached those obligations in one or more ways as set forth above.

344.   The parties to the MCA expressly acknowledged in the MCA that irreparable harm will occur to Tecnomatic as a result of a breach of the MCA and that monetary damages are difficult to determine.

345.   Irreparable harm has occurred to Tecnomatic as a result of the breach of the MCA.

346.   Tecnomatic has no adequate remedy at law.

347.   Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief, constructive trust, punitive damages, and all other relief deemed reasonable and necessary.

## COUNT II

### Breach Of The Extension Confidentiality Agreement

### (Against Remy Defendants, Young, Stephenson, Van Sickle, and Perry)

348.   Paragraphs 1 to 339 are incorporated herein as if fully restated herein.

349.   The ECA is a valid, enforceable agreement between Tecnomatic, the Remy Defendants, and the Individual Defendants – who, on information and belief, ratified and/or agreed to be bound by it

350.   One or more of the Remy Defendants and one or more of the Individual Defendants have obligations under the ECA.

351.   One or more of the Remy Defendants has breached those obligations in one or more ways described above.

352.   The parties to the ECA expressly acknowledged in the ECA that irreparable harm will occur to Tecnomatic as a result of a breach of the ECA and that monetary damages are difficult to determine.

353.   Irreparable harm has occurred to Tecnomatic as a result of the breach of the ECA.

354.   Tecnomatic has no adequate remedy at law.

355.   Tecnomatic has been harmed and damaged and seeks compensation for its damages in addition to injunctive relief constructive trust, punitive damages, and all other relief deemed reasonable and necessary.

## COUNT III

### Misappropriation of Trade Secrets

### (Against Remy Defendants and Individual Defendants)

356.   Paragraphs 1 to 339 are incorporated herein as if fully restated herein.

58

357.   Defendants have committed acts of Misappropriation through acquisition of Tecnomatic' Trade Secrets, and on information and belief, and a reasonable opportunity for discovery will show, disclosure and use of Tecnomatic's trade secrets, in one or more of the ways set forth in this Count.

358.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by acquiring one or more of such trade secrets with knowledge that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute Indiana Trade Secret Act at Indiana Code §24-2-3-2 (hereinafter "IC 24-2-3-2"), including one or more of: theft by deception; theft by false pretext; theft of property lost, mislaid or delivered by mistake; misrepresentation by spoken or written words; misrepresentation inferred by conduct; misrepresentation by concealment; breach of duty to maintain secrecy; inducement of breach of duty to maintain secrecy; espionage by electronic means; espionage by other means; and/or industrial espionage. (These examples of improper means are hereinafter incorporated into the later paragraphs referring to "one or more of the improper means enumerated in the statute IC 24-2-3-2" and will not be repeated herein).

359.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by acquiring one or more of such trade secrets when Remy International, Remy Inc. and/or Remy Mexico had reason to know that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

360.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets to others such as employees of Remy Defendants,  Eagle and certain of its employees, Odawara and certain of its employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and/or Remy Mexico have used at least one, and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2.

361.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic to others such as employees of Remy Defendants,  Eagle and certain of its employees, Odawara and certain of its employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, and Remy International, Remy Inc. and/or Remy Mexico have, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was derived from or through the Remy Defendants, Van Sickle, Stephenson, Perry, and/or Young, each persons who had utilized one and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2.

362.   Remy International, Remy Inc. and Remy Mexico have  committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, to Remy

Employees, Eagle and certain Eagle employees, Odawara and certain Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, and Remy International, Remy Inc. and/or Remy Mexico have, at the time of disclosure, knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

363.  Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets to Remy Employees, Eagle and Certain Eagle employees, Odawara and certain Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have, at the time of disclosure, knew or had reason to know that Remy International, Remy Inc. and Remy Mexico's knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Stephenson, Perry, and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

364.  Remy International, Remy Inc. and Remy Mexico have  committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets to Remy Employees, Eagle and certain of Eagle Employees, Odawara and certain of Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have, before a material change of its  position, knew or had

reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

365.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have used one or more of the improper means enumerated in the statute IC 24-2-3-2.

366.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have, at the time of use, knew or had reason to know that its knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Stephenson, Young, and/or Perry, who had utilized one, and on information and belief and a reasonable opportunity for discovery will show, one  or more of the improper means enumerated in the statute IC 24-2-3-2.

367.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have, at the time of use, knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

368.   Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of

such trade secrets, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have at the time of use, knew or had reason to know that its knowledge of the trade secret was derived from or through a Remy Defendants, Van Sickle, Stephenson, Perry and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

369.  Remy International, Remy Inc. and Remy Mexico have committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Remy International, Remy Inc. and Remy Mexico have, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**Richard Van Sickle**

370.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets with knowledge that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

371.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets when Van Sickle, directly and/or in concert with others, had reason to know that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

372. Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to others such as Remy employees, Odawara, Eagle, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, without the express or implied consent of Tecnomatic, and Van Sickle, directly and/or in concert with others, used at least one, and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire knowledge of one or more of Tecnomatic's trade secrets:

373. Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, and Van Sickle, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was derived from or through a Remy Defendant or its employees, Stephenson, Perry, and/or Young, each a person who had utilized one and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2.

374. Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, to Remy Defendant employees, Odawara's employees, Tag McGough, J2 Innovations, Eagle Employees and on information and belief and a reasonable opportunity for discovery will show GM and others, and Van Sickle, at the time of disclosure, knew or had reason to know that his knowledge of the

trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

375.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to Remy Defendants, Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Van Sickle, at the time of disclosure or use, knew or had reason to know that Van Sickle's knowledge of the trade secret was derived from or through Remy Defendants, Stephenson, Perry, and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

376.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by, alone or in active concert with other Defendants, disclosing one or more of such trade secrets to Remy Employees, Eagle Employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Van Sickle, before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

377.  On information and belief, and a reasonable opportunity for discovery will show, Van Sickle, alone and/or in concert with others, has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Van Sickle,

alone or in concert with others, used one or more of the improper means enumerated in the statute IC 24-2-3-2.

378.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Van Sickle, alone or in concert with others, at the time of use, knew or had reason to know that the knowledge of the trade secret was derived from or through Remy Defendants, Stephenson, Young, and/or Perry, who had utilized one, and on information and belief and a reasonable opportunity for discovery will show, one  or more of the improper means enumerated in the statute IC 24-2-3-2.

379.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using, alone or in concert with others,  one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Van Sickle, at the time of use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

380.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such trade secrets, without the express or implied consent of Tecnomatic,  and Van Sickle at the time of use, knew  or had reason to know that its knowledge of the trade secret was derived from or through a Remy Defendants, Stephenson, Perry and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

381.  Van Sickle has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such

66

trade secrets, without the express or implied consent of Tecnomatic, and Van Sickle, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**Mark Stephenson**

382.  Mark Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets with knowledge that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

383.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets when Stephenson, directly and/or in concert with others, had reason to know that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

384.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to others such as Remy employees, Odawara, Eagle, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, without the express or implied consent of Tecnomatic, and Stephenson, directly and/or in concert with others, used at least one, and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire knowledge of one or more of Tecnomatic's trade secrets.

385.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, and Stephenson, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was derived from or through a Remy Defendant or its employees, Van Sickle, Perry, and/or Young, each a person who had utilized one and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire it.

386.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, to Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, Eagle Employees and on information and belief and a reasonable opportunity for discovery will show GM and others, and Stephenson, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use:

387.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to Remy Defendants, Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Stephenson, at the time of disclosure or use, knew or had reason to know that Stephenson's knowledge of the trade secret was derived from or through Remy

Defendants, Van Sickle, Perry, and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

388.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by, alone or in active concert with other Defendants, disclosing one or more of such trade secrets to Remy Employees, Eagle Employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Stephenson, before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

389.  On information and belief, and a reasonable opportunity for discovery will show, Stephenson, alone and/or in concert with others, has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Stephenson, alone or in concert with others, used one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire knowledge of the trade secret.

390.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Stephenson, alone or in concert with others, at the time of use, knew or had reason to know that the knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Young, and/or Perry, who had utilized one, and on information and belief and a reasonable opportunity for

discovery will show, one  or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire it.

391.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using, alone or in concert with others,  one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Stephenson, at the time of use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

392.  Stephenson has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such trade secrets, without the express or implied consent of Tecnomatic,  and Stephenson at the time of use, knew  or had reason to know that its knowledge of the trade secret was derived from or through a Remy Defendants, Van Sickle, Perry and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

393.  Stephenson  has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such trade secrets, without the express or implied consent of Tecnomatic,  and Stephenson, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**Kevin Young**

394.  Kevin Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets with knowledge that the trade secret was acquired by at least one, and on information and

belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

395. Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets when Perry, directly and/or in concert with others, had reason to know that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

396. Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to others such as Remy employees, Odawara, Eagle, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, without the express or implied consent of Tecnomatic, and Young, directly and/or in concert with others, used at least one, and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire knowledge of one or more of Tecnomatic's trade secrets.

397. Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, and Young, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was derived from or through a Remy Defendant or its employees, Perry, Van Sickle, Stephenson, and/or Young, each a person who had utilized one and on information and belief and a reasonable opportunity

for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2.

398.  Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, to Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, Eagle Employees and on information and belief and a reasonable opportunity for discovery will show GM and others, and Young, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

399.  Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to Remy Defendants, Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Perry, at the time of disclosure or use, knew or had reason to know that Perry's knowledge of the trade secret was derived from or through Remy Defendants, Perry, Van Sickle, Stephenson, and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

400.  Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by, alone or in active concert with other Defendants, disclosing one or more of such trade secrets to Remy Employees, Eagle Employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a

reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Young, before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

401. On information and belief, and a reasonable opportunity for discovery will show, Young, alone and/or in concert with others, has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Young, alone or in concert with others, used one or more of the improper means enumerated in the statute to acquire knowledge of the trade secret.

402. On information and belief, Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Young , alone or in concert with others, at the time of use, knew or had reason to know that the knowledge of the trade secret was derived from or through Remy Defendants, Perry, Van Sickle, Stephenson, Young, and/or Perry, who had utilized one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

403. On information and belief, Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using, alone or in concert with others, one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Young, at the time of use, knew or had reason to know that the knowledge of the

trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

404.   On information and belief, Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Young at the time of use, knew  or had reason to know that its knowledge of the trade secret was derived from or through a Remy Defendants, Stephenson, Van Sickle, Perry and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

405.   On information and belief, Young has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Young, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**Stuart Perry**

406.   Stuart Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets with knowledge that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

407. Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by acquiring one or more of such trade secrets when Perry, directly and/or in concert with others, had reason to know that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for

discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

408. Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to others such as Remy employees, Odawara, Eagle, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, without the express or implied consent of Tecnomatic, and Perry, directly and/or in concert with others, used at least one, and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire knowledge of one or more of Tecnomatic's trade secrets.

409. Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, and Perry, at the time of disclosure, knew or had reason to know that his knowledge of the trade secret was derived from or through a Remy Defendant or its employees, Van Sickle, Stephenson, and/or Young, each a person who had utilized one and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute to acquire it.

410. Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, to Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, Eagle Employees and on information and belief and a reasonable opportunity for discovery will show GM and others, and Perry, at

the time of disclosure , knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

411.  Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to Remy Defendants, Remy Defendant employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Perry, at the time of disclosure or use, knew or had reason to know that Perry's knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Stephenson, and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

412.  Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by, alone or in active concert with other Defendants, disclosing one or more of such trade secrets to Remy Employees, Eagle Employees, Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Perry, before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

413.  On information and belief, and a reasonable opportunity for discovery will show, Perry, alone and/or in concert with others, has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets,

without the express or implied consent of Tecnomatic, and Perry, alone or in concert with others, used one or more of the improper means enumerated in the statute to acquire knowledge of the trade secret.

414.  Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Perry, alone or in concert with others, at the time of use, knew or had reason to know that the knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Stephenson, Young, and/or Perry, who had utilized one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute to acquire it.

415.  Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using, alone or in concert with others, one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Perry, at the time of use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

416.  Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others, by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Perry at the time of use, knew or had reason to know that its knowledge of the trade secret was derived from or through a Remy Defendants, Stephenson, Van Sickle, Perry and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

417.  Perry has committed acts of misappropriation of one or more of Tecnomatic's trade secrets, alone or in concert with others,  by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Perry, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

418.  Remy Defendants and one or more of the Individual Defendants acquired trade secrets and confidential information of Tecnomatic by improper means.

419.  Remy Defendants and one or more of the Individual Defendants used improper means to acquire knowledge of the trade secret.

420.  Remy Defendants and one or more of the Individual Defendants' acquisition, disclosure or use of the trade secrets of Tecnomatic are without express or implied consent by Tecnomatic and have been used by Defendants and upon information and belief by its agents, joint venture partners, customers, and others who, at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or, (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

421.  Tecnomatic has suffered injury as a result of the acts or omissions of Remy Defendants and one or more of the Individual Defendants.

422.   Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of the Remy Defendants and one or more of the Individual Defendants.

423.   There is no adequate remedy at law.

424.   Tecnomatic has been damaged and seeks compensation for its damages in addition to injunctive relief and a constructive trust, and for all relief, including but not limited to unjust enrichment, and Tecnomatic's attorneys fees and costs incurred as a result of having to seek relief against Remy, the Individual Defendants, Eagle and Odawara, permitted under the Trade Secret Act.

## COUNT IV

## Trade Secret Misappropriation

## (Against Odawara)

425.   Paragraphs 1 to 339 are incorporated herein as if fully restated herein.

426.   Odawara has committed acts of misappropriation of one or more of Tecnomatic's   trade secrets by acquiring one or more of such trade secrets with knowledge that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2. including one or more of Theft by deception; Theft by false pretext; Theft of property lost, mislaid or delivered by mistake; Misrepresentation by spoken or written words; Misrepresentation inferred by conduct; Misrepresentation by concealment; Breach of duty to maintain secrecy; Inducement of breach of duty to maintain secrecy; Espionage by electronic means; Espionage by other means; and/or Industrial espionage. (These examples of improper means are hereinafter

incorporated into the later paragraphs referring to "one or more of the improper means enumerated in the statute IC 24-2-3-2" and will not be repeated herein).

427.  Odawara has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by acquiring one or more of such trade secrets when Odawara had reason to know that the trade secret was acquired by at least one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute IC 24-2-3-2.

428.  On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets to others such as its employees,  Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show, GM and others, without the express or implied consent of Tecnomatic, and Odawara used at least one, and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire knowledge of one or more of Tecnomatic's trade secrets.

429.  On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, and Odawara, at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a Remy Defendants, Van Sickle, Stephenson, Perry, and/or Young, each persons who had utilized one and on information and belief and a reasonable opportunity for discovery will show one or more of the improper means enumerated in the statute IC 24-2-3-2 to acquire it.

430. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets without the express or implied consent of Tecnomatic, to Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, and Odawara, at the time of disclosure or use, knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

431. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Odawara, at the time of disclosure or use, knew or had reason to know that Odawara's knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Stephenson, Perry, and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

432. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by disclosing one or more of such trade secrets to Odawara employees, Tag McGough, J2 Innovations, and on information and belief and a reasonable opportunity for discovery will show GM and others, without the express or implied consent of Tecnomatic, and Odawara, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

433. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Odawara used one or more of the improper means enumerated in the statute to acquire knowledge of the trade secret.

434. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Odawara, at the time of use, knew or had reason to know that its knowledge of the trade secret was derived from or through Remy Defendants, Van Sickle, Stephenson, Young, and/or Perry, who had utilized one, and on information and belief and a reasonable opportunity for discovery will show, one or more of the improper means enumerated in the statute to acquire it.

435. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Odawara, at the time of use, knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

436. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic, and Odawara at the time of use, knew or had reason to know that its knowledge of the trade secret was

derived from or through a Remy Defendants, Van Sickle, Stephenson, Perry and/or Young, who owed a duty to Tecnomatic to maintain its secrecy or limit its use.

437. On information and belief, Odawara has committed acts of misappropriation of one or more of Tecnomatic's  trade secrets by using one or more of such trade secrets, without the express or implied consent of Tecnomatic,  and Odawara, before a material change of its position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

438. Tecnomatic has suffered injury as a result of the acts or omissions of Odawara and/or its agents, joint venture partners, customers, or other such persons.

439. Irreparable harm will occur to Tecnomatic as a result of the wrongful acts of the Odawara and/or its agents, joint venture partners, customers, or other such persons. In addition, Odawara's possession Tecnomatic's trade secrets information constitutes a continued threatened misappropriation by Odawara.

440. Accordingly, Tecnomatic has no adequate remedy at law and Tecnomatic will suffer irreparable harm unless Odawara is enjoined.

441. Additionally, Tecnomatic has been damaged and seeks compensation for its damages and imposition of a constructive trust, and relief including but not limited to unjust enrichment, and Tecnomatic's attorneys fees and costs incurred as a result of having to seek relief against Remy, Eagle and Odawara, permitted under the Trade Secret Act.

## COUNT V

### Set Off

### (Against Remy Defendants)

442.  Tecnomatic incorporates by reference paragraphs 1 to 339 as if fully restated herein.

443.  Remy has sued Tecnomatic on various claims relating to the leased equipment.

444.  Remy did not disclose all of its uses and value received from the lease equipment.

445.  The value of those uses and value taken and or obtained by Remy, and the Individual Defendants, directly or indirectly, should be set off of any recovery or potential recovery.

## COUNT VI

### Conversion

### (Against Remy Defendants, Perry and Stephenson)

446.  Tecnomatic incorporates by reference paragraphs 1 to 339 as if fully restated herein.

447.  Remy and Tecnomatic were in a special relationship of trust given that they were holding the other's confidential information for the stated purposes of considering a joint venture, and expressly admitting that a breach of the confidentiality agreement to keep information confidential would cause irreparable harm, for which it may be impossible to establish monetary damages.

448.   This specific arrangement placed Remy and Tecnomatic in a situation where they were holding the property of each other and each was highly dependent on the other to maintain the integrity of the property received due to its sensitive nature.

449.   Remy's holding of Tecnomatic's property gave rise to a duty for Remy not to take, use, or destroy the value of that property, in addition to, and independent of, the contractual obligations that Remy undertook pursuant to the confidentiality agreement.

450.   Being entrusted with property of Tecnomatic, and agreeing that Tecnomatic would be irreparably harmed if that property were misused, destroyed, or disseminated, also gave rise to a duty for Remy not to conceal breaches or improper disclosures when they happen or when disclosures are learned to have occurred.

451.   Perry and Stephenson surreptitiously obtained software code from Tecnomatic that was in the personal possession of Tecnomatic employees and sent it to others within Remy and to at least Eagle. This amounted to an actual physical taking of this version of the Tecnomatic software code.

452.   In addition, Remy had in its possession Tecnomatic software, which software was resident on certain Tecnomatic equipment that Remy had in its possession. Remy has attempted to revoke certain purchase orders related to this equipment.  Remy was the last entity who possessed the version of the software that Tecnomatic placed on the subject equipment, that software exists in the precise form in which Tecnomatic left it, and Remy is unable to return it with the various equipment it is endeavoring to return under its revocation attempt.  Remy has thus converted Tecnomatic's software.

453.   Remy, Shives, Stephenson, Young, Van Sickle, and Perry undertook a course of conduct that irreparably destroyed the value of Tecnomatic's property.

454. Remy and Shives, by virtue of their learning of the disclosure of Tecnomatic information and property have an affirmative duty to retrieve the information and property and not to conceal the breaches from Tecnomatic.

455. Remy, Shives, Stephenson, Young, Van Sickle and Perry breached their duties to preserve the Tecnomatic property.

456. These acts have damaged Tecnomatic and have converted the title.

457. Remy, Shives, Stephenson, Young, Van Sickle, and Perry undertook a course of conduct by which they gained value by the destruction of the value of Tecnomatic information.

458. Tecnomatic has suffered harm and injury as a result of Remy's and the Individual Defendants' acts or omissions as described herein.

459. Tecnomatic has been damaged and seeks compensation for same, as well as injunctive relief, and all other relief deemed appropriate whether at law or in equity, Tecnomatic seeks a constructive trust for all Tecnomatic information and property in possession of each Defendant and for all derivative projects and on all revenue generated therefrom.

<u>**COUNT VII**</u>

<u>**Copyright Infringement**</u>

<u>**(Against Remy and Odawara)**</u>

460. Tecnomatic incorporates by reference paragraphs 1 to 339 as if fully restated herein.

461. Tecnomatic created and is the sole author of the original works identified in Exhibits J, K and M to the Amended Complaint. These works were created in Italy

between 2004 and 2008 and comprise operation manuals and technical drawings, as well as computer software programs.

462.   These works are entitled to copyright protection under Articles 1 and 2 of the Italian Copyright Act, Law No. 633 of April 22, 1941 (as last amended by Law No. 2 of January 9, 2008) because they are of a creative character and constitute scientific works, works of drawing and similar graphic arts, and/or works of industrial design, or constitute computer programs (the "Copyrighted Works").

463.   In addition to receiving protection under Italian copyright law, the Copyrighted Works are entitled to protection under the United States Copyright Act of 1976 because they share a sufficient point of attachment to the United States under 17 U.S.C. § 104(a) and are unpublished as that term is understood in copyright, contain a large amount of material that is wholly original to Tecnomatic, and further, qualify as copyrightable subject matter under 17 U.S.C. § 102(a)(5) because they are pictorial and/or graphic works, or are computer software programs that are protectable under 17 U.S.C. § 102(a)(1).  Because the Copyrighted Works are of foreign origin, they are not subject to the requirement to obtain registration prior to initiating suit in the federal courts of the United States.

464.   At all times relevant to this action, Tecnomatic complied with the Italian Copyright Act, Law No. 633 of April 22, 1941, and all subsequent revisions thereto; the United States Copyright Act of 1976 and all subsequent revisions thereto; as well as all other laws governing copyright, and secured the exclusive rights and privileges in and to the Copyrighted Works.

465.   At all times relevant to this action, Tecnomatic has been and still is the sole proprietor of all rights, title, and interest in and to the copyright in the Copyrighted Works throughout the world.  Tecnomatic has never assigned the copyright in any of the Copyrighted Works to any person or entity.

466.   Between 2004 and 2008, Tecnomatic made a limited number of copies of the Copyrighted Works solely for its internal use and/or for its dealings with Remy that related to EP8 production line.  All of the Copyrighted Works indicate that Tecnomatic is the originator thereof and further, that Tecnomatic is the proprietor of all rights, title, and interest in and to the Copyrighted Works.

467.   The Copyrighted Works also contain language that expressly prohibits their transmission to third parties by any other person or entity besides Tecnomatic.

468.   On several occasions throughout the course of the Tecnomatic/Remy relationship, Remy asked for electronic copies of the copyrighted manuals and of other Copyrighted Works.   Pursuant to and in furtherance of its relationship with Remy, Tecnomatic made available copies of one or more of the Copyrighted Works to Remy for the limited purpose of furthering the joint venture.  All such copies were made available only in connection with Remy's use of the corresponding machine, and Tecnomatic made clear that such copies were not to be: (a) reproduced in any manner; (b) altered or adapted in any manner (including in connection with the creation of new works); or (c) transmitted to any third party.   Despite the foregoing, Remy made additional, unauthorized electronic copies of the Copyrighted Works, and further, distributed them to Odawara and Eagle, Perry, one or both of whom made unauthorized copies thereof and/or altered same.

469.   By way of illustration of the foregoing, but by no means in an exhaustive sense, in December 2006, Oaf asked Tecnomatic for Microsoft Word copies of the operation manuals that related to certain of the component machines of the EP8 production line.  In response, Tecnomatic employees uploaded the requested manuals to an FTP server that was housed and stored in Italy on or about December 22, 2006, and in addition, sent Oaf an e-mail message containing a link to the FTP server and login credentials so that he could access and download the manuals.  Instead of using the link and login credentials to make the single, authorized use.  Oaf, on information and belief, either: (a) downloaded the manuals for purposes of further reproduction or transmission within Remy and/or to third parties; or (b) e-mailed the link and login credentials to Young, Stephenson and Mendoza, one of more of whom then downloaded manuals, thereby and without authorization, reproducing the manuals electronically.   Either of the foregoing scenarios would have, and did, exceed the scope of Tecnomatic's authorization, and given the functionality of computers, at least three copies of each discrete work were made on the server in Italy prior to each work reaching the network so that it could be transmitted via the Internet.  Further, Remy employees made additional reproductions of the manuals and/or transmitted same to third parties, and in at least one instance, burnt the manuals to a CD-R that was later delivered to Odawara, and possibly other third parties.   Metadata from a disc produced by Odawara in this litigation demonstrate that the Tecnomatic manuals given to Odawara were dated December 22, 2006.

470.   In addition to the foregoing, it is believed that Remy made several PDF and other copies of the Copyrighted Works without authorization, saved them to various discs

and drives, and made them available and/or transmitted them to Odawara, Eagle, or other third parties who, upon information and belief, made further unauthorized copies of same.  In addition to the foregoing, Remy had access to, and on information and belief did access, the laptop(s) of Tecnomatic employee(s) for purposes of copying Tecnomatic software without Tecnomatic's knowledge or authorization.

471.  Defendants continue to retain unauthorized copies of the Copyrighted Works and, upon information and belief, other of Tecnomatic's technical drawings that are entitled to copyright protection.   In addition, and upon information and belief, Defendants' infringing activities are ongoing and continue at the present.

472. The practices set forth above constitute violations of the rights that Tecnomatic has in and to the Copyrighted Works under both United States and Italian Copyright Acts, and as a result, Tecnomatic has suffered harm that is compensable under both acts.

Wherefore, Tecnomatic demands:

(a)    That Defendants, their agents, and servants be enjoined during the pendency of this action and permanently from infringing the Copyrighted Works in any manner, including reproducing them and distributing them to third parties.

(b)    That Defendants be required to pay to Tecnomatic such damages as Tecnomatic has sustained as a consequence of Defendants' infringement of the Copyrighted Works and all gains, profits, and advantages derived by Defendants by their infringement of Tecnomatic's copyrighted works or such damages as to the Court shall appear proper within the provisions of the copyright statutes.

(c)      That Defendants be required to deliver up to be impounded during the pendency of this action all copies of the Copyrighted Works in their possession or under their control and to deliver up for destruction all infringing copies of the Copyrighted Works.

(d)      That Tecnomatic have such other and further relief as is just.

## COUNT VIII

## Article 99 of the Italian Copyright Act

## (Against Remy, Odawara, Stephenson,  Young, and Van Sickle)

473.  Tecnomatic incorporates by reference paragraphs 1 to 339 as if fully restated herein.

474.  Article 99 of the Italian Copyright Act states that: "The author of engineering works, or other similar works, which represent original solutions of technical problems, is entitled to, besides an exclusive right of reproducing plans and drawings of the projects themselves, a right to a fair compensation from those who realize the technical project for profit-making purposes without its consent."

475.  Tecnomatic is the author of one or more engineering works that represent original solutions to technical problems.  These engineering works are among or contained in, for example, the disc the Remy burnt and delivered to Odawara, which disc has been produced by Odawara in this litigation.  These engineering works are also among or contained in the materials that Tecnomatic provided to Remy and the Individual Defendants, as well as the Tecnomatic materials that Eagle identified as being received from Remy.

476.   Remy, Stephenson and Young realized the technical projects reflected in Tecnomatic's engineering woks for profit making purposes by incorporating Tecnomatic drawings in their patent applications.

477.   Remy, Odawara, Van Sickle, Stephenson, Young, and  Eagle realized one or more the technical projects reflected in Tecnomatic's engineering works for profit-making purposes without Tecnomatic's consent.

478.   Remy, Odawara, Van Sickle, Stephenson, Young, and Eagle owe Tecnomatic compensation for their acts.

479.   Tecnomatic has thereby been harmed and is entitled to damages, compensation for losses, and all other relief deemed appropriate.

## COUNT IX

## Unfair Competition Under 15 U.S.C. 1125(a)(1)(B) – False Advertising

## (Against Remy)

480.   Tecnomatic incorporates by reference paragraphs 1 to 339 as if fully restated herein.  15 USC 1125(a)(1)(B) provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

481.   Remy has made one or more false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising and promotion, misrepresents the nature, characteristics, qualities, and geographic origin of Remy's goods, services, or commercial activities.

482.   These false or misleading  representations include:

A.      Exhibit A is an advertisement and/or promotional piece for HVH 250 and HVH 410 motors with a copyright of 2010.  Remy used this advertisement and/or promotional piece at least on its website from 2010-2012.

B.      Remy made representations in Exhibit A about the HVH having over 1 billion miles of proven reliability.

C.      At the time of the advertisement/promotion attached as Exhibit A, only prototypes of  the HVH 250 and HVH 410 had been made and none were in commercial production.

D.      In 2011 Remy testified that the HVH 250 and HVH 410 were still prototypes and were not in production.

E.  This representation in Exhibit A is literally false and/or misleading.

483.   These false or misleading  representations include:

A.      Exhibit A is an advertisement and/or promotional piece for HVH 250 and HVH 410 motors with a copyright of 2010.  Remy used this advertisement and/or promotional piece at least on its website from 2010-2012.

B.      Remy has made representations in Exhibit A about "Remy patented winding  technology provides more power and torque density *than any other competitor."*

C.    This is a false or misleading representation for one or more of the following reasons:

1) Remy did not have an issued patent on the winding technology when this statement was made and its patent application on the twister remains pending.

2) Remy's representation is a "tests prove" claim and at the time Remy had not conducted tests to prove this over every other competitor and or the tests were deficient.

3)  Remy's representation is a "tests prove" claim and at the time Remy had not conducted a test to prove this statement true over Tecnomatic's winding technology and or the tests were deficient.

484.   These false or misleading  representations include:

A.    Exhibit A is an advertisement and/or promotional piece for HVH 250 and HVH 410 motors with a copyright of 2010.  Remy used this advertisement and/or promotional piece at least on its website from 2010-2012.

B.    Remy has made representations in Exhibit A that Remy's patented winding technology provides better continuous power than any other motor on the market. This is a tests prove claim and at the time this statement was issued Remy had not conducted tests to prove this statement true over every other motor on the market or the testing was deficient.

485.   These false or misleading  representations include:

A.    Exhibit A is an advertisement and/or promotional piece for HVH 250 and HVH 410 motors with a copyright of 2010.  Remy used this advertisement and/or promotional piece at least on its website from 2010-2012.

B.      Remy made representations in its Exhibit A about its manufacturing capabilities for this product line around the world.

C.      At the time Remy made this representation Remy did not have and/or did not have sufficient manufacturing capabilities for the HVH 250 or HVH 410.

D.      At the time Remy made this representation Remy did not have and/or did not have sufficient manufacturing capabilities to undertake new production.

E. In its Project narrative submitted to the Department of Energy states on page 27716 that:

 "Existing Equipment from Remy's existing manufacturing lines is either unavailable or unable to be used for this project.  First these manufacturing lines are not located outside the United States (Remy's desired manufacturing location).  Secondly Remy's proposed systems are to be very flexible by design to include multiple motor diameters, lengths, and output capabilities.  This flexibility requires different designs than a system designed primarily for one specific customer and model.  Finally the equipment used for the current customer applications does not have available capacity above that committed to those customers."

F.      Thus this representation is false and/or misleading.

486.   Exhibit G is a Remy advertisement and promotion dated October 9, 2009.

487.   At the time this advertisement or promotion is made in October 2009 the "HVH "off the shelf" line including the HVH 250 and HVH 410 were not production ready and only prototypes had been made.  As of Remy's deposition in March  2011, only prototypes had been made.

488.   The false or misleading representations in the Exhibit G advertisement or promotion include:

A.      Remy made representations in Exhibit G, dated October 2009 about "Remy has significantly lowered the cost of entering the Hybrid market both technologically and financially." This statement is false and misleading and is a test show claim where either no tests were conducted prior to making the statement or deficient testing was done.

489.   The false or misleading  representations in the Exhibit G advertisement or promotion include:

A.      Remy made representations in Exhibit G, dated October 2009 about" Remy proprietary high voltage hairpin winding technology and unique  cooling strategies that produces the **highest efficiency and power density available on the market**."  This statement is false and misleading and is a test show claim where either no tests were conducted prior to making the statement or deficient testing was done.  Remy did not conduct a test with respect to Tecnomatic high voltage hairpin winding technology.

B.      At the time this statement was made Remy did not have the HVH off the shelf products in anything other than prototype, and thus its products were not on the market, and could not be on the market.  As of March 2011 deposition the HVH products were still in prototype.

490.   The false or misleading representations in the Exhibit G advertisement or promotion include:

A.      Remy made a representation in Exhibit G, dated October 2009 about Remy allegedly having "a solution." - "Off the shelf hybrid motors from Remy." At the time this statement was made Remy only had prototype and production ready "off the shelf hybrid motors" were not available. Remy also  had no production capabilities for the promoted "off the shelf motors."   *See* representation in the Department of Energy Grant.

B.      Remy made these representations in the context of stating that start up costs for design development, validation and manufacture of the alleged " off the shelf" hybrid motors are cost prohibitive.   This is a false and misleading representation.

491.   The false or misleading  representations in the Exhibit G advertisement or promotion include:

A.      Remy made a representation in Exhibit G, dated October 2009 on page 4 about the "patented design."

B.      Remy made this representation on the same page as Figures 1 and 2.

C.      On page Remy 00027752 of Remy's representations to the DOE, Remy lists the "Intellectual Property with the HVH design" and then lists a number of patent applications and three two issued patents.  None of these are design patents.

D.      In addition, at the time this statement was made Remy had not patented the design, and Remy had not patented the design in Figures 1 and 2 of page 4 of Exhibit G.

E.      In addition on information and belief and a reasonable opportunity for discovery will show, Remy did not have issued patents on the specific technology addressed on page 4.

492.   The false or misleading  representations in the Exhibit G advertisement or promotion include:

A.      Remy made a representation  in Exhibit G, dated October 2009 on page 4-5 about tests comparing to a round wire stator, but then goes on to represent that the resultant are similar when HVH are used in AC induction machines.   On information and belief and a reasonable opportunity for discovery will show this statement is false and misleading and is a test show claim where either no tests were conducted prior to making the statement or deficient testing was done.

493.   The false or misleading representations in the Exhibit G advertisement or promotion include:

A.      Remy made a representation  in Exhibit G, dated October 2009 on  page 6 that the HVH line is a "proven solution for integration."   At the time this statement was made Remy had only made prototypes and did not have a manufacturing facility with available capacity.

B.      This statement is false and misleading and is a test show claim where either no tests were conducted prior to making the statement or deficient testing was done.

494.   The false or misleading  representations in the Exhibit G advertisement or promotion include:

A.      Remy made a representation in Exhibit G, dated October 2009 on page 8 that it has the capacity to manufacture 100,000 motors. In December 2008 Remy made representations to the Department of Energy stating that it did not have available capacity for these products.

B.      This statement is false or misleading because the capacity was not available capacity and additional production ready manufacturing plants or equipment was not ready or available.

495.   Remy used and distributed Exhibit A and G on its website.

496.   Remy uses the American flag symbol in commercial advertising and promotion on its website that misrepresents the geographic origin of Remy's goods or services.  Remy's use of the American Flag is false or misleading because:

A.      As of February 2012  Remy has not made any production of HVH motors in the United States yet uses the American flag in its advertising and promotion activity.

B.      As of February 2012 Remy had only made production of  HVH in Mexico and Hungary, not the United States.

C.      At the time of the advertisements and promotion Remy had no production facility or capability to produce HVH in the United States.

D.      Thus Remy's advertisements are misleading as to the commercial activities of Remy and the geographic origin of its goods and services.

497.   Remy has made a misleading representation of fact by using in advertising and promotion the reference to the Grant because the Grant application was submitted and obtained using Tecnomatic confidential information and thus such reference is

misleading as to the commercial activities of Remy and the geographic origin of its goods and services.

498.   Remy knows that Tecnomatic offers and sells services in connection with stator design and stator manufacturing equipment because Tecnomatic provided those services to Remy and provides those services to others.

499.   Remy has implemented a standardization strategy that, as admitted by Remy President Pittas, is designed to cut out the need for customers to use Tecnomatic's goods and services.

500.   Tecnomatic goods and services are an alternate solution to Remy's prototype "off the shelf solution."  Remy's advertisement and promotion misleading as to the "patent" protected status of its "design" and or technology, as to its current state of development (*i.e.,* prototype) and its current state of manufacturing capabilities in a "standardization strategy" designed to cut out customers needs for Tecnomatic's services is unfair competition and false advertising and is harmful to companies like Tecnomatic that provide competitive goods and services in this area.

501.   Remy's statements are likely to damage Tecnomatic.

502.   Tecnomatic seeks damages, disgorgement of profits, unjust enrichment, and other relief that is deemed reasonable and proper.

WHEREFORE as part of and in addition to the relief requested at each count, Tecnomatic respectfully requests the following relief:

A.      Actual damages in the amount of $110,000,000 or an amount to be determined at trial;

B.      Disgorgement of Defendants' profits;

C.      Enhanced damaged in the amount of three times the actual damages;

D.      Punitive damages;

E.      Attorneys' fees and costs;

F.      Preliminary and permanent injunctive relief;

G.      Constructive trust; and

H.      Any and all other relief that this Court deems appropriate.

## COUNT X

### Correction of Patent Inventorship

### (Against Remy)

503.   Paragraphs 1 to 339 are incorporated herein as if fully restated herein.

504.   One or more of the Remy Defendants has obtained a patent on an invention for which Tecnomatic individuals, including but not limited to Sante Guercioni, are the true inventors or, at a minimum, joint inventors.  Under Italian law, all inventions by individuals employed by an Italian company become the property of the Italian company.

505.   Particularly, the Patent Application for a Method and Device for Bending Electric Machine Conductors issued as U.S. Patent No. 8,327,677 ("the '677 Patent") on December 11, 2012.  *See* Exhibit N.

506.  Tecnomatic employees are the inventor(s) or co-inventor(s) of the '677 Patent because they contributed in a significant manner to the conception and/or reduction to practice of the claimed invention and made a contribution to the claimed invention that is significant in quality when measured against the dimension of the full invention.

507.   The inventorship should be corrected under 35 U.S.C. § 256 of the Patent Statute.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Tecnomatic S.p.A. requests a trial by jury in this matter.

Dated: July 12, 2013                                              Respectfully submitted,


BRYAN CAVE LLP

By: /s/ Kara E. F. Cenar
S. Patrick McKey (*pro hac vice*)
Kara E. F. Cenar (*pro hac vice*)
BRYAN CAVE, LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
kara.cenar@bryancave.com
Patrick.mckey@bryancave.com

A. Richard M. Blaiklock
John C. Trimble
Jason M. Lee
LEWIS WAGNER, LLP
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202
Telephone: (317) 237-0500
Facsimile:(317)630.2790
rblaiklock@lewiswagner.com
jtrimble@lewiswagner.com
jlee@lewiswagner.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the following counsel of record via ECF on this 12th day of July, 2013.

David M. Allen
Colby Anne Kingsbury
Trina Kissel Taylor
FAEGRE BAKER DANIELS LLP
311 South Wacker Drive, Suite 4400
Chicago, IL  60606
Tel:  (312) 212-6573
Fax:  (312) 212-6501
david.allen@faegrebd.com
colby.kingsbury@faegrebd.com
trina.taylor@faegrebd.com

Joseph H. Yeager, Jr.
Ryan Michael Hurley
Munjot Sahu
FAEGRE BAKER DANIELS LLP
300 N. Meridian, Suite 2700
Indianapolis, IN 46204
Tel:  (317) 237-0300
Fax:  (317) 237-1000
jay.yeager@faegrebd.com
ryan.hurley@faegrebd.com
munjot.sahu@faegrebd.com

David P. Irmscher
FAEGRE BAKER DANIELS LLP
111 E Wayne St, #800
Fort Wayne, IN 46802
Tel:  (260) 460-1602
Fax:  (260) 460-1700
david.irmscher@faegrebd.com

Charles P. Rice
Patrick David Murphy
BOVERI MURPHY RICE, LLP
210 S. Michigan Street, Suite 400
South Bend, IN  46601
Tel:  (574) 232-0300
Fax:  (574) 232-0400
crice@bmrllp.com
pmurphy@bmrllp.com

Fred Anthony Paganelli
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, ,IN  46204
Tel:  (317) 713-3500
Fax:  (317) 713-3699
paganelli@taftlaw.com

Thomas A. Knoth
Nicholas W. Myles
Jason P. Bichsel
THOMPSON HINE LLP
Austin Landing I
10050 Innovation Drive, Suite 400
Dayton, OH  45342-4934
Tel:  (937) 443-6600
Fax:  (937) 443-6635
tom.knoth@thompsonhine.com
nicholas.myles@thompsonhine.com
jason.bichsel@thompsonhine.com

/s/  Kara E. F. Cenar