UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| REMY, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TECNOMATIC S.P.A., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| TECNOMATIC S.P.A., | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:11-cv-00991-SEB-MJD |
| | ) | |
| vs. | ) | |
| | ) | |
| REMY, INC., | ) | |
| ODAWARA AUTOMATION, INC., | ) | |
| REMY INTERNATIONAL, INC., | ) | |
| DELCO REMY MEXICO, S.R.L. DE C.V., | ) | |
| REMY COMPONENTES S. DE R.L. DE | ) | |
| C.V., RICHARD VAN SICKLE, | ) | |
| MARK STEPHENSON KEVIN, | ) | |
| KEVIN YOUNG, | ) | |
| STUART PERRY, | ) | |
| REMY TECHNOLOGIES, LLC., | ) | |
| RVS DIRECT SERVICES INC., AND DOES | ) | |
| 1-5 | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS TO DISMISS**

This cause is once again before the Court, this time for resolution of two Motions to

Dismiss Tecnomatic, S.P.A.'s ("Tecnomatic's") Third Amended Complaint ("TAC").

Defendant Odawara Automatation, Inc. ("Odawara") seeks the dismissal of the claims against it

1

for misappropriation of trade secrets (Count IV) and copyright infringement under United States and Italian law (Counts VII and VIII). [Docket No. 614]. For the reasons detailed below, Odawara's Motion is <u>GRANTED</u> with regard to Tecnomatic's Italian law claims (part of Count VII and all of Count VIII), which shall be <u>DISMISSED WITHOUT PREJUDICE</u>. The Motion is <u>DENIED</u> in all other respects.

Other Defendants have filed a joint Partial Motion to Dismiss [Docket No. 616], which is <u>GRANTED IN PART and DENIED IN PART</u>. Specifically, Defendants Richard Vansickle, Mark Stephenson, Kevin Young, and Stuart Perry (the "Individual Defendants") seek the dismissal of the breach of contract (Counts I and II) claims as well as the copyright infringement pursuant to Italian law (Count VIII) claims brought against each of them. These motions are granted and the related claims are <u>DISMISSED</u>. The dismissals of the breach of contract claims are with prejudice, but the Italian copyright infringement claim is dismissed without prejudice. Defendants Stuart Perry and Mark Stephenson additionally seek the dismissal of the conversion claim (Count VI) against them. This request is granted and that claim is <u>DISMISSED WITH PREJUDICE</u>.

Remy Inc., Remy International, Inc. and Delco Remy Mexico S.R.L. de C.V. ("Remy") seek the dismissal of the claims against it for conversion (Count VI), copyright infringement pursuant to Italian law (part of Counts VII and all of Count VIII), and correction of patent inventorship (Count X). As discussed below, the claim for conversion will be <u>DISMISSED WITH PREJUDICE</u>, the Italian copyright infringement claim will be <u>DISMISSED WITHOUT PREJUDICE</u> but the motion is <u>DENIED</u> with regard to the correction of patent inventorship claim. RVS Direct Services ("RVS") seeks dismissal of the copyright infringement pursuant to Italian law (Count VIII) claim against it. This request is granted and that claim will be

DISMISSED WITHOUT PREJUDICE.  Finally, Remy Technologies, LLC ("Remy

Technologies") seeks dismissal of the correction of patent inventorship claim (Count X) against

it, which motion is DENIED.

## I.     Factual Background[1]

## A.     The Parties and the Pending Claims

Tecnomatic is an Italian corporation that invents, develops, and creates stators and stator

winding in electric motors, most notably those utilized by the automotive industry in hybrid

electric vehicles.  Tecnomatic also develops equipment used in the manufacture of stators.

According to the TAC, through a feigned interest in a "joint venture" with Tecnomatic, Remy

induced Tecnomatic to enter into two confidentiality agreements which allowed it to obtain

certain confidential information from Tecnomatic.  Remy employees, several of whom are

defendants in this litigation, shared this information with Odawara[2] and with former Defendant

Hanson Systems, LLC d/b/a Eagle Technologies Group ("Eagle"), who also engaged in

unauthorized uses of the confidential information.

Each Individual Defendant (Van Sickle, Stephenson, Young, and Perry) was an employee

of Remy,[3] who allegedly passed Tecnomatic's drawings, manuals, and information to Eagle and

---

[1] The recitation of the facts is drawn from the TAC.  To the extent the TAC is replete with conclusory statements and legal conclusions (and it is), they are not included.

[2] Odawara is an Ohio corporation with its principal place of business in Tipp City, Ohio.  Odawara Automation, Inc. is owned by newly added Defendant Odawara Engineering Co. Ltd., which maintains its principal place of business in Japan.  TAC ¶ 41.

[3] Van Sickle is allegedly also president and incorporator of Defendant RVS Direct Services, Inc.  TAC ¶ 56.  The TAC alleges that "further discovery will clarify the relationship between or among Van Sickle, RVS Direct Services, and the Remy Defendants."  TAC ¶ 58.

Odawara. The TAC also asserts that Defendants Young and Perry wrongly and evasively testified in connection with this litigation.[4] TAC ¶¶ 60-61.

Remy is accused of having retained Eagle to create a "twister" and providing Eagle with access to Tecnomatic's "manufacturing equipment and various physical components of Tecnomatic's equipment and tooling and Tecnomatic's manuals, drawing, and software." Defendants Stephenson and Young allegedly provided Eagle with "access to Tecnomatic's information" and "worked with Eagle on the copied twister." TAC ¶ 17.

Remy is also accused of having engaged Defendant Odawara to provide a "slot liner, welder and swedger machine." Defendants Stephenson and Young along with other Remy employees not currently named as defendants allegedly provided Odawara with two discs of "Tecnomatic drawings, manuals, videos, and other information." TAC ¶ 19. After Tecnomatic discovered that Odawara had possession of these two discs in 2012, Odawara has refused to return these discs to Tecnomatic despite requests to do so. TAC ¶ 37-39.

### B. Remy's Interest in Tecnomatic's Stator Technology

At all times relevant to this litigation, the automotive industry was projected to move increasingly toward the use of hybrid motors in which "stators" are a key component. Based on these predictions, Remy sought to offer hybrid technology in order to maintain a product presence in the future. By 2002, however, Remy had still been "unable to develop sufficient complex stator technology using its own resources, and/or could not do so in a manner

---

[4] Defendant Van Sickle allegedly supervised Defendants Stephenson, Young, and Perry and non-Defendant Terry Oaf and engaged with them in wrongfully transmitting confidential information to Eagle and Odawara. Defendant Young also is accused of forwarding Tecnomatic's drawings to others and "wrongly [testifying] that no drawings were sent to Eagle." Defendant Perry allegedly made copies of Tecnomatic's information and "wrongfully and evasively" testified that he no longer had Tecnomatic related documents in his possession. Defendant Stephenson was "held out as Remy's "lead engineer" on the projects with Eagle and Odawara, and . . . was directly involved in making copies of Tecnomatic information, sending that information to others including Eagle and Odawara, and was personally involved in distributing" a copy of Tecnomatic software. TAC ¶ 68.

timely enough for potential customer demand, or ahead of competitor activity." TAC ¶ 90. Thus, Remy's strategy was to establish itself in the hybrid automotive industry where it could effectively block its competitors. TAC ¶ 90.

In early 2002, knowing of Tecnomatic's established reputation in the stator and stator winding industries including their technology for manufacturing such stators, Remy approached Tecnomatic to make a presentation to Tecnomatic regarding its stator technology and capabilities. TAC ¶ 96. Tecnomatic refused to provide Remy access to its "know-how" or other proprietary information without contractual assurances from Remy to protect that confidential information. TAC ¶ 98.

By 2003, Remy had developed an interest in a "possible joint venture" with Tecnomatic, which Tecnomatic refers to as the "Hybrid Motor Project." TAC ¶ 99. At that time, Tecnomatic was the "only known source" for the "hairpin twist application." Unbeknownst to Tecnomatic, however, Remy "had no intention to enter into a joint venture," instead "intend[ing] to gain access to and learn about Tecnomatic's know-how and proprietary information relating to stators and stator winding technology, as well as the manufacture of lines to build the same." TAC ¶¶ 103-04.

### C.     The Confidentiality Agreements Between Remy and Tecnomatic

Based on Remy's representations, Tecnomatic executed the Mutual Confidentiality Agreement ("MCA") in May 2003, agreeing to facilitate the exchange of certain confidential information between the companies between May 2003 and May 2005. Thereafter, Tecnomatic collaborated with Remy on technology relating to complex stators and productions lines for the stators. TAC ¶ 116. Remy designated Defendants Kevin Young and Stuart Perry as well as non-

defendants Terry Oaf and Jim Spellman to have access to the confidential information from Tecnomatic.

In August 2004, Remy continued to maintain an interest in entering into a joint venture with Tecnomatic. In that regard, Remy and Tecnomatic extended the MCA until May 2007 through the Extension Confidentiality Agreement ("ECA"). TAC ¶¶ 128-138.

Between late 2005 and early 2006, Remy instituted a change in management and undertook significant cost cutting and budgetary reductions. TAC ¶¶ 145, 148. As a part of these curtailments, unbeknownst to Tecnomatic, the decision was made by Remy to cut Tecnomatic out of the Hybrid Motor Project. Remy also sought to disparage Tecnomatic's reputation in an effort to block Tecnomatic's participation in "the United States complex stator, stator winding and manufacturing systems for stators for hybrid motors marketplace." TAC ¶¶ 152-53. However, it became clear that Remy required access to Tecnomatic's information "related to complex stators, stator winding technology, and stator manufacturing technology without jeopardizing the Remy Defendant's business objectives going forward." TAC ¶¶ 156, 159-160. Thus, Remy devised a disingenuous "negotiation strategy" whereby Remy would mislead Tecnomatic with regard to the potential of future business between them in order to secure continued cooperation from Tecnomatic. TAC ¶ 162.

### D.    Remy Accesses and Transfers Tecnomatic's Confidential Information

Around 2006, Remy began to demand access to Tecnomatic's technical drawings and manuals. TAC ¶¶ 172, 249-253. Remy employees allegedly knew that Remy had no intention of conducting further business with Tecnomatic; their only purpose in making these demands was to secure an opportunity to copy the otherwise proprietary and privileged information contained in them. TAC ¶¶ 175, 253. On July 17, 2006, Tecnomatic President Guiseppe Ranalli

sent a letter to Defendant Van Sickle reluctantly agreeing to provide Remy with the requested drawings. TAC ¶ 178. At some point thereafter, Remy modified its own internal drawings relating to stators to incorporate Tecnomatic's confidential information. TAC ¶ 158. In August 2006, Remy employees discussed via email the possibility of using Eagle and Odawara instead of Tecnomatic to supply equipment based on cost concerns relating to reliance on Tecnomatic for multiple systems. TAC ¶ 247. Remy executives and employees including Van Sickle, Perry, Stephenson, and Oaf also sought access to Tecnomatic drawings and began "systematically" transferring such drawings, manuals, and other information to Eagle and Odawara. TAC ¶¶ 213, 215, 255. By knowing the details from Tecnomatic's drawings, Eagle and Odawara were able to "shorten development, research and development, engineering and manufacturing time and to sell stator equipment to Remy." TAC ¶ 216.

Part of Remy's negotiation strategy was to convince Tecnomatic to lease and have delivered a line of equipment to Remy's facility in Mexico that would allow Remy a strategic leverage over Tecnomatic.[5] TAC ¶¶ 162-63. Tecnomatic refers to this stage of their relationship as "Phase I." Tecnomatic and Remy entered into a lease agreement of Phase I equipment on January 31, 2006. TAC ¶ 165. Tecnomatic alleges that Remy's plan was to copy the equipment and give unauthorized individuals access to it. TAC ¶ 166.

The leased equipment was installed in Remy's facility in Mexico between December 2006 and January 2007.[6] TAC ¶ 182. Also in January 2007, Remy employees Alford, Muir, Tocco, Kirby, Van Sickle, Stephenson, Oaf, and Americo Cruz met to develop a plan to further mislead Tecnomatic, inducing it to transfer its knowledge, to copy Tecnomatic's equipment for

---

[5] Tecnomatic alleges that Van Sickle requested that Remy obtain Tecnomatic's equipment for this purpose in October 2006. TAC ¶ 249.

[6] It appears that there was some quibbling between Remy and Tecnomatic over the "readiness" of the equipment but that it was shipped at Remy's insistence at that time. TAC ¶¶ 167-68, 170, 182.

sourcing, and to seek a review by its attorney Shives as to the possibility of patenting Tecnomatic's intellectual property. TAC ¶ 184.

Remy contacted Eagle and Odawara in January 2007 to enlist them in the process of mirroring, duplicating and/or otherwise copying the Tecnomatic equipment. TAC ¶ 189. Between February and March 2007, after concealing their identities from Tecnomatic, employees of Remy, Eagle, and Odawara traveled to the Remy facility in Mexico to photograph and "otherwise access Tecnomatic's proprietary and confidential information" for purposes of copying Tecnomatic's equipment. TAC ¶¶ 191, 200. Tecnomatic alleges that all these individuals "knew that such information was being improperly accessed and that Remy had a duty to maintain the information as confidential."[7] TAC ¶ 198.

On March 26, 2007, counsel for Tecnomatic sent a letter to Muir, Van Sickle, and Kirby, stating as follows:

> Tecnomatic has provided Remy, Inc. with copies of drawings, manuals and other documents containing Tecnomatic proprietary information relating to production equipment for the production of electric motors for vehicles. This proprietary information is properly marked as proprietary, and was provided to Remy, Inc. for Remy, Inc.'s use solely for the operation and maintenance of equipment purchased from Tecnomatic. Any other use of this information is a misappropriation of Tecnomatic's trade secrets.
>
> It has come to our client's attention that between February 22 and March 2 of this year, during the Tecnomatic system commissioning and start up, the system was being photographed by persons not known to our client's employees. We ask that you advise us of the identity and affiliation of the persons who were permitted to photograph the Tecnomatic system and the purpose of those photographs.
>
> In addition, please note that the equipment and its use are the subject of numerous pending applications for U.S. patents. Included are applications for process patents. When issued, an importation of motors or vehicles with motors manufactured on similar equipment provided by anyone other than Tecnomatic will constitute infringement of these patents. In that regard, please note subsection

---

[7] This effort was allegedly coordinated by Defendant Van Sickle, who also instructed Defendant Stephenson to begin collecting videos, pictures, and other materials for "on-location review."

(g) of section 271 "Infringement of patent" of Title 35 of the U.S. Code which provides as follows:

(g) Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.

Tecnomatic expects Remy to respect Tecnomatic's rights under U.S. Patent laws and trade secret laws just as Remy would expect someone else to respect Remy's rights. Accordingly Tecnomatic expects Remy to not provide drawing or other documentation or allow pictures to be taken of its equipment that would disclose Tecnomatic trade secrets. Tecnomatic further expects Remy to not import motors or vehicles containing motors into the U.S. manufactured with processes that infringe Tecnomatic's U.S. Patents when they issue.


TAC, Ex. E.

On May 9, 2007, Remy's counsel, JJ Shives, responded to Tecnomatic's March 26, 2007

letter, as follows:

Thank you for your recent letter regarding equipment purchased by Remy Inc. from Tecnomatic Group SpA of Teramo, Italy.

Remy has no intention of violating Tecnomatic's intellectual property rights. However, if you truly believe that a potential infringement is occurring, please provide a list detailing: (1) all pending and issued patents related to the equipment; and (2) descriptions of specific aspects of equipment covered by Tecnomatic intellectual property.

Remy currently takes photographs of its equipment for multiple purposes, including within limitation staffing efficiencies, takt time studies, plant layout planning, and materials flow improvements. However, I have been assured by the Remy employees responsible for this project that Remy has no intention of replicating the Tecnomatic equipment or infringing upon any Tecnomatic intellectual property.

Additionally, it has come to my attention that during their recent visits to Remy's facility in San Luis Potosi, representatives from Tecnomatic were seen examining and takes notes on confidential and proprietary Remy production assembly equipment not related to the Tecnomatic equipment nor within their scope of authority for entering Remy's facility. Remy would also expect Tecnomatic to

respect Remy's rights under United States trade secret laws in the same manner
Tecnomatic has request (sic) Remy to respect its rights.

Compl. Ex. F.  It is alleged that at least one former Remy employee has admitted that Shives's

statement regarding Remy's lack of intention to replicate Tecnomatic's equipment was false.

TAC ¶ 206.

Tecnomatic maintains that over the course of early 2007, Remy transferred various

videos, manuals, photographs, drawings, discs, etc. containing its confidential information to

both Eagle and Odawara.[8]  As a result, "Eagle and Odawara and others were able to shorten

development, research and development, engineering and manufacturing time and to sell stator

equipment to Remy that is a copy of and/or the result of the benefits of improper accessing and

using of Tecnomatic confidential information."  TAC ¶ 216.

Tecnomatic further alleges that "upon information and belief" Remy prepared and filed

patent applications on Tecnomatic's inventions despite having knowledge that Tecnomatic was

the actual owner of that intellectual property.  TAC ¶¶ 218-19.  No Tecnomatic employees were

listed as inventors of this technology on these patent applications filed between 2006 and 2009.

TAC ¶ 222.  The patent issued as United States Patent No. 8,327,677 ("the '677 patent") on

December 11, 2012 and lists Remy Technologies, LLC as the "Assignee."  TAC ¶ 222.

E.      Termination of the Relationship Between Remy and Tecnomatic

On May 12, 2008, Remy terminated its relationship with Tecnomatic, including the lease

of Tecnomatic's equipment, and sought a refund of amounts it had paid to Tecnomatic over the

term of the lease.  In September 2008, Remy also revoked certain purchase orders.  TAC ¶ 226.

Tecnomatic alleges that Remy now holds itself out as the inventor of "a new stator

---

[8] Paragraphs 245-353 of the TAC contain "Additional General Allegations" regarding specific instances of this
continuing course of conduct.  To the extent that these facts are relevant to our resolution of the Motions before
us, we discuss them in more detail below.

winding design that uses rectangular wire . . . with windings that are arranged in multiple layers," i.e. "hairpin stator technology," (TAC ¶ 230) and that Remy publicizes this technology is being incorporated into its motors.  TAC ¶ 233.

Tecnomatic also cites the fact that Remy recently obtained a federal grant for at least $60,000,000 from the Department of Energy as evidence of and a consequence of its misrepresentations to the DOE relating to the development of the technology at issue.  TAC ¶ 242.

## II.     Standard of Review

The Defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand the requirements of Federal Rules of Civil Procedure 8 and 12(b)(6).  Id. "[A]t some point, the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."[9] Killingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 619 (7th Cir. 2007) (quoting Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007)) (internal quotations omitted)).

A party moving to dismiss nonetheless bears a weighty burden.  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations

---

[9] Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim that the pleader is entitled to relief."  Fed. R. Civ. Pro. 8(a).

in the complaint."  Twombly, 550 U.S. at 563 (citing Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) ("[At the pleading stage] the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.")).  In addressing a Rule 12(b)(6) motion, we treat all well-pleaded factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in the light most favorable to the non-movant.  Lee v. City of Chicago, 330 F.3d 456, 459 (7th Cir. 2003); Szumny v. Am. Gen. Fin., 246 F.3d 1065, 1067 (7th Cir. 2001).

## III.    Discussion

As noted above, the two motions to dismiss currently before the Court attack claims against various defendants or groups of defendants.  We address each of these motions in turn below.

### A.    Count IV: Tecnomatic's Trade Secret Misappropriation Claim

Odawara asserts that Tecnomatic has failed to include all the essential elements of its trade secret misappropriation claim against it.[10]  The adequacy of Tecnomatic's misappropriation claim is governed by the Indiana Uniform Trade Secrets Act ("IUTSA"), IND. CODE § 24-2-3-1. *et seq*, which defines misappropriation as follows:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret;

---

[10] Odawara also argues that Indiana's statute of limitations bars Tecnomatic's trade secret misappropriation claims against them.  This matter has been previously addressed by this Court and will not be revisited here.  Dkt No. 497 (holding that Tecnomatic's claims are not time-barred).

(B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

> (i) Derived from or through a person who had utilized improper means to acquire it;

> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

IND. CODE § 24-2-3-2.

Odawara argues that Tecnomatic has failed to allege facts that, if proven, would establish that Odawara "used improper means to acquire knowledge of the trade secret" or that Odawara acquired a trade secret when it "kn[ew] or ha[d] reason to know that the trade secret was acquired by improper means." "Improper means" is defined by the IUTSA as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." IND. CODE § 24-2-3-2.

The TAC alleges that sometime during February or March 2007, "one or more of the Remy Defendants and Eagle and Odawara employees and/or management entered the Remy facility in Mexico, concealing their true identities from Tecnomatic, and began to photograph and otherwise access Tecnomatic's proprietary and confidential information in violation of the MCA and ECA." TAC ¶ 191. These individuals allegedly "knew that such information was being improperly accessed and that Remy had a duty to maintain the information as confidential" and were accessing the information "in order to copy Tecnomatic's equipment, and improperly access and use Tecnomatic confidential information to jumpstart their duplication of the

Tecnomatic equipment." TAC ¶¶ 198, 200. If true, these allegations would establish that Odawara acquired Tecnomatic's trade secrets with knowledge that that information was being acquired improperly. Thus, the trade secret misappropriation claim against Odawara is not subject to dismissal.[11]

Odawara also argues that Tecnomatic has failed to allege facts establishing that Odawara wrongfully disclosed or used the alleged trade secrets by incorporating them into Odawara machines. Specifically, Odawara argues that the TAC fails to "allege what trade secrets Odawara misappropriated, how those trade secrets were incorporated into the Odawara machines, or even what aspects of the Tecnomatic and Odawara machines are alike." Tecnomatic rejoins, and we agree, that it is not required to plead facts that would disclose its trade secrets or provide highly specific facts relating to improper trade secret use that would only become known to Tecnomatic during discovery. Tecnomatic alleges that Odawara was engaged by Remy to "provide a slot liner, welder and swedger machine" and for that purpose Remy provided Odawara with two discs containing "Tecnomatic drawings, manuals, videos, and other information." TAC ¶¶ 19, 37. Odawara is accused of having been able to "shorten development, researched and development, engineering and manufacturing time and to sell stator equipment to Remy that is a copy of and/or the result of the benefits or improper accessing and using of Tecnomatic confidential information." TAC ¶ 216. The TAC further alleges that Odawara copied Tecnomatic's "existing tooling" and, thus, saved time and engineering resources. TAC ¶¶ 272-73, 283, 299. These allegations provide sufficient notice to Odawara of Tecnomatic's claims against it. Odawara's motion to dismiss the claim is <u>DENIED</u>.

---

[11] Odawara also argues that allegations in the TAC that Odawara obtained the trade secret information from Remy and with Remy's consent preclude Tecnomatic from being able to establish that Odawara did anything illegal to obtain the alleged trade secrets. However, Odawara cites no authority for this theory and we can find none from our own research.

### B.    Copyright Infringement Claims Under United States and Italian Law

#### 1.    Count VII: Copyright Infringement Under United States Law

Odawara again faults the TAC for its failure to state a claim for copyright infringement under federal statutes.  Odawara advanced this argument previously in opposition to Tecnomatic's Motion for Leave to Amend its Complaint and the Magistrate Judge rejected it, finding that Tecnomatic had alleged sufficient facts to support each of the elements of its copyright infringement claim.  Dkt. No. 403 at 56-57.  We adopt the same reasoning as articulated by the Magistrate Judge, and hold that Odawara's requested dismissal of this claim must be <u>DENIED</u>.

#### 2.    Counts VII and VIII: Copyright Infringement Pursuant to Italian Law

Odawara next contends that Counts VII and VIII must be dismissed against it because they invoke Italian law, which is inapplicable here.[12]  Odawara maintains that United States law provides the only basis for relief since the alleged infringement occurred within the United States.  Remy, Stephenson Young, Van Sickle and RVS Direct seek dismissal of these claims (to the extent the claims are directed at them) on the same grounds.  Thus, we shall discuss the viability of the Italian copyright infringement claims against all of these Defendants.

In <u>Itar-Tass Russian New Agency v. Russian Kurier, Inc.</u>, the Second Circuit held that the laws of the country with the most significant relationship to the work's creation govern ownership disputes.  153 F.3d 82, 90-91 (2d Cir. 1998).  However, "[f]or infringement issues,

---

[12] In granting Tecnomatic's Motion to Amend Complaint to include its claims for copyright infringement under Italian law, the Magistrate Judge noted that the parties did not sufficiently discuss the issue of whether United States or Italian law applies to Tecnomatic's claims for copyright infringement.  Dkt. No. 403 at 59.  The Magistrate Judge instructed the parties to address the choice of law issues in a motion to dismiss if one were filed challenging the new version of the complaint.  <u>Id</u>.

such as the scope of protection or recovery, the relevant law is that of the country where the alleged infringement occurred." <u>Rudnicki v. WPNA 1490 AM</u>, Case No. 04 C 5719, 2009 U.S. Dist. LEXIS 115236, at *21-22 (N.D. Ill. Dec. 10, 2009) (citing <u>Itar-Tass Russian New Agency</u>, 153 F.3d at 90-91). Although the Seventh Circuit has not addressed this issue, district courts within our circuit have adopted the view of the Second Circuit. <u>See, e.g.</u>, <u>Rudnicki</u>, 2009 U.S. Dist. LEXIS 115236, at *21-22. Tecnomatic responds to Defendants' arguments on the basis that it would be premature to determine at this juncture whether the laws of the United States, Italy, or perhaps various other countries apply to resolve its copyright claim(s) because "[d]iscovery is needed to determine the full nature, extent, and precise locations of the Defendants' various acts of infringement . . . ." Tecnomatic also maintains that the TAC contains allegations of infringement that occurred in Italy. However, for the reasons detailed below, we are not persuaded by these arguments.

Tecnomatic's prematurity argument asks that we entertain the possibility of future claims that are not included within the current allegations set out in the TAC. Our review of the TAC reveals that there is no reference to any act of infringement that occurred in Italy. Indeed, the TAC lacks any specificity as to the place where the alleged infringement occurred. We agree with Odawara and Remy that it is fair to assume that these allegations refer to activities within the United States, given that these companies are located in the United States and no reference is made to infringing activity having occurred in any other specified country. If Tecnomatic's prediction comes true – that discovery may reveal infringing activities taking place in Italy or elsewhere – it can seek to amend its pleading to include such a claim at that time.[13]

---

[13] Defendants have requested that the dismissal be with prejudice in light of the fact that the pleading amendment deadline has expired. However, because we recognize that discovery is ongoing, we leave open the possibility for

We also reject Tecnomatic's attenuated argument that Remy (acting in either the United States or Mexico) in allegedly downloading electronic copies of manuals from a secured File Transfer Protocol ("FTP") server that was located in Italy thereby committed acts of infringement in Italy. The TAC states: Remy "asked for electronic copies of the copyrighted manuals and of other Copyrighted Works," which materials were made available to Remy via the FTP server for a "single, authorized use," and Remy exceeded that authorization when it distributed the information to third parties or engaged in other conduct constituting infringement. TAC ¶¶ 482-483. No other allegation ties Remy's infringing conduct in Italy.[14]

We hold that in its current form, the TAC does not invoke or otherwise implicate issues arising under Italian copyright law. Thus, Count VIII and the portion of Count VII referencing Italian law will be <u>DISMISSED WITHOUT PREJUDICE</u>.[15]

## C.     Counts I and II: Breach of Contract Claims Against the Individual Defendants

The Individual Defendants (Vansickle, Stephenson, Young, and Perry) contend that they are not parties to the MCA or the ECA and thus cannot be sued for breaching those agreements. Under Indiana law, "[a] person typically cannot be held liable for breach of contract unless it is shown that she was a party to the contract." <u>DiMizio v. Romo</u>, 756 N.E.2d 1018, 1021 (Ind. Ct. App. 2001). Tecnomatic concedes that the Individual Defendants, all of whom are or were

Tecnomatic to amend its pleading should evidence of infringement in locations outside of the United States be revealed.

[14] Tecnomatic's attempt to analogize the allegations in the TAC to cases allowing a copyright owner to invoke the law of a first country to recover damages for infringements that occur in a second country is unconvincing. As Tecnomatic admits, in those cases there was at least a "predicate act" of infringement in the first country that led to further infringement abroad. The TAC alleges no such predicate act to have occurred in Italy.

[15] Because we find that Count VIII fails for this reason, we need not address the Defendants' other argument for its dismissal, to wit, that the TAC fails to allege Tecnomatic's compliance with the requirement under Article 99 of the Italian Copyright Act that a claimant have deposited the copyrighted works at issue in the Public Register.

Remy employees, did not sign either contract. However, Tecnomatic maintains that the "plain language of the MCA – drafted by Remy – expressly binds a party's employees, advisors, consultants, and agents." However, the language Tecnomatic cites in support of this assertion, while arguably creating obligations on the part of Remy, does not create any obligation on the part of individuals who are not individually bound by the contract. For instance, the MCA states:

> [A]ny such Confidential Information may be disclosed to the receiving party's employees, advisors, consultants and agents . . . it being understood that all such Representatives receiving Confidential Information shall be identified to the information providing party and shall be informed of the confidential nature of the Confidential Information *and shall be required to maintain such Confidential Information in accordance with this Agreement.*

TAC Ex. C (emphasis in Tecnomatic's Response). This provision does not create a contract with anyone who is not otherwise a party to the contract, even if the person is a "Representative" in receipt of the Confidential Information referenced therein. This interpretation is bolstered, as the Individual Defendants point out, by other language in the MCA, which provides that "[E]ach *party* shall be responsible for any breach of this Agreement by its Representatives," e.g. employees.[16]

Tecnomatic also asserts that the Individual Defendants assented to the terms of the MCA or ECA and thus ratified those contracts, directing the Court specifically to Paragraphs 118 and 130 in support of this argument. Clearly, an individual can assent to the terms of a contract. Resp. at 5 (citing Ind. BMV v. Ash, Inc., 895 N.E.2d 359, 366 (Ind. Ct. App. 2008)). However, there simply are no allegations in the TAC that could reasonably be construed as acceptance of an offer from Tecnomatic by any of the Individual Defendants. Ash, Inc., 895 N.E.2d at 365

---

[16] Tecnomatic argues that this statement does not "exclude an action against the individuals or say they are not liable." Tecnomatic may be correct that if the Individual Defendants were otherwise parties to the contract then this statement would not absolve them of liability. However, Tecnomatic has provided no support for its position that a breach of contract claim against a non-party is viable under Indiana law.

("[t]o bring a contract into existence, an offer must be extended and the offeree must accept it, the communication of acceptance being crucial. Thus, a meeting of the minds between the contracting parties is essential to the formation of a contract."). Moreover, Paragraphs 118 and 130 comprise nothing more than conclusory statements that the Individual Defendants "ratified their acceptance" and thus are bound by the contracts.[17] Such conclusory allegations are clearly inadequate. Iqbal, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Finally, Tecnomatic claims that it is entitled to secure enforcement of certain provisions of the MCA and ECA or injunctive relief from the Individual Defendants. In support, Tecnomatic invokes Federal Rule of Civil Procedure 65, which provides that a "parties' officers, agents, servants, employees, and attorneys" may be bound by an order granting an injunction. As the Individual Defendants note, however, this Rule lists those against whom an injunction may be enforced. It does not authorize Tecnomatic's breach of contract claim against the Individual Defendants.

In summary, because the Individual Defendants are not parties either to the MCA or ECA, Tecnomatic's claims against them for breach of those agreements are not sustainable. Those claims against the Individual Defendants are thus DISMISSED WITH PREJUDICE.

**D.    Count VI: Conversion Claim Against Remy and Defendants Perry and Stephenson**

Remy and Individual Defendants Perry and Stephenson seek dismissal of Tecnomatic's conversion claim (Count VI) contending that it is preempted by the Indiana Uniform Trade

---

[17] Paragraphs 118 and 130 both contain the following language relating to the Individual Defendants: "The Individual Defendants knew [or should have known] of the existence of the terms of the MCA and individually ratified their acceptance to be bound by the terms thereof."

Secret Act ("IUTSA"), which provides that the IUTSA "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract law and criminal law." IND. CODE § 24-2-3-1(c). In support, Defendants cite to HDNet LLC v. North Am. Boxing Council, which held that the preemption provision of the IUTSA "abolishes all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status (e.g. idea misappropriation, information piracy, theft or commercial information, etc.)." 972 N.E.2d 920, 925 (Ind. Ct. App. 2012) (quoting BlueEarth Boifuels, LLC v. Hawaiian Elec. Co., 123 Haw. 314, 235 P.3d 310 (Haw. 2010)). The Indiana Court of Appeals also ruled that the civil conversion claim in that case, which was premised on "another allegation of civil misappropriation of [the claimant's] ideas," was not derivative of criminal law and thus "not saved by the criminal law exception to the IUTSA's preemption provision." HDNet LLC, 972 N.E.2d at 927. Tecnomatic describes its conversion claim as one seeking redress for the act of taking and/or destroying computer or electronic files, which constitute tangible property and thus renders the HDNet decision inapplicable.[18]

Tecnomatic correctly notes that conversion claims based on a claimant's rights with respect to material or tangible objects are not preempted by the IUTSA. In Patriot Homes, Inc. v. Forest River Housing, Inc., for example, our sister court held that claims for the conversion of "information on confidential state submissions, technical drawings for modular homes, three-dimensional computer models for modular homes, and confidential sales and cost information, as well as computer or CAD "files" were "theft/conversion of the tangible medium embodying the intellectual property," and thus were not preempted. Patriot Homes, Inc., 489 F. Supp. 2d 865, 871 (N.D. Ind. 2007). However, for this claim to survive, the tangible property must have some

---

[18] Tecnomatic also argues that it is not preempted by the IUTSA because the conversion claim is a derivative of criminal law. As noted above, this is in direct conflict with the HDNet decision and thus fails.

intrinsic value apart from the information contained within it.  CardioNet, Inc. v. LifeWatch Corp., Cause No. 07 C 6625, 2008 U.S. Dist. LEXIS 15938, at *8 (N.D. Ill. Feb. 27, 2008); Patriot Homes, Inc.,489 F. Supp. 2d at 871; Dick Corp. v. SNC-Lavalin Constructors, Inc., Cause No. 04 C 1043, 2004 U.S. Dist. LEXIS 26767, at *33-34 (N.D. Ill. Nov. 23, 2004) ("in cases where the value of a claim stems primarily from the ideas contained within items rather than their tangible forms, the ITSA preempts the claim.");  AutoMed Techs., Inc. v. Eller, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001) (finding that although software and design plans "exist in tangible form, their value is primarily from the information contained within that form" and thus the conversion claim based upon them was preempted by the ITSA); Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 973 (N.D. Ill. 2000).

The property upon which Tecnomatic's conversion claims are based is software allegedly located within equipment that Tecnomatic had built and leased to Remy.  According to the TAC, Defendant Perry made copies of the software and transmitted that software via zip file to Eagle and Defendant Stephenson.  The zip file containing the software was allegedly removed from the laptop of a Tecnomatic technician.  TAC ¶ 329.  We agree with Defendants' argument that this property has little or no value apart from the intangible information contained therein.  At least, Tecnomatic has not claimed that it has intrinsic value.  Thus, we hold that this claim duplicates Tecnomatic's trade secret misappropriation claim and the conversion claims are preempted by the IUTSA.  They shall be DISMISSED WITH PREJUDICE.

E.    **Count X: The Correction of Patent Inventorship Claim Against Remy and Remy Technologies**

The Remy Defendants and Remy Technologies, LLC assert that Tecnomatic has failed to adequately state a claim for correction of patent inventorship, pursuant to 35 U.S.C. § 256

making dismissal of that claim necessary.  Section 256 provides, "Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error."  The TAC avers that "Tecnomatic individuals, including but not limited to Sante Guercioni, are the true inventors or, at a minimum, joint inventors" of an invention covered by United States Patent No. 8,327,677 ("the '677 Patent").  Remy Technologies, LLC is listed as the "Assignee" of the '677 Patent.

Tecnomatic has not identified which of the seven claims covered by the '677 Patent are implicated by the activities of Tecnomatic's employees.  However, we are not convinced that such specificity is required.  As noted above, the TAC contains allegations that individuals not named in Patent '677 are in fact inventors.  These allegations suffice to put Defendants on notice of the claims against them.  Dismissal of Tecnomatic's correction of inventorship claim is therefore <u>DENIED</u>.

## IV.     Conclusion

For the reasons explicated above, the Motions to Dismiss [Dkt Nos. 614 and 616] are <u>GRANTED IN PART AND DENIED IN PART</u>.  Specifically, the Court finds as follows:

- The breach of contract claims against the Individual Defendants are <u>DISMISSED WITH PREJUDICE</u>.

- Tecnomatic's conversion claim is <u>DISMISSED WITH PREJUDICE</u>.

- The Italian copyright infringement claims set out in the TAC are <u>DISMISSED WITHOUT PREJUDICE</u>.

- The claims for trade secret misappropriation, copyright infringement pursuant to the United States Copyright Act, and correction of inventorship survive dismissal, and the motion to dismiss is therefore <u>DENIED</u>.

IT IS SO ORDERED:

Date: 06/24/2014

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

James E. Michel
BARNES & THORNBURG - Chicago
jmichel@btlaw.com

C. John Brown
BARNES & THORNBURG LLP
john.brown@btlaw.com

Patrick David Murphy
BOVERI MURPHY RICE  LLP
pmurphy@bmrllp.com

Charles P. Rice
BOVERI MURPHY RICE, LLP
crice@bmrllp.com

Justin M. Righettini
BRYAN CAVE LLP
justin.righettini@bryancave.com

Kara E. F. Cenar
BRYAN CAVE LLP
kara.cenar@bryancave.com

Mariangela M. Seale
BRYAN CAVE LLP
merili.seale@bryancave.com

Paula L Zecchini
BRYAN CAVE LLP
paula.zecchini@bryancave.com

S. Patrick McKey
BRYAN CAVE LLP
patrick.mckey@bryancave.com

Andrew C. Warnecke
Bryan Cave LLP
andrew.warnecke@bryancave.com

Donald A. Cole
Byan Cave LLP.
donald.cole@bryancave.com

Colby Anne Kingsbury
FAEGRE BAKER DANIELS LLP - Chicago
colby.kingsbury@FaegreBD.com

David M. Allen
FAEGRE BAKER DANIELS LLP - Chicago
david.allen@faegrebd.com

Trina Kissel Taylor
FAEGRE BAKER DANIELS LLP - Chicago
trina.taylor@faegrebd.com

David P. Irmscher
FAEGRE BAKER DANIELS LLP - Indianapolis
david.irmscher@faegrebd.com

Munjot Sahu
FAEGRE BAKER DANIELS LLP - Indianapolis
munjot.sahu@faegrebd.com

Ryan Michael Hurley
FAEGRE BAKER DANIELS LLP - Indianapolis
ryan.hurley@FaegreBD.com

Joseph H. Yeager, Jr
FAEGRE BAKER DANIELS LLP - Indianapolis
jay.yeager@FaegreBD.com

Randall E. Kahnke
FAGRE BAKER DANIELS, LLP
randall.kahnke@faegrebd.com

Scott A. Weathers
KEN NUNN LAW OFFICE
scottw@kennunn.com

Jason Michael Lee
LEWIS WAGNER LLP
jlee@lewiswagner.com

John Carl Trimble
LEWIS WAGNER LLP
jtrimble@lewiswagner.com

A. Richard Blaiklock
LEWIS WAGNER, LLP

rblaiklock@lewiswagner.com

Anne L. Cowgur
TAFT STETTINIUS & HOLLISTER LLP
acowgur@taftlaw.com

Fred Anthony Paganelli
TAFT STETTINIUS & HOLLISTER LLP
tony@tonypaganelli.com

Charles D. Cooper
THOMPSON HINE LLP
chad.cooper@thompsonhine.com

Jason P. Bichsel
THOMPSON HINE LLP
jason.bichsel@thompsonhine.com

Nicholas W. Myles
THOMPSON HINE LLP
nicholas.myles@thompsonhine.com

Thomas A. Knoth
THOMPSON HINE LLP
tom.knoth@thompsonhine.com

Victoria L. Nilles
THOMPSON HINE LLP
victoria.nilles@thompsonhine.com